IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

Warren Distributing Co., d/b/a Hub City  :
Distributing Co. *and* Warren Distributing :
Co. South, Peerless Beverage Co, Inc., and :
Shore Point Distributing Company   :
             : **CASE NO. 07-1053-RBK-JS**
       *Plaintiffs,* :
  **vs.**        :
             : **MOTION DATE:**
InBev USA L.L.C, and      :
Anheuser-Busch, Incorporated   :
             :
      *Defendants.*  :
             :
             :

## ORDER

   AND NOW, this ____ day of _____, 2008, upon consideration of

Plaintiffs' Motion to Compel Production of Joint Defense Privilege and Confidentiality

Agreement ("Motion"), it is hereby ORDERED that the Motion is GRANTED.

   Defendants are hereby directed to produce the Joint Defense Privilege and

Confidentiality Agreement dated May 8, 2006 within ten (10) days of today's date.

   IT IS SO ORDERED.

               _____

                         J.

**HANGLEY ARONCHICK SEGAL & PUDLIN**
William T. Hangley (admitted *pro hac vice*)
Joseph A. Dworetzky (admitted *pro hac vice*)
Michael Lieberman (ML 9456)
Alva C. Mather (AM 6495)
20 Brace Road, Suite 201
Cherry Hill, NJ  08034
(856) 616-2100

Attorneys for Warren Distributing Co., d/b/a Hub City Distributing Co. and Warren
Distributing Co. South, Peerless Beverage Co., Inc. and Shore Point Distributing Company

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | | |
|---|---|---|
| Warren Distributing Co., d/b/a Hub City Distributing Co. *and* Warren Distributing Co. South, Peerless Beverage Co, Inc., and Shore Point Distributing Company | : : : : | CASE NO. 07-1053-RBK-JS |
| *Plaintiffs,* | : : : | MOTION TO COMPEL PRODUCTION OF JOINT DEFENSE PRIVILEGE AND |
| vs. | : : | CONFIDENTIALITY AGREEMENT |
| InBev USA L.L.C, and Anheuser-Busch, Incorporated | : : : | MOTION DATE: |
| *Defendants.* | : : : : | ORAL ARGUMENT REQUESTED |

Plaintiffs Warren Distributing Co., d/b/a Hub City Distributing Co. and Warren

Distributing Co. South, Peerless Beverage Co., Inc. and Shore Point Distributing Co. move,

pursuant to Rule 37(a) of the Federal Rules of Civil Procedure and L. Civ. R. 37.1(b), for an

order compelling the production of the Joint Defense Privilege and Confidentiality Agreement

dated May 8, 2006 and made between and among Defendant Anheuser-Busch, Incorporated

("AB"), InBev nv/sa ("InBev-Belgium"), and their counsel Howrey LLP and Sullivan &

Cromwell LLP.

A memorandum of law in support of this motion is attached hereto and incorporated herein.

Dated:  June 27, 2008

HANGLEY ARONCHICK SEGAL & PUDLIN, P.C.

By:  s/ Alva C. Mather (AM 6495)
William T. Hangley (admitted *pro hac vice*)
Joseph A. Dworetzky (admitted *pro hac vice*)
Michael Lieberman
Alva C. Mather
20 Brace Road, Suite 201
Cherry Hill, NJ  08034-2634
856-616-2100

*Attorneys for Plaintiffs*

2

**HANGLEY ARONCHICK SEGAL & PUDLIN**
**William T. Hangley (admitted *pro hac vice*)**
**Joseph A. Dworetzky (admitted *pro hac vice*)**
**Michael Lieberman (ML 9456)**
**Alva C. Mather (AM 6495)**
**20 Brace Road, Suite 201**
**Cherry Hill, NJ  08034**
**(856) 616-2100**

**Attorneys for Warren Distributing Co., d/b/a Hub City Distributing Co. and Warren
Distributing Co. South, Peerless Beverage Co., Inc. and Shore Point Distributing Company**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | | |
|---|---|---|
| **Warren Distributing Co., d/b/a Hub City Distributing Co. *and* Warren Distributing Co. South, Peerless Beverage Co, Inc., and Shore Point Distributing Company** | : : : : | **CASE NO. 07-1053-RBK-JS** |
| *Plaintiffs,* | : : : | **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL** |
| vs. | : : | **PRODUCTION OF JOINT DEFENSE PRIVILEGE AND** |
| **InBev USA L.L.C., and Anheuser-Busch, Incorporated** | : : : | **CONFIDENTIALITY AGREEMENT** |
| | : : | **MOTION DATE:** |
| *Defendants.* | : : | **ORAL ARGUMENT REQUESTED** |
| | : : | |

Plaintiffs Warren Distributing Co., d/b/a Hub City Distributing Co. and Warren

Distributing Co. South, Peerless Beverage Co., Inc. and Shore Point Distributing Co.

(collectively, "Plaintiffs"), through counsel, submit this Memorandum of Law in support of their

Motion to Compel Defendant Anheuser-Busch ("AB") to produce the Joint Defense Privilege

and Confidentiality Agreement (the "Joint Defense Agreement") dated May 8, 2006 entered into

between AB and InBev nv/sa ("InBev-Belgium").  The Joint Defense Agreement was entered

into almost a year before the commencement of this litigation and nearly eight months prior to

AB and InBev-Belgium entering into the Import Agreement which incorporates the Joint

Defense Agreement as one of its terms.  However, to date, AB has used the Joint Defense

Agreement as the basis for shielding over half of the items it has identified as privileged.  At the

parties' April 1, 2008 conference, defendants represented to the Court that the Joint Defense

Agreement contains no substantive terms and merely memorializes AB's and InBev-Belgium's

mutual desire to protect from waiver those privileged communications shared between them as a

part of their negotiation and implementation of the Import Agreement.  Therefore, whether or not

the underlying communications exchanged between the parties are privileged, the Joint Defense

Agreement <u>itself</u> is not and should be produced.

## STATEMENT OF RELEVANT FACTS

Plaintiffs distribute beer in New Jersey pursuant to long term distribution agreements.

Plaintiffs had such distribution agreements with defendant InBev (USA), LLC ("InBev USA")

the exclusive United States importer of brands brewed by InBev-Belgium.  In November of

2006, InBev-Belgium entered into an exclusive arrangement with defendant AB that purported to

give AB the right to import various InBev brands (the "Brands") to the U.S.  In February 2007,

AB purported to unilaterally terminate plaintiffs' distribution agreements with InBev USA.

Plaintiffs allege that defendants unilaterally terminated their distribution agreements in

violation of the Practices Act and by that violation of law appropriated Wholesalers' valuable

distribution rights.  Under the New Jersey Malt Alcohol Beverage Practices Act (the "Practices

Act") wholesalers such as the plaintiffs are protected from termination without good cause.  In

defending their conduct, neither InBev USA nor AB have asserted that plaintiffs were terminated

for cause.  To the contrary, both defendants rely on a narrow exception to the statutory

prohibition against terminating distribution agreements without good cause.  That exception, contained at N.J.S.A. 33:1-93:15, provides:

> It shall not be a violation of this act for a successor brewer to:
>
> (1) terminate . . . the contract agreement or relationship with a wholesaler of the brewer it succeeded, for the purpose of transferring the distribution rights in the wholesaler's territory for the . . . brands to which the successor brewer it succeeded . . . provided that the successor brewer . . . first pays the fair market value of the first Wholesaler's business with respect to the terminated brand or brands.

In order to invoke the exception, defendants seek to demonstrate that AB is a "successor brewer" which is defined as "any person, not under common control with the predecessor brewer, who by any means . . . acquires the business or malt alcoholic beverage brands of another brewer, or otherwise succeeds to a brewer's interest with respect to any malt alcoholic beverage brands." N.J.S.A. 33:1-93.14.  Whether AB is, in fact, a successor brewer turns in part on the nature of its relationship with InBev-Belgium and InBevUSA.  Therefore, the Import Agreement entered into between AB and InBev Belgium, which codifies their relationship, is clearly an important component of the dispute between the parties.

> The import agreement references the joint defense agreement and says, "This import agreement, together with the joint defense agreement, constitutes the entire agreement between the parties."

*See* Transcript of April 1, 2008 Status conference ("April 1 Tr."), a true and correct copy of which is attached hereto as Exhibit A, at 18.  The Joint Defense Agreement is thus explicitly a part of the agreement at issue in this litigation.

Despite this obvious relevance, counsel for AB has refused to produce a copy of the Joint Defense Agreement, claiming that it is a privileged document. *See, e.g.,* April 1 Tr. at 11-12 (counsel for Defendants claiming that "the terms of the joint defense agreement are privileged").

During argument before the Court on April 1, 2008, counsel for AB represented that it was not withholding any documents on the basis of the Joint Defense Agreement. April 1 Tr. at 17-18. However, on May 28, 2008 defendants produced a privilege log which showed that in its first responsive production to Plaintiffs' Requests for Documents, AB withheld numerous documents on the basis of this very agreement. (*See* Defendants' Privilege Log, a true and correct copy of which is attached hereto as Exhibit B listing "Joint Defense" as the basis for withholding or redacting 40 of the 76 documents identified as privileged). Plaintiffs do not believe that many of the assertedly privileged documents are in fact privileged. However, in order to assess the merits of the privilege claim, Plaintiffs seek the production of the Joint Defense Agreement so as to understand fully the entire agreement between AB and InBev-Belgium and to assess the basis and nature of the agreement that AB is now using to shield information from disclosure to Plaintiffs. Plaintiffs do not, at this time, challenge the privileged nature of any of the underlying documents but reserve their right to do so.

## ARGUMENT

### I.   Defendants Have No Basis for Withholding the Joint Defense Agreement

AB has refused to produce the Joint Defense Agreement, claiming that it is privileged. Specifically, Defendants claim that the document, which is approximately ten pages long, was entered into:

> because there is a recognition that there are going to be regulatory issues that arise in connection with this import agreement, there may be litigation that arises in connection with this import agreement, and all that the joint defense agreement sets forth is that if there is a privileged communication between InBev and its lawyer that is then extended to Anheuser-Busch or its lawyers, it doesn't waive the privilege.

April 1 Tr. at 12.

Of course, "A party asserting a privilege bears the burden of proving the applicability of the privilege." *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 126 (3d Cir. 1986). The joint defense agreement itself is not privileged.

## A.       The Information the Joint Defense Agreement Contains is Not Privileged

Federal law recognizes a joint defense privilege, also known as a common interest rule. *United States v. LeCroy*, 348 F. Supp. 2d 375, 381 (E.D. Pa. 2005); *see also In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 363-65 (3d Cir. 2007) (discussing generally the community-of-interest or common-interest privilege). The privilege "protects communications between an individual and an attorney for another when the communications are 'part of an ongoing and joint effort to set up a common defense strategy.'" *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 126 (3d Cir. 1986) (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 787 (3d Cir. 1985)). However, the joint defense/common interest privilege "is not itself an evidentiary privilege. Instead, when it applies, it protects from disclosure information that would not otherwise be discoverable." *In re Total Containment, Inc.*, No. 04-13144BIF, 2007 WL 1775364, at *6 (Bankr. E.D. Pa. June 18, 2007). *See also Nidec Corp. v. Victor Co. of Japan*, No. C-05-0686 SBA (EMC), 2007 WL 1994171, at *2 (N.C. Cal. July 5, 2007) ("The joint defense and common interest doctrines are not privileges in and of themselves. Rather, they constitute exceptions to the rule on waiver where communications are disclosed to third parties. . . . The common interest privilege . . . comes into play only if the communication at issue is privileged in the first instance."). In other words, the privilege provides an exception to the rule on waiver where otherwise privileged communications are shared with a third party. *See id.*

AB cannot rely on the joint defense/common interest doctrine to protect against disclosure of the Joint Defense Agreement because the information the Joint Defense Agreement itself contains is not protected by the attorney-client or any other privilege, and the doctrine is

therefore inapplicable. As discussed above, AB's counsel has represented to this Court that all that the Joint Defense Agreement sets forth "is that if there is a privileged communication between InBev and its lawyer that is then extended to Anheuser-Busch or its lawyers, it doesn't waive the privilege." April 1 Tr. at 12. This type of information is not covered by the attorney-client privilege. Under well-settled law, "the communication of factual information is not protected by the attorney-client privilege." *Stanziale v. Vanguard Info-Solutions Corp.*, No. 06-2208(MBL), 2008 WL 1808318, at *1 (Bankr. D.N.J. Apr. 21, 2008). This includes, for example, information regarding the fact of an attorney-client relationship and the reason for its existence. *Id.* (citing *National Union Fire Ins. Co. of Pittsburgh v. Aetna Cas. & Surety Co.*, 384 F.2d 316, 317 n.4 (D.C. Cir. 1967)); *see also In re Grand Jury Subpoena Served Upon John Doe*, 781 F.2d 238, 247 (2d Cir. 1986) ("We consistently have held that, absent special circumstances, client identity and fee information are not privileged."); *In re Nat'l Medical Imaging, L.L.C.*, No. 05-12714DWS, 2005 WL 3299712, at *6 (Bankr. E.D. Pa. Oct. 31, 2005) (a cover letter between attorney and client "that evidences nothing more than the existence of an attorney-client relationship... is therefore not a privileged communication"); Wright, Miller and Marcus, 8 FED. PRAC. & PROC. CIV.2D §2017 ("Information about the existence of an attorney-client relationship is ordinarily held not privileged.").

According to AB, the Joint Defense Agreement contains no substantive terms, *see* April 1. Tr. at 13, and merely memorializes AB's and InBev-Belgiums mutual desire to protect from waiver those privileged communications shared between them as a part of their negotiation and implementation of the Import Agreement. In other words, Joint Defense Agreement, as described by AB's counsel, contains only the type of factual information – the existence of and reason for the attorney-client relationship and the nature of the relationship among the parties –

that has been repeatedly determined not to be privileged.  Therefore, as described by AB, the

Joint Defense Agreement is not privileged and should be produced.

## II.   Conclusion

For the foregoing reasons, the Joint Defense Agreement is not protected by any privilege,

and AB's withholding of the document is improper.  This Court should therefore grant Plaintiffs'

Motion and compel its production.

Dated:  June 27, 2008                    HANGLEY ARONCHICK SEGAL & PUDLIN, P.C.


                                         By:   s/ Alva C. Mather (AM 6495)
                                               William T. Hangley (admitted *pro hac vice*)
                                               Joseph A. Dworetzky (admitted *pro hac vice*)
                                               Michael Lieberman
                                               Alva C. Mather
                                               20 Brace Road, Suite 201
                                               Cherry Hill, NJ  08034-2634
                                               856-616-2100

                                               *Attorneys for Plaintiffs*

William T. Hangley (admitted *pro hac vice*)
Joseph A. Dworetzky (admitted *pro hac vice*)
Michael Lieberman
Alva C. Mather
HANGLEY ARONCHICK SEGAL & PUDLIN
One Logan Square, 27th Floor
Philadelphia, PA 19103
Telephone: (215) 568-6200

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | | |
|---|---|---|
| **Warren Distributing Co., d/b/a Hub City Distributing Co.** *and* **Warren Distributing Co. South, Peerless Beverage Co, Inc., and Shore Point Distributing Company** | : : : : : | |
| | : | **CASE NO. 07-1053-RBK-JS** |
| *Plaintiffs,* | : | |
| **vs.** | : : | |
| **InBev USA L.L.C, and Anheuser-Busch, Incorporated** | : : : | |
| *Defendants.* | : : | |

**ATTORNEY AFFIDAVIT OF GOOD FAITH
PURSUANT TO L. CIV. R. 37.1(b)(1)**

I, ALVA C. MATHER, of full age, hereby certify and attest as follows:

1.     I am an attorney admitted to practice in the State of New Jersey and this

Court, and am one of counsel for Plaintiffs Peerless Beverage Co, Inc., Shore Point Distributing

Company, and Warren Distributing Co., d/b/a Hub City Distributing Co. and Warren

Distributing Co. South ("Plaintiffs") in the above-captioned matter. Having conferred with

counsel for Defendants Anheuser-Busch, Inc. and InBev USA L.L.C. ("Defendants") and having

presented oral argument to the Court on April 1, 2008, I submit this affidavit in support of

Plaintiffs' Motion to Compel the Joint Defense Privilege and Confidentiality Agreement dated May 8, 2006 entered into between defendant Anheuser-Busch, Inc. and InBev nv/sa.

2.      On March 20, 2008, Plaintiffs' counsel wrote to counsel for Anheuser-Busch, Inc. requesting production of the Joint Defense Privilege and Confidentiality Agreement.

3.      On March 26, 2008, counsel for the parties participated in a teleconference in a good faith effort to resolve Plaintiffs' request for the Joint Defense Privilege and Confidentiality Agreement dated May 8, 2006 as well as other outstanding discovery disputes among the parties.

4.      Counsel was unable to reach agreement as to the production of the Joint Defense Privilege and Confidentiality Agreement.

5.      On April 1, 2008, the parties presented oral argument before the Honorable Magistrate Judge Joel Schneider regarding the production of the Joint Defense Privilege and Confidentiality Agreement.

6.      On April 1, 2008, Magistrate Judge Schneider denied Plaintiffs' request for the production of the Joint Defense Privilege and Confidentiality Agreement without prejudice and granted Plaintiffs leave to brief and file a Motion to Compel the Joint Defense Privilege and Confidentiality Agreement.

_____
Alva C. Mather

Sworn to before me this

27th day of June, 2008

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Elise M. Ribikauskas, Notary Public
City Of Philadelphia, Philadelphia County
My Commission Expires April 21, 2011
Pennsylvania Association of Notaries

2

## CERTIFICATE OF SERVICE

I, Alva C. Mather, hereby certify that, on this 27th day of June, 2008, I caused

true and correct copies of Plaintiffs' Motion to Compel Production of Joint Defense Privilege

and Confidentiality Agreement to be served by electronic filing and e-mail upon:

Natalie Garcia, Esquire
John Bonventre, Esquire
Landman Corsi Ballaine & Ford P.C.
One Gateway Center, 4th Floor
Newark, NJ 07102

*Attorneys for InBev USA LLC*

Michael Vassalotti, Esquire
Brown & Connery, LLP
360 Haddon Avenue
Post Office Box 539
Westmont, NJ 08108

Peter Moll, Esquire
Brian Wallach, Esquire
Vanessa Forsythe, Esquire
Jason Lichtman, Esquire
Howrey LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004

*Attorneys for Anheuser-Busch, Inc.*

s/ Alva C. Mather
Alva C. Mather

Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| WARREN DISTRIBUTING CO., . | Case No. 07-1053(RBK) | |
| et al., . | | |
| . | | |
| Plaintiffs, . | | |
| . | | |
| v. . | 1 John F. Gerry Plaza | |
| . | 4th & Cooper Streets | |
| . | Camden, NJ 08101 | |
| INBEV USA LLC, et al., . | | |
| . | | |
| Defendants. . | | |
| . | April 1, 2008 | |
| . . . . . . . . . . . .. | 11:38 a.m. | |

TRANSCRIPT OF STATUS CONFERENCE
BEFORE HONORABLE JOEL SCHNEIDER
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          Hangley, Aronchick, Segal &
                              Pudlin
                            By:  WILLIAM T. HANGLEY, ESQ.
                                 ALVA MATHER, ESQ.
                            One Logan Square
                            27th Floor
                            Philadelphia, PA  19103

For Defendant               Landman Corsi Ballaine & Ford
InBev USA LLC:              By:  JOHN A. BONVENTRE, ESQ.
                                 NATALIE GARCIA, ESQ.
                            One Gateway Center
                            Suite 400
                            Newark, NJ  07102

Audio Operator:             Beth Bagnell

Proceedings recorded by electronic sound recording, transcript
          produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd.):

| For Defendant | Brown & Connery, LLP |
|---|---|
| Anheuser-Busch | By:  MICHAEL J. VASSALOTTI, ESQ. |
| Incorporated: | 360 Haddon Avenue |
| | P.O. Box 539 |
| | Westmont, NJ  08108 |

| For Defendant | Howrey LLP |
|---|---|
| Anheuser-Busch, | By:  PETER E. MOLL, ESQ. |
| Incorporated: | BRIAN WALLACH, ESQ. |
| | 1299 Pennsylvania Avenue NW |
| | Washington, DC  20004 |

1          THE COURT:  Counsel, please be seated.  Make yourself

2    comfortable.  We're on the record this morning.  This is Warren

3    Distributing v. InBev USA, et al., Docket 07-1053.  Could we

4    get the entries of appearance, starting with the plaintiff?

5          MR. HANGLEY:  William Hangley, Hangley, Aronchick,

6    for plaintiff.  With me, Alva Mather.

7          THE COURT:  Good morning.

8          MR. HANGLEY:  Good morning, Your Honor.

9          THE COURT:  Who's here for InBev?

10         MR. BONVENTRE:  Oh, I'm sorry, Your Honor.  John

11   Bonventre and Natalie Garcia from Landman Corsi Ballaine &

12   Ford, Your Honor.  Good morning.

13         THE COURT:  Okay.  Good morning.

14         MR. VASSALOTTI:  Good morning, Judge.  Mike

15   Vassalotti, Brown & Connery, for Anheuser-Busch, and with me

16   today are Peter Moll and Brian Wallach of the Howrey firm.

17         THE COURT:  Good morning.

18         MR. MOLL:  Good morning, Your Honor.

19         MR. WALLACH:  Good morning, Your Honor.

20         THE COURT:  Okay.  I figured we'd do this on the

21   record because we have the discovery issues to address.  What

22   I'd like to do is address those issues, see if there's any

23   other issues we need to address.  I did read the parties'

24   submissions.  Like I do with all cases, I'd like to start with

25   the plaintiff, see what their issues are, see if we can get

4

them resolved and, when we exhaust that, then go to the
defendant and see if we can address all of the defendant's
concerns.  Mr. Hangley, before we get to the specific issues
raised in your March 31st, 2008, letter, are there any other
general issues that you want to raise with the Court or update
the Court on regarding the status of this case?

MR. HANGLEY:  I think not, Your Honor.

MS. MATHER:  No.

THE COURT:  I know that from the last conference and
the sense I get from this case is that the defendants would
like to get let's call it a settlement proposal from the
plaintiffs and get a sense of what the plaintiffs believe the
fair market value is that they weren't paid so that the
defendants can evaluate whether or not to settle this case
before we go down the road of all the litigation that I'm sure
you're familiar with.  What do you need to be in a position to
make a settlement demand in the case?

MR. HANGLEY:  Really, Your Honor, we need to -- a
little bit more of initial discovery.  I think we do not have a
good picture.  And when I speak of initial discovery, I'm
talking about the voluntary production, self-starting,
calculated to enable both sides, all sides, to reach reasoned
judgments on the value of the case.  I don't think we have that
so far in the following respects.  With respect to InBev, we
have nothing.  We had an agreement among all of us -- we have

**J&J COURT TRANSCRIBERS, INC.**

1 all been wonderfully cordial and professional people in all our

2 communications.  We had an agreement among all of us that we

3 were going to be as forthcoming as possible on our initial

4 disclosures so that we could kick-start a negotiation process

5 that would possibly enable us to get this whole thing out of

6 the way.

7         Part and parcel of the kinds of things we need,

8 remembering that what happened here was that InBev was the

9 national importer, or its parent company, International InBev

10 -- InBev SA, and then one day they weren't.  Anheuser-Busch

11 became that and calls itself, which we think it is not, a

12 successor brewer under the statute.  Important to us is knowing

13 what the relationships were before, how they changed when

14 Anheuser-Busch took over, what filings there were with state

15 agencies and other regulatory entities, et cetera, and I would

16 have thought that the most basic of these agreements, the

17 organic documents governing the relationship between InBev and

18 InBev, the one that AB supplanted, I would have thought that

19 those were going to be voluntarily produced.  We were expecting

20 them.  We were very surprised when we got nothing at all from

21 InBev.  I think we need that if we're going to have an

22 intelligent conversation with all of the defendants with

23 respect to the possible settlement of this matter.

24         There is also I think -- I am certain incomplete

25 production with respect to some of Anheuser-Busch's

**J&J COURT TRANSCRIBERS, INC.**

6

1  documentation.  They have given us the import agreement.  They

2  have told us, and I have to take them at their word, that there

3  are not related agreements, other than the master agreement

4  itself.  I've been around law firms long enough to know that I

5  have never seen such a thin-bound volume, Your Honor.  I think

6  there are other agreements, but they tell me there are not.

7  I'm sure all of us will realize during discovery that there

8  are, in fact, other agreements and that they will produce them.

9  I wish we had them now.  One particularly that I want now is

10  one that is incorporated into the import agreement, and that's

11  the joint defense agreement.

12         THE COURT:  We'll discuss that.  Let me ask you this

13  question.  Assuming, for the sake of argument, we get to the

14  bottom of the document production issue, do you envision,

15  without prejudice to your final position, that you will need

16  depositions in order to make a settlement agreement?

17         MR. HANGLEY:  I don't think so.

18         THE COURT:  Do -- will you --

19         MR. HANGLEY:  You'll note, I always look at my

20  associate to make sure I'm not saying something profoundly

21  stupid.  That's when she'll stop me.

22         THE COURT:  Do you envision that when and if there

23  comes a time you produce a settlement demand that it will be

24  accompanied by an expert report from someone you've engaged?

25         MR. HANGLEY:  Yes.  You just touched the rub.  We are

**J&J COURT TRANSCRIBERS, INC.**

1  going to be using the services of experts in this case.  We are

2  trying to keep the experts as separate as possible from the lay

3  witnesses, except to the extent that they appropriately and

4  with disclosure will be communicating with one another.  What

5  we have been able to give so far is our own client's

6  perceptions of what their damages are.  What we have been able

7  to provide so far in accordance with the local rule is

8  something that is essentially a -- I think a fair market value

9  computation, because I've done it by using certain S&P ratios,

10  applying them to the gross profits attributable to these brands

11  before they were taken away.

12           THE COURT:  Did you actually produce a number?

13           MR. HANGLEY:  We produced -- we have produced numbers

14  in our damages disclosures, and those numbers, Your Honor, in

15  the statement of damages are a low of 62 million to a high of

16  79 million, before deducting the 25 million that's already been

17  paid.

18           THE COURT:  Okay.  Well, I got the wrong impression

19  then.  I got the impression, and we'll address it from the

20  March 31st letter of Mr. Vassalotti, that --

21           MR. VASSALOTTI:  Judge, the damages --

22           THE COURT:  -- you had not even provided that much.

23           MR. VASSALOTTI:  No, the damages statement is

24  attached as Exhibit D to our letter.

25           THE COURT:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1           MR. HANGLEY:  Oh, no.  We have produced that much,
2   Your Honor.
3           UNIDENTIFIED ATTORNEY:  Could we just ask --
4           MR. HANGLEY:  How good it is, I --
5           UNIDENTIFIED ATTORNEY:  As a point of -- just as a
6   point of clarification, is the damage number -- it was our
7   impression that the damage number is more than the fair market
8   value number of the brands.
9           THE COURT:  That's a good point.  I was going to
10  address that.  Is that, in fact, the case?
11          MR. HANGLEY:  Not really.  Not really, Your Honor.
12  Really, at this juncture, what -- because of the mechanism that
13  we used, and I think we'll be giving you details of that
14  mechanism, if we already haven't --
15          MS. MATHER:  Yes.
16          MR. HANGLEY:  -- in response to some outstanding
17  discovery that's due -- what we -- what this essentially
18  represents is a formulaic computation using S&P price/earnings
19  ratios and applying them to this of the fair market value.
20  Now, to caveats.  One is, when the experts get their hands on
21  this -- the raw information, they make come up with completely
22  different fair market value numbers.
23          THE COURT:  Absolutely.
24          MR. HANGLEY:  That's going to happen.
25          THE COURT:  Absolutely.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. HANGLEY:  Likewise, there are elements of damages

2    for which we reserve the right to claim in the case.  We

3    haven't enumerated anything along those lines in the statement

4    of damages, but that doesn't mean that they're not going to be

5    there.  There's time to develop.

6          THE COURT:  All right.  I think that's very good

7    background.  Why don't we do this then?  Why don't we just get

8    into the specific issues that you have with the defendants'

9    responses, and let's address them.  I assume a good place to

10   start is your March 31st letter, and if there are any issues

11   not identified in that letter, we'll do that after we get

12   through the letter.  So, let's just -- let's deal with the

13   first issue, which I think has to do with this confidentiality

14   agreement.  Why don't you just give me some background?  I'm a

15   little confused as to what specifically you're asking for.

16         MR. HANGLEY:  There's a confidentiality agreement out

17   there.

18         THE COURT:  Between who and who?

19         MR. HANGLEY:  Between InBev and -- InBev USA and AB.

20   It's

21         MS. MATHER:  It's --

22         MR. HANGLEY:  Oh, I'm sorry, and -- and Sullivan &

23   Cromwell and Howrey.

24         THE COURT:  Okay.  Hold on.  A confidentiality

25   agreement between InBev, the named party in this case, and

**J&J COURT TRANSCRIBERS, INC.**

1    Sullivan & Cromwell.  Is it an agreement that was --

2              MR. HANGLEY:  No, there's more.

3              THE COURT:  Okay.

4              MR. HANGLEY:  Okay --

5              UNIDENTIFIED ATTORNEY:  But, Your Honor, I believe

6    it's --

7              THE COURT:  Well, let's hear from the plaintiff.

8              UNIDENTIFIED ATTORNEY:  I think it's a joint defense

9    agreement he's referring to.

10             THE COURT:  Okay.

11             MR. HANGLEY:  It is.  It's a joint defense privilege

12   and confidentiality agreement.

13             THE COURT:  In connection with this litigation?

14             MR. HANGLEY:  We're all -- pardon me?

15             THE COURT:  That was entered into in connection with

16   this litigation?

17             MR. HANGLEY:  It was entered into in connection with

18   the negotiation of the import agreement.

19             THE COURT:  Before this litigation was started?

20             MR. HANGLEY:  Must be because the import agreement --

21   the import agreement incorporates this agreement by reference

22   and makes this agreement I'm talking about a term of the import

23   agreement.

24             THE COURT:  Okay.  Let's -- I still don't understand.

25   Can you help me -- what this agreement is that you're talking

1  about?

2         UNIDENTIFIED ATTORNEY:   Your Honor, it was entered

3  into in connection with the import agreement before this

4  litigation was instituted.

5         THE COURT:   Who are the parties to it?

6         UNIDENTIFIED ATTORNEY:   The parties to it are InBev

7  SA, not InBev USA, which is the other party to this lawsuit,

8  InBev SA and Anheuser-Busch.

9         THE COURT:   Where's SA based?

10        UNIDENTIFIED ATTORNEY:   In Europe, in Belgium.

11        THE COURT:   And they're not a party to this case?

12        UNIDENTIFIED ATTORNEY:   No, they are not.  They're --

13        THE COURT:   InBev and Anheuser-Busch --

14        UNIDENTIFIED ATTORNEY:   Who are the parties to the

15 import agreement, and so at the time they entered into the

16 import agreement, they also entered into what's called a joint

17 defense agreement, and the parties to it are InBev SA,

18 Anheuser-Busch, Sullivan & Cromwell, who was InBev SA's lawyers

19 in connection with the import agreement, and our firm, Howrey,

20 which represents Anheuser-Busch.

21        THE COURT:   Okay.  Help me, because usually when I

22 see the term or hear the term "joint defense agreement," it's

23 in connection with litigation, but you're saying that's how

24 this agreement was titled even before litigation was filed.

25        UNIDENTIFIED ATTORNEY:   That's right, in connection

**J&J COURT TRANSCRIBERS, INC.**

1  with the entry of the import agreement because there was a --

2  and I don't -- the terms of the joint defense agreement are

3  privileged, and so I can't -- I don't -- I want to be careful

4  about how much I --

5           THE COURT:  Well, help me here.  I'm not so concerned

6  about what you call it.  I'm more concerned about what it

7  covers.  Is it a two-paragraph agreement that says whatever we

8  exchange during our negotiations we're going to keep

9  confidential, or is it -- have more substance than that?

10          UNIDENTIFIED ATTORNEY:  It's more substantive than

11 that.  It's -- and I -- it's about ten pages, and the essence

12 of the agreement is, is it basically sets down in a contract a

13 joint defense arrangement whereby --

14          THE COURT:  How can you have a joint defense when

15 there's no litigation?

16          UNIDENTIFIED ATTORNEY:  Because there is a

17 recognition that there are going to be regulatory issues that

18 arise in connection with this import agreement, there may be

19 litigation that arises in connection with this import

20 agreement, and all that the joint defense agreement sets forth

21 is that if there is a privileged communication between InBev

22 and its lawyer that is then extended to Anheuser-Busch or its

23 lawyers, it doesn't waive the privilege.  That is in essence

24 what the joint -- what a joint defense agreement is.  It's not

25 that everything that is discussed between Anheuser-Busch and


**J&J COURT TRANSCRIBERS, INC.**

1  InBev is privileged.  It is that it gives the parties the

2  freedom to be able to have their lawyers talk to each other

3  about legal issues in connection with the import agreement.

4        THE COURT:  But is it fair to state that the purpose

5  of this agreement was an attempt to cloak the communications

6  amongst the companies with some type of privilege, but the

7  agreement itself doesn't contain substantive information about

8  the terms of the sale or purchase?

9        UNIDENTIFIED ATTORNEY:  The joint defense agreement,

10  and I'm speaking from recollection, does not have any

11  information about the terms of the -- there is no sale.  It was

12  not an acquisition.  But it does not have specific business

13  information about the terms of the import agreement.

14        THE COURT:  Got it.  Okay.

15        UNIDENTIFIED ATTORNEY:  It merely speaks to potential

16  privilege issues that may arise in connection with the import

17  agreement.  That's all it is.  It does not have anything to do

18  with anything substantive in the import agreement.  The import

19  agreement they have.  It's been produced.  And all the

20  substance of the import agreement is there, and all this is, is

21  a separate agreement between the parties and their law firms

22  that would enable privileged communications to be shared

23  between the companies without waiving the privilege.

24        THE COURT:  Okay.  Now, Mr. Hangley, why -- you have

25  the import agreement.  Why is what they're calling a joint

1  defense agreement, what you're calling a confidentiality

2  agreement, why is it relevant to the issues in the case?

3          MR. HANGLEY:  It is a joint defense and

4  confidentiality agreement, by the way.  That's its name, so

5  we're both right on it.  Your Honor, there -- as you point out,

6  there was no litigation at the time that they entered into this

7  agreement.

8          THE COURT:  But why is the agreement relevant?

9          MR. HANGLEY:  I think --

10         THE COURT:  Why is it relevant to -- it doesn't

11 contain any business terms.  It doesn't --

12         MR. HANGLEY:  I don't know that.  I don't know that,

13 Judge.  And I do know that for reasons that have not been

14 disclosed to me or to you, for some reason these companies saw

15 fit not just to have that agreement, but to incorporate it into

16 another agreement that they cannot cloak.

17         THE COURT:  Well, tell me about this incorporation,

18 because I don't have that agreement in front of me.

19         MR. HANGLEY:  The import agreement, and Ms. Mather

20 will find the language for me, the import agreement expressly

21 incorporates by reference, takes into, adopts, doesn't just

22 refer to it, the joint defense and confidentiality agreement.

23 It's part of a document that I'm entitled to see, but they say,

24 wait, you can't see that document because it's privileged.

25 Now, I agree that that document may relate to privileged

**J&J COURT TRANSCRIBERS, INC.**

information and that I may or may not be able to pierce that

privilege with respect to the underlying communications, but

the agreement itself, who knows what's in that agreement, and

it's part of an agreement that my clients are entitled to see,

and, therefore, QED, my clients are entitled to see the

agreement.

THE COURT:  At the moment, we have a representation

that there is no substantive terms in the joint defense

confidentiality agreement.  We have that representation.  So,

let's assume for the sake of argument -- you're arguing you're

entitled to see it and it's relevant because, one, it's

incorporated into an agreement that you're otherwise entitled

to see --

MR. HANGLEY:  It's part of the agreement, yes.

THE COURT:  -- and, two, why else?

MR. HANGLEY:  Because I'm entitled to validate how it

affects the terms of that agreement.  I don't think that's

saying the same thing twice.  I think that's saying a separate

thing.  On the other hand, Your Honor, I think what I heard the

gentleman say is that the agreement doesn't deal with substance

-- I want to check that -- and that the agreement basically

provides for the relationships of the parties in the event that

the nosey Parkers come around and start making trouble, I among

them.  Okay.  If that's the case, then perforce there is

nothing in those agreements that is itself privileged.

**J&J COURT TRANSCRIBERS, INC.**

1       THE COURT:  Let me ask this question.  Are -- is your

2  client, or any of the parties in this case, withholding any

3  documents at the present time in the case on the grounds of

4  privilege on the basis of this agreement?

5       UNIDENTIFIED ATTORNEY:  On the basis of the joint

6  defense agreement?

7       THE COURT:  Yes.

8       UNIDENTIFIED ATTORNEY:  Not at this time because we

9  haven't gotten that far in discovery, but I want to be candid

10  with the Court.  I'd be surprised if there aren't documents

11  that are requested that might otherwise be responsive that

12  wouldn't be --

13       THE COURT:  At sometime in the case.

14       UNIDENTIFIED ATTORNEY:  That's exactly right.  We

15  were --

16       THE COURT:  For example, if they ask, for example,

17  the negotiation -- the e-mails that your parties exchanged

18  regarding the negotiation of the sale terms, I suspect you may

19  argue that that's privileged?

20       UNIDENTIFIED ATTORNEY:  No.  I don't -- I don't think

21  so.  Again, I -- you know, it's difficult for me to sit here in

22  a vacuum and speak to those issues, but I don't believe that

23  the negotiations back and forth would be privileged as a

24  general rule.  There may be some documents that were sent back

25  and forth at the time of the negotiation where lawyers were

1  involved dealing with regulatory issues where it may be subject

2  to the joint defense agreement, but as a general rule, the

3  negotiations back and forth, and when I say "back and forth,"

4  between InBev SA on the one hand and AB on the other hand,

5  wouldn't necessarily be covered by the joint defense agreement.

6  　　　　THE COURT:  Unless a lawyer from Howrey, for example,

7  was negotiating directly with the company.  Would you claim

8  that was privileged?

9  　　　　UNIDENTIFIED ATTORNEY:  Well, I -- again, I don't

10 know that we would claim that privilege.  I don't have all the

11 e-mails in front of me, and it's difficult to do this in a

12 vacuum, but generally those probably would not be privileged,

13 but it may be that if they were discussing some type of

14 regulatory issue where they were -- where they were disclosing

15 legal advice that was -- again, the key is it's a -- a common

16 interest here that has to be, so if there was a common interest

17 at issue, then it could be covered by the joint defense

18 agreement, but most of the -- most of the documents related to

19 the negotiations would not be covered by the joint defense

20 agreement.  I just -- I don't want to represent that there

21 might not be something out there.

22 　　　　THE COURT:  But at the present time you're not

23 claiming that this document, this joint defense confidentiality

24 agreement, cloaks an otherwise relevant and responsive document

25 with privilege --


**J&J COURT TRANSCRIBERS, INC.**

1          UNIDENTIFIED ATTORNEY:  No.

2          THE COURT:  -- at the present time?

3          UNIDENTIFIED ATTORNEY:  No, at the present time we're

4   not, and I want -- I also want to be clear on something because

5   -- because Mr. Hangley keeps saying the import agreement

6   incorporates it directly by reference.  I mean, I have the

7   language here in Mr. Hangley's letter to the Court.  The import

8   agreement references the joint defense agreement and says,

9   "This import agreement, together with the joint defense

10  agreement, constitutes the entire agreement between the

11  parties.  That's what it says.  It doesn't incorporate it into

12  the body of the import agreement.  It's the reason why it's a

13  separate agreement.

14          MR. HANGLEY:  But I didn't ask for a document.  I

15  asked for the entire agreement between the parties, and they

16  just told you that this is part of the entire agreement between

17  the parties.  It is incorporated.  Of course it is, and --

18          THE COURT:  Okay.  I think I have enough information

19  to rule on this issue at the present time.  My ruling on this

20  issue at the present time is that plaintiff's request for the

21  document is denied without prejudice.

22          One, at this time, we're focusing on a document

23  exchange that would permit the plaintiffs to prepare their

24  estimate or the fair market value of the business so that they

25  can prepare a settlement demand.  We have a representation from

1  the defendant that this agreement does not contain substantive

2  terms.  So it appears to the Court that for present purposes

3  this document is irrelevant and unnecessary for plaintiff to

4  prepare a settlement demand.

5       Second, it seems to the Court that this is a

6  significant legal privilege issue, whether or not a "joint

7  defense agreement" is, in fact, privileged, and the request for

8  the document is denied without prejudice, but the Court grants

9  plaintiff leave pursuant to the local rules to file a motion to

10  compel the production of the document if it so chooses.  It

11  seems to the Court that this does involve a significant

12  privilege waiver issue that the Court would like to hear and

13  receive briefing and argument on before it rules on the issue.

14       Given that the letter from plaintiff was not received

15  until yesterday, the Court has -- the defendant obviously has

16  not had a sufficient time to prepare a letter brief on the

17  issue.  So, Mr. Hangley, at whatever time the plaintiff deems

18  appropriate, pursuant to the local rules, the Court is granting

19  the plaintiff leave to file a motion to compel.  We'll get your

20  brief.  We'll get the defendant brief -- defendant's brief.  If

21  the Court needs oral argument, it will request it.  You will

22  not be prejudiced if the Court grants your motion and the

23  document is produced.  If it turns out that you need additional

24  discovery related to the document, you'll have a fair

25  opportunity to get it.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. HANGLEY:  Thank you, Your Honor.  And I take it

2    that when you say you grant leave, this is a ticket that I

3    could use anytime.  It's not necessary to be done within the

4    next month.  Frankly, I think we all agree that we would like

5    to talk about the possibility of settling this thing, getting

6    the damages issues resolved, et cetera, rather than have that

7    kind of motion practice, if we can avoid it.

8          THE COURT:  I think you're absolutely right, Mr.

9    Hangley.  If I didn't say it, that's what I intended.  I leave

10   it to your best professional judgment when you think it's

11   appropriate to file the motion.

12         MR. HANGLEY:  I got burned that way once, but it was

13   not in this district.

14         THE COURT:  There may be another issue in the second

15   paragraph of your letter aside from just the production of this

16   document.  If there is, let me know.

17         MR. HANGLEY:  I don't know what to say about the --

18         THE COURT:  There's a reference about "other related

19   documents," but you state that Anheuser-Busch has represented

20   that no such documents exist.

21         MR. HANGLEY:  I suspect I'm ultimately going to find

22   out that they are all exhibits to the joint defense and

23   confidentiality agreement.

24         UNIDENTIFIED ATTORNEY:  That's --

25         THE COURT:  Okay.  We'll get there if we have to.


**J&J COURT TRANSCRIBERS, INC.**

1      UNIDENTIFIED ATTORNEY:  Your Honor, that's --

2      MR. HANGLEY:  I was kidding when I said it.

3      UNIDENTIFIED ATTORNEY:  Okay.  That's -- that must --

4 that must have been because it's April 1st, that Mr. Hangley

5 said April Fools Day joke.

6      UNIDENTIFIED ATTORNEY:  I would just point out, Your

7 Honor, if you look at the language that Mr. Hangley quotes in

8 the -- on the first page of his letter to the Court, he quotes

9 the language from the import agreement that says --

10      THE COURT:  You already won it.

11      UNIDENTIFIED ATTORNEY:  Well --

12      THE COURT:  Sit down.  Next issue, Mr. Hangley.

13      MR. HANGLEY:  I think the only remaining issue, Your

14 Honor, is with respect to InBev we think we would have gotten

15 at least the original import agreement between InBev and InBev

16 USA to which Anheuser-Busch claims to be a successor.

17      THE COURT:  Are you talking about InBev -- the

18 foreign InBev or InBev USA?

19      MR. HANGLEY:  InBev USA and InBev -- the foreign

20 InBev had an importer relationship.  Anheuser-Busch claims to

21 be the successor.

22      THE COURT:  To the foreign InBev?

23      MR. HANGLEY:  To the United States InBev.

24      THE COURT:  United States.  Okay.  So you're -- so is

25 what you're looking for the agreement between InBev USA and

22

1  InBev outside this country?

2         MR. HANGLEY:  Yes, and -- yes, and we also want the
3  documentation of the exact terms of the termination.  We know
4  that Anheuser-Busch got into the driver's seat.  What we don't
5  know is the terms under which InBev USA got out.  It's
6  obviously relevant.

7         THE COURT:  Okay.  So the first issue for InBev is
8  the agreement between InBev USA and the foreign InBev.

9         UNIDENTIFIED ATTORNEY:  Right, and just so it's
10 clear, we represent InBev USA.  The foreign --

11        THE COURT:  Correct.  They're the only party in the
12 case.

13        UNIDENTIFIED ATTORNEY:  That is correct, Judge.

14        THE COURT:  But obviously you would have access to
15 the agreement.  So, we don't have an issue of inaccessibility.

16        UNIDENTIFIED ATTORNEY:  Yes.  If there -- if there
17 actually is a formal written agreement, yes, we would have
18 access to that, Judge.  The reason it wasn't produced, just so
19 it's clear because there's been a couple of comments here, the
20 documents that clearly should have been produced are the
21 agreements between InBev USA and the various plaintiffs.  We
22 didn't actually formally produce additional copies because
23 there's been about a hundred copies of that circulated among
24 the parties.  It clearly wasn't necessary to produce any more
25 paper.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  He's not asking for that.

2          UNIDENTIFIED ATTORNEY:  I understand that, but the

3  implication is that we didn't produce anything, Judge.  Number

4  two, what was asked for and what was agreed among the parties

5  was documents that were relevant to the issue of fair market

6  value.  We don't believe that the relationship between InBev

7  International and InBev USA is relevant.

8          THE COURT:  Mr. Hangley, do you believe these

9  documents are relevant in order for you to prepare a settlement

10  demand?

11          MR. HANGLEY:  Sure.

12          THE COURT:  So, if the documents are relevant to the

13  case, why can't we produce them?

14          UNIDENTIFIED ATTORNEY:  I said -- I don't think they

15  are relevant.  I'm --

16          THE COURT:  They're -- are they relevant to the case?

17  You're going to have to produce them sometime in the case,

18  right?  So why not produce them now?

19          UNIDENTIFIED ATTORNEY:  That's fine, Judge.  I just

20  want to make clear, I don't know that they, in fact, exist, and

21  when counsel sent me a letter, I --

22          THE COURT:  If they don't exist, you can't produce

23  them.

24          UNIDENTIFIED ATTORNEY:  Understood that, Judge.

25          THE COURT:  But the defendants are urging plaintiff

1  to make a settlement demand.  Plaintiffs have asked for

2  documents that they say are relevant to their settlement

3  demand.  The documents you disagree are relevant to the

4  settlement demand, but are unquestionably relevant to the case,

5  and if they exist they're going to have to be produced

6  sometime.  So why not produce them sooner rather than later?

7  UNIDENTIFIED ATTORNEY:  Okay.  I would -- I'm not

8  really sure what the relevance is to the case, Judge, but I --

9  the Court has ruled, and I understand what the Court has said.

10  THE COURT:  Okay.  So that's the agreement -- if they

11  exist between InBev USA and the foreign InBev.  What's the

12  other category of documents?

13  MR. HANGLEY:  The other category of documents, Your

14  Honor, was documentation describing the exact terms of the

15  termination of the agreement that was succeeded or replaced by

16  Anheuser-Busch.

17  UNIDENTIFIED ATTORNEY:  I would make the same

18  position, Judge, and, again, I don't know if such documents

19  exist.  If the Court wants me to do a search, which we,

20  frankly, are doing, we will do that and we'll produce anything

21  that's relevant.

22  THE COURT:  Thank you.

23  UNIDENTIFIED ATTORNEY:  I don't think it --

24  respectfully, I don't think it's relevant, but I will concede

25  that the Court disagrees.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Well, I think they're relevant.  I think

2    they should be produced and I think it's going to advance the

3    ball.  It also seems to me this latter category of documents

4    may also be in the possession of Anheuser-Busch.

5          MR. HANGLEY:  They may be.

6          THE COURT:  If there's an agreement between

7    Anheuser-Busch and InBev, I would assume Anheuser-Busch, as

8    well as InBev, might have those documents.

9          UNIDENTIFIED ATTORNEY:  We don't have any such

10   documents.

11         THE COURT:  There's no documents regarding the

12   termination of the -- you're asking for the documents between

13   Anheuser-Busch and InBev regarding the termination of the InBev

14   - InBev agreement?

15         MR. HANGLEY:  It's a -- I've asked for InBev USA's

16   documents relating to the termination of its relationship as

17   importer of InBev SA.  Now, I am -- I believe that there very

18   probably are documents between Anheuser-Busch and InBev SA or

19   InBev USA that relate to that topic, and I am sure in the

20   fullness of time we're going to have discovery directed toward

21   that.  I'd love to have them now, particularly if InBev can't

22   -- InBev USA can't find them, but the immediate purpose in

23   being here today was to get what InBev USA has from InBev USA

24         THE COURT:  Okay.  InBev, they're going to look for

25   the documents.  We'll circle back at the end of this conference

1  and get a time frame, and if they exist they're going to

2  produce them.   Does that take care of plaintiff's discovery

3  issues?

4       MR. HANGLEY:   It does.

5       THE COURT:   Great.   Why don't we go, then, to the

6  defendants, and I don't know if there's a joint interest on the

7  defendants' part, but I received a letter from Anheuser-Busch,

8  so let's talk about Anheuser-Busch's discovery issues.

9       UNIDENTIFIED ATTORNEY:   Your Honor, with the Court's

10  permission, I'll -- I think Anheuser-Busch can handle the

11  discovery issues.   I'm not sure that InBev --

12       MR. BONVENTRE:   Agree --

13       UNIDENTIFIED ATTORNEY:   -- has anything separate.

14  Your Honor, we, as Mr. Hangley mentioned, had made an initial

15  agreement in connection with the Rule 26 statement that the

16  parties were going to exchange gross profit, fair market value

17  calculations for purposes of facilitating early settlement

18  discussions.

19       THE COURT:   Right.

20       UNIDENTIFIED ATTORNEY:   We did so.   We put all our

21  cards on the table.   We gave the plaintiffs all of our

22  calculations, all of our formulas, so they could see in very

23  clear black and white how we arrived at the numbers we arrived

24  at.

25       THE COURT:   Does this get to your issue about

**J&J COURT TRANSCRIBERS, INC.**

1  Interrogatory Number 2, the fair market value of the brands at

2  issue on the date of termination?

3         UNIDENTIFIED ATTORNEY:  One and two, Your Honor.  One

4  --

5         THE COURT:  So what you're asking the plaintiffs to

6  provide at this moment is their estimate of what the fair

7  market value is that they should have been paid, correct?

8         UNIDENTIFIED ATTORNEY:  That's right, Your Honor.

9         THE COURT:  I don't want to put words in plaintiffs'

10  mouths, but we went over this at the last conference.

11  Plaintiffs are saying that they need discovery in order to

12  produce that information, and the plaintiffs have produced, I'm

13  assuming, their best present estimate of the fair market value,

14  and that's in their statement of damages.  So if the plaintiffs

15  are saying they need discovery to give you a more refined

16  number, how can the Court compel the plaintiffs to provide that

17  information now?

18         UNIDENTIFIED ATTORNEY:  Let me answer that in two

19  parts.  One, when Mr. Hangley stood up and said the calculation

20  of damages was, in fact, their current estimate of fair market

21  value, that was the first we had heard that because when we

22  spoke last week, the plaintiffs' position was that they didn't

23  know what the fair market value calculations were.  So if, in

24  fact, the damage calculations are fair market value, then I

25  would think it would be a relatively easy process for the pos*

**J&J COURT TRANSCRIBERS, INC.**

1  to put that in the form of a interrogatory answer and tell us

2  what the fair market value is as to each of the 20 some brands

3  that are at issue for each of the --

4          THE COURT:  What should we do about the fact that the

5  plaintiffs are saying that they can't give you their final

6  estimate of the fair market value without additional discovery?

7  How should we address that issue?

8          UNIDENTIFIED ATTORNEY:  Well, I would address that in

9  two parts.  One, it's -- it really is a mystery I think to me

10  as to what they need from Anheuser-Busch in order to calculate

11  the fair market value of brands that they were distributing

12  prior to Anheuser-Busch taking over these importation rights.

13          THE COURT:  So you may disagree with them, but you

14  don't control what plaintiff and their experts do.

15          UNIDENTIFIED ATTORNEY:  I understand that.  They

16  should give us what their calculations are now.

17          THE COURT:  Haven't they done that in their statement

18  of damages?

19          UNIDENTIFIED ATTORNEY:  Well, with all due respect,

20  Your Honor, I don't believe so.  They've given us a general

21  range of numbers for I assume all of the brands, which means

22  they -- they can break it out by brands and by plaintiffs to

23  give us the detail that they have.

24          THE COURT:  Your client has a counterclaim in the

25  case, right?

**J&J COURT TRANSCRIBERS, INC.**

1       UNIDENTIFIED ATTORNEY:   That's correct, Your Honor.

2       THE COURT:   If they said to you, how much is your

3  counterclaim worth, could you provide that information now?

4       UNIDENTIFIED ATTORNEY:   Well, I will tell you, Your

5  Honor, we may be able to get a little farther down the road now

6  than we did last week, but the distinction is critical here,

7  because our counterclaim is based upon the plaintiffs'

8  continued sales of these products after their termination,

9  information that obviously is in their possession, custody and

10  control and that we did not have.  We have -- some of it we got

11  yesterday, but until yesterday we didn't have any of it.  Okay.

12       THE COURT:   But --

13       UNIDENTIFIED ATTORNEY:   So that is -- I think it's a

14  little bit like comparing apples to oranges in that they know

15  what the fair market value of their own brands are.  I'm not

16  saying -- and I hear what the Court's saying -- that they might

17  further refine it and they might have an expert down the line,

18  but they can give us a number now.  You know, they answered the

19  interrogatories saying they were giving us documents from which

20  we could ascertain the number.

21       THE COURT:   That's a different issue.  That's a

22  different issue.  We'll get to that issue.  Okay.  But the

23  issue now is whether the plaintiff should be ordered to provide

24  more definiteness than they already have regarding their belief

25  of the fair market value.  Mr. Hangley, why can't the

1  plaintiffs give more specificity?

2         MR. HANGLEY:  Because we don't know yet.  We're doing

3  the best we can, Your Honor.   We --

4         THE COURT:  Do you need more discovery to do that?

5         MR. HANGLEY:  Oh, yes.

6         THE COURT:  Okay.  The Court's prepared to rule on

7  this issue.  The Court views this as akin to a contention

8  interrogatory, and depending upon the nature of the question,

9  sometimes contention interrogatories have to be answered early

10 in a case, in the middle of the discovery process or towards

11 the end of the discovery process, but there's no question it

12 has to be provided.

13        In this case, it appears to the Court that the

14 plaintiffs have given a good faith estimate of what they

15 believe the fair market value is.  That's contained in their

16 statement of damages.  Granted, it's not definite.  Granted,

17 they give ranges.  But, frankly, at this stage of the case,

18 before the plaintiffs have had an opportunity to conduct the

19 discovery that they request, it does not appear to the Court

20 that it's unreasonable for them to say that their range is 62

21 million to 78 or 79 million.

22        Clearly and obviously there will come a time in the

23 case where the plaintiffs have to put their cards on the table.

24 That's what we're working towards.  We'll get there, but I

25 think it's premature at this point of the case to require the

**J&J COURT TRANSCRIBERS, INC.**

1  plaintiffs at this point, before they have had an opportunity

2  to conduct discovery, before they have had an opportunity to

3  have their expert review that information, to require

4  plaintiffs to give any more definiteness.  Now, that's only as

5  to the issue about whether they have to give a specific number

6  as to the fair market value.

7          The issue that you raise that plaintiffs cannot just

8  make a document dump and say see the documents, that's an

9  entirely different issue.  Why don't you speak to that issue,

10  because I think you have a stronger argument that plaintiffs

11  have to specify what documents they're relying upon in response

12  to your interrogatory.  So, let's address that issue.

13          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.  In

14  the document production that we received --

15          THE COURT:  How many documents were there?

16          UNIDENTIFIED ATTORNEY:  That we received?

17          THE COURT:  Yes.

18          UNIDENTIFIED ATTORNEY:  I think there were about a

19  thousand documents.

20          THE COURT:  Okay.

21          UNIDENTIFIED ATTORNEY:  Give or take.

22          THE COURT:  Okay.

23          UNIDENTIFIED ATTORNEY:  And a large portion of the

24  production consisted of what I will call spreadsheets that had

25  been taken from a native format, printed out and converted into

1  --

2         THE COURT:  That's a different issue.  We'll get to

3  that issue --

4         UNIDENTIFIED ATTORNEY:  I know.  I -- well, the issue

5  is we've got hundreds and hundreds of those pages.  They're

6  brands that are not at issue on those pages, and I know we're

7  working with the plaintiffs in trying to get that information

8  in a more user-friendly format.

9         THE COURT:  Do you want the plaintiffs to specify by

10  Bates Number the documents responsive to each of your four

11  interrogatories?

12         UNIDENTIFIED ATTORNEY:  That would certainly be

13  helpful, Your Honor.

14         THE COURT:  And why can't the plaintiffs do that if

15  we're only talking about four interrogatories and a thousand

16  pages?  Is there any reason why that can't be done?

17         MS. MATHER:  No, Your Honor --

18         THE COURT:  Okay.  I don't think --

19         MS. MATHER:  -- and we're happy to do it.

20         THE COURT:  I don't think so either.  So, plaintiff

21  will be directed to identify the specific Bates Numbers of the

22  documents responsive to each of the four interrogatories.  The

23  last issue has to do with receiving the spreadsheets or

24  printouts in Excel format.  I'm not sure what you mean by

25  "native format," counsel, but certainly if these documents are

**J&J COURT TRANSCRIBERS, INC.**

1  available in that type of format I think it's perfectly

2  reasonable that they be produced in a form that defendants can

3  manipulate the data.  Can that be worked out?

4          MS. MATHER:  Well, Your Honor, what -- what our

5  clients did is that they have sort of sophisticated inventory

6  software, and they -- some of them run similar systems, some of

7  them are different, and in an effort to provide as detailed a

8  production to defendants as to what the breakups -- breakdowns

9  of the brands were in terms of their costs, these are very

10 detailed spreadsheets that we -- it is not possible to produce

11 them in a native format in the sense of an electric file that

12 you can put on the disk.

13         THE COURT:  Why not?

14         MS. MATHER:  I could not explain the --

15         THE COURT:  Have the --

16         MS. MATHER:  -- the technology to you.  Now, after we

17 spoke on -- last week and in going back to the clients, it

18 appears -- and we are working with the defendant to convert

19 from the information -- the inventory information that is on

20 the systems that we printed out and have provided into an Excel

21 spreadsheet.  We are working with out clients to, in part,

22 understand how to do that because they haven't necessarily been

23 engaged in doing this prior to this litigation, but at the time

24 that we were making the production, we were just trying to give

25 --

1          THE COURT:  All right.

2          MS. MATHER:  -- the most --

3          THE COURT:  All right.

4          MS. MATHER:  -- detailed information that we had

5   available --

6          THE COURT:  That's fine.

7          MS. MATHER:  -- and we are working towards --

8          THE COURT:  Good.

9          MS. MATHER:  -- providing them in an Excel

10  spreadsheet.

11         THE COURT:  Have the --

12         MR. HANGLEY:  That's what we agreed upon the other

13  day.

14         MS. MATHER:  Yes.

15         MR. HANGLEY:  Yes.

16         THE COURT:  That's great.  Have the technical

17  computer people from the parties consulted about this issue?

18         MS. MATHER:  Not this specific issue.  We have a

19  general agreement to have all of the most technical people who

20  understand this speak by the end of the week.

21         THE COURT:  I think that's a great idea, and that's

22  required pursuant to 16. -- Local Rule 16.1(b), so what I'm

23  hearing is in good faith in order to comply with the Court's

24  deadlines you produced a hard copy of what you had.  Defendants

25  said to you, we'd like them in a more workable format.  You're

**J&J COURT TRANSCRIBERS, INC.**

1 working together with defendants to try and work out how you

2 could you produce that, if possible, in a format that they can

3 use.   That's what I'm hearing.

4 　　　　　MS. MATHER:   Yes.   And I sympathize -- I mean, as --

5 they're not intuitive, but all of the information is there.

6 　　　　　THE COURT:   It sounds perfectly reasonable.   You're

7 trying to work it out.   We'll talk about deadlines.   But it

8 sounds like the plaintiffs are working in good faith to try and

9 give you what you want.

10 　　　　　UNIDENTIFIED ATTORNEY:   Your Honor, I -- that -- I

11 think we're making progress, and that all sounds well and good.

12 I have talked with the people at Anheuser-Busch, and if the

13 plaintiffs are telling us that they're willing to provide us

14 the transactional-level data in a format that we can -- we can

15 use, I think that's -- that's all we're asking for.   It's my

16 understanding that, you know, these distribution rights are

17 bought and sold all the time and, in fact, one of -- the

18 largest plaintiff in the case purchased the distribution rights

19 to most of these brands just several months before the

20 termination, and, as part of those transactions, the technical

21 people, I'm sure, get together and they send the information in

22 the database to the other side in a usable format, and maybe

23 that's what we need to do, because sometimes when the lawyers

24 talk about these issues, we leave with one understanding and

25 then the technical people have a completely different

1   understanding, and maybe we get on the phone, two lawyers and
2   two technical people, and tell them exactly the format we need
3   the information in, and as long as they're willing to provide
4   it to us in that format, that would be terrific.  That's all we
5   need.

6           THE COURT:  Well, I wasn't sure if I did this or not,
7   but that's fine.  It sounds to me you're doing exactly what
8   you're supposed to do.  As a general matter, it seems to me,
9   given the resources of the defendants and the plaintiffs, this
10  should be an issue that the -- sophisticated technical people
11  can work out.  I would assume this could be done.  You know,
12  the general parameters that I would -- I think you should work
13  under is that if the plaintiffs are going to take the position
14  that this data cannot be put in a workable format for the
15  defendant, I think you have an uphill battle to do that, and
16  I'm -- if that's going to be your final position, I would
17  definitely want to hear from experts on that issue, and it just
18  seems to me that this issue comes up all the time, and maybe
19  you can't give them everything they want, but certainly with
20  all the sophistication and resources you have, we can have more
21  than a paper copy.  So, that's, you know, my general direction.
22  I think you're doing exactly what you're supposed to.  I'll
23  leave it to you to work it out.

24          The last order provided that the parties were
25  required to confer pursuant to Local Rule 26.1.  That's what

**J&J COURT TRANSCRIBERS, INC.**

1  you're doing.  So, I think the way I can help is just to give

2  you deadlines, but, other than that, it sounds like you're

3  doing exactly what you're supposed to do.

4            MR. HANGLEY:  I think so.

5            THE COURT:  Yes.

6            UNIDENTIFIED ATTORNEY:  That's fine, Your Honor.

7  Thank you.

8            THE COURT:  Any other discovery issues for the

9  defendants?

10            UNIDENTIFIED ATTORNEY:  Your Honor, there is one

11  issue, and I -- in the letter that we sent to the Court, we had

12  identified -- there was -- one of the interrogatories dealt

13  with gross profits.  It was Interrogatory Number 1, I believe,

14  and we reached, I believe, an agreement with the plaintiffs

15  last week that they would provide us an answer to that

16  interrogatory and identify the gross profits by brand with case

17  equivalent sales going back to January 2006, and I noted that

18  in the letter to the Court.  I didn't think there was going to

19  be an issue, but we got yesterday from the plaintiffs several

20  charts that purported to provide some of that information, and

21  our agreement, and I was -- I think we were very clear on this

22  in the meet and confer -- we wanted a verified interrogatory

23  answer on that issue, on gross profits, which it's my

24  understanding is readily available to plaintiffs.

25            THE COURT:  You're entitled to it, especially since

**J&J COURT TRANSCRIBERS, INC.**

1  there's only four interrogatories in the case.  Plaintiffs have

2  to provide that information in an interrogatory, sworn,

3  according to Rule 33.

4            MS. MATHER:  We can do that, Your Honor.

5            THE COURT:  Great.

6            MS. MATHER:  It might have just been a

7  misunderstanding.  I was trying to provide it in a very usable

8  format --

9            THE COURT:  And before the conference, I assume.

10           MS. MATHER:  -- given all the back and forth on the

11  Excel spreadsheets.

12           THE COURT:  Okay.  That's fine.  So plaintiff is

13  going to provide it in interrogatory form.

14           UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

15           THE COURT:  Any other issues from the defendants?

16           UNIDENTIFIED ATTORNEY:  I don't believe so, Your

17  Honor.

18           THE COURT:  Okay.  Let's start with the plaintiffs.

19  You have to supplement the answers to interrogatories.  How

20  long do you reasonably need to do that?  You just give me a

21  date.

22           MR. HANGLEY:  I won't be doing the hard work, Your

23  Honor, so I'm not going to answer your question.

24           THE COURT:  Let the record reflect Mr. Hangley is

25  looking at his very competent associate.

1          MR. HANGLEY:  Why would I lie?

2          MS. MATHER:  Yes.  Just to be on the safe side, Your

3   Honor, I would ask until next Monday.  I don't have the --

4          THE COURT:  Well, you'll get more time than that.

5   Don't worry.

6          MS. MATHER:  -- specific date.

7          THE COURT:  How about the defendants?  You have some

8   work you have to do.  InBev, that might require the most work

9   from you.

10         UNIDENTIFIED ATTORNEY:  Judge, could we have 30 days?

11         THE COURT:  Sure, 30 days.  I think that's fair.  And

12  there's nothing to stop you from doing it early.  Mr. Hangley,

13  where do we go from here?  What do you need?

14         MR. HANGLEY:  With respect to time or with respect --

15         THE COURT:  No, with respect to the case.  You're

16  going to get your supplement.  You're going to get your

17  documents.  You may or may not file your motion.  They're

18  waiting --

19         MR. HANGLEY:  I think when we get the InBev

20  documents, when we complete this discovery, I think it's time

21  for us to sit down and set up the negotiation that we talked

22  about setting up among ourselves.

23         THE COURT:  Okay.  So let's say everybody supplements

24  within 30 days.  Let's say we take it to May 1st.  How long

25  will it take you to prepare a written settlement demand to the

**J&J COURT TRANSCRIBERS, INC.**

1  defendants?

2          MR. HANGLEY:  Two weeks after that.

3          THE COURT:  Defendants, what's the next step after

4  that?

5          UNIDENTIFIED ATTORNEY:  Well, the next step after

6  that, assuming we have all the data, is to try to sit down and

7  work out and see if we can figure out exactly how it was

8  calculated.  Our objective, Your Honor, on this fair market

9  value, and I stress what we're talking about here is the fair

10  market value issue, is to -- is to -- we came up with it a

11  certain way, and that's why we're saying we want to have the

12  data on gross profits, because that's the way it's done.  We

13  want to know whether we have the right gross profit information

14  --

15          THE COURT:  You're going to get it.

16          UNIDENTIFIED ATTORNEY:  -- and all of that stuff.  So

17  we'll get it and we'll check it, and then we'll get Mr.

18  Hangley's demand letter, and then I think that what needs to

19  happen is the parties need to sit down and talk about it, and

20  they need to do it --

21          THE COURT:  I think that's a good idea.

22          UNIDENTIFIED ATTORNEY:  Now, the question is, do we

23  want to do it with or without either -- I don't want to be

24  presumptuous -- either Your Honor's assistance or do we want to

25  do it with or without the assistance of perhaps some retired

1  Judge or some mediator that can help to get this focused so we

2  can get realistic about trying to resolve this.

3            THE COURT:  I think you're right on -- right on

4  point.  What I was thinking of is this, that assuming you get

5  plaintiffs' settlement demand by May 15th or thereabouts, you

6  obviously need a couple of weeks to review it, talk to your

7  clients about it and maybe have some discussions with

8  plaintiffs about it.  Then what I -- I'll do is early June I'll

9  set up a conference call with counsel, and what I'd like to

10 address at that call is whether the parties believe they still

11 have enough information to realistically talk settlement and

12 what direction you would like to go.  If you want to use the

13 resources of the Court, I'll make my time available, but it

14 clearly cannot be as much time as you would have from a private

15 mediator.  If you want to go with a private mediator, that's

16 perfectly fine with me.  You can discuss amongst yourselves who

17 you want to use.  And I have absolutely no problem staying the

18 litigation, if that's what the parties want to do, pending the

19 results of your mediation.  If it works, great.  If it doesn't,

20 we'll be back here and we'll get a schedule.  You won't be

21 prejudiced by any short delay in the mediation.

22            So, why don't we talk in early June about where you

23 are on the settlement front.  Do you want to have a settlement

24 conference, do you want to engage the services of a mediator,

25 what the status is of your discussions about an acceptable

1  mediator and issues like that.

2           UNIDENTIFIED ATTORNEY:  Your Honor, if I may, I'll

3  only make one suggestion, and I agree with the Court a hundred

4  percent.  I currently have a jury trial scheduled to begin in

5  Federal Court in Wilmington on June 2nd, and so if there was

6  any way that we could schedule this telephone conference call

7  before that, I would like to --

8           THE COURT:  No problem at all.

9           UNIDENTIFIED ATTORNEY:   -- I would like to

10  participate.

11           THE COURT:  Happy to do it.

12           UNIDENTIFIED ATTORNEY:  If not, I would like to be

13  excused --

14           THE COURT:  Okay.

15           UNIDENTIFIED ATTORNEY:   -- assuming I'm in trial.

16           THE COURT:  No problem at all.  We'll do it in the

17  last week of May.  You don't have any problem with that, Mr.

18  Hangley, do you?

19           MR. HANGLEY:  I do not.

20           THE COURT:  No problem at all.

21           UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

22           THE COURT:  How long will that trial take?

23           UNIDENTIFIED ATTORNEY:  It's -- this is a Section 2

24  Sherman Act Claim, a monopolization case, and it is -- that

25  issue is now before the Court.  It's -- it -- but we are

1  looking at a trial that is either going to be two or three

2  weeks long.

3  　　　　　THE COURT:  Okay.  No problem at all.

4  　　　　　UNIDENTIFIED ATTORNEY:  This is not one of those

5  months and months and months.

6  　　　　　THE COURT:  No problem at all.  We'll accommodate

7  your schedule, like anyone's schedule.

8  　　　　　UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

9  　　　　　THE COURT:  I think we're proceeding very

10  appropriately in the case, not surprising given the caliber of

11  the lawyers in the case.  Where we are is that the parties, and

12  I'll put this in an order, are going to supplement their

13  discovery in accordance with the Court's rulings today.  You

14  can order a copy of the transcript, if you'd like.  Plaintiffs'

15  written settlement demand by May 15th.  Late May we'll have a

16  conference call, talk about if you need any more information

17  for settlement purposes and whether you want to have a

18  settlement conference or go to mediation.  Mr. Hangley, if it

19  turns out that you need more time to prepare the settlement

20  demand, I think it's better to have a -- rather than rushing to

21  do it, if you find you need more time, your expert needs more

22  time, just work out a schedule with defense counsel, submit it

23  to the Court, and that's perfectly fine with the Court.  I

24  assume you have as much interest as anyone to try and settle

25  this case, so you'll work with all due diligence.  So --

1    MR. HANGLEY:  You said that just as I was standing

2 here saying to myself, I hope I asked for enough time.

3    THE COURT:  If you don't have enough time --

4    MR. HANGLEY:  You're a mind reader, Judge.

5    THE COURT:  -- just agree with defense counsel on a

6 reasonable schedule, submit a letter to the Court.  There's

7 absolutely no problem.  We'll talk in June after the trial.  I

8 think we're making great progress on a complicated case, so

9 we'll work this out.

10    MR. HANGLEY:  Thank you, Your Honor.

11    THE COURT:  No problem at all.

12    MR. HANGLEY:  Your Honor, I have a hard copy, a paper

13 copy, of what we faxed you yesterday, the letter.  I suppose it

14 ought to be given to you --

15    THE COURT:  Sure.  Thank you.  Okay, counsel, any

16 other issues we need to address on this case?

17    UNIDENTIFIED ATTORNEY:  No, Your Honor.

18    THE COURT:  Okay.  We're adjourned.  Does anyone have

19 an objection if I talk to --

20       *  *  *  *  *

21

22

23

24

25

# C E R T I F I C A T I O N

I, DENISE M. O'DONNELL, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

_Denise M. O'Donnell_ DATE:   April 24, 2008

DENISE M. O'DONNELL

J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**

Exhibit B

## Warren Distributing, et al. vs. Anheuser-Busch, et al.  -- Privilege Log

| REDACTED BATES NUMBER | DOC DATE | AUTHOR(S) | ADDRESSEES | CC/COPIES | DESCRIPTION | DEFENSE |
|---|---|---|---|---|---|---|
| | 11/7/2006 | PEACOCK-D | SHORT-T KRUGER-F, ESQ. SANTEL-T | | EMAIL PROVIDING CONFIDENTIAL INFORMATION FOR THE PURPOSE OF RENDERING LEGAL ADVICE TO COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| | 11/22/2006 | PEACOCK-D | BUSCH-A BOBAK-M, ESQ. | | EMAIL PROVIDING CONFIDENTIAL INFORMATION FOR THE PURPOSE OF RENDERING LEGAL ADVICE TO COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| | 11/22/2006 | PEACOCK-D | BUSCH-A BOBAK-M, ESQ. | | EMAIL PROVIDING CONFIDENTIAL INFORMATION FOR THE PURPOSE OF RENDERING LEGAL ADVICE TO COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |
| | 11/23/2006 | CHALMERS-S, ESQ. | BOBAK-M, ESQ. | | EMAIL REFLECTING LEGAL ADVICE AND STRATEGY FROM COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |
| | 11/25/2006 | PEACOCK-D | CHALMERS-S, ESQ. | | EMAIL CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| | 11/28/2006 | PEACOCK-D | CORBETT-D CHALMERS-S, ESQ. | | EMAIL CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| | 11/28/2006 | PEACOCK-D | CORBETT-D CHALMERS-S, ESQ. DANKENBRINK-O WILLIAMS-B BRICKEY-J | | EMAIL CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| | 11/28/2006 | PEACOCK-D | CHALMERS-S, ESQ. VOGT-T BOBAK-M, ESQ. | | EMAIL REFLECTING LEGAL ADVICE OF COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |
| | 11/29/2006 | PEACOCK-D | CHALMERS-S, ESQ. BOBAK-M, ESQ. | KRUGER-F, ESQ. | EMAIL TO COUNSEL PROVIDING CONFIDENTIAL INFORMATION FOR THE PURPOSE OF RENDERING LEGAL ADVICE REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |
| | 11/29/2006 | PEACOCK-D | CHALMERS-S, ESQ. KRUGER-F, ESQ. BOBAK-M, ESQ. | MARLER-S | EMAIL AND ATTACHED DRAFT IMPORT AGREEMENT AMENDMENT REFLECTING CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATIONS REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |
| | 12/15/2006 | PEACOCK-D | CORBETT-D VOGT-T WILLIAMS-B ZELNO-J | | EMAIL CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |
| | 11/7/2006 | SANTEL-T | BOBAK-M, ESQ. PEACOCK-D | KELLEY-J, ESQ. KRUGER-F, ESQ. | EMAIL PROVIDING CONFIDENTIAL INFORMATION FOR THE PURPOSE OF RENDERING LEGAL ADVICE TO COUNSEL REGARDING PROPOSED CONTRACT LANGUAGE | ATTORNEY CLIENT |
| | 11/7/2006 | BOBAK-M, ESQ. | KRUGER-F, ESQ. PEACOCK-D | | EMAIL PROVIDING CONFIDENTIAL INFORMATION FOR THE PURPOSE OF RENDERING LEGAL ADVICE TO COUNSEL REGARDING PROPOSED CONTRACT LANGUAGE | ATTORNEY CLIENT |
| | 11/7/2006 | KRUGER-F, ESQ. | PEACOCK-D SANTEL-T BOBAK-M, ESQ. | KELLEY-J, ESQ. | EMAIL AND ATTACHED DRAFT AGREEMENT CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| | 11/7/2006 | KRUGER-F, ESQ. | PEACOCK-D BOBAK-M, ESQ. | | EMAIL AND ATTACHED DRAFT PRESENTATION CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING PROPOSED CONTRACT LANGUAGE | ATTORNEY CLIENT |
| | 11/8/2006 | KRUGER-F, ESQ. | SANTEL-T BOBAK-M, ESQ. PEACOCK-D | KELLEY-J, ESQ. SHORT-T | EMAIL AND ATTACHED DRAFT IMPORT AGREEMENT CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| | 11/13/2006 | MURRAY-M, ESQ. | BOBAK-M, ESQ. PEACOCK-D | KRUGER-F, ESQ. SMITH-L, ESQ. VOELKERDING-R MARLER-S | EMAIL AND ATTACHED DRAFT IMPORT AGREEMENT CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| | 11/16/2006 | VOELKERDING-R | PEACOCK-D KRUGER-F, ESQ. ENGLISH-D | | EMAIL AND ATTACHED DRAFT LETTER CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| | 11/22/2006 | BOBAK-M, ESQ. | BUSCH-A PEACOCK-D | | EMAIL PROVIDING CONFIDENTIAL INFORMATION FOR THE PURPOSE OF RENDERING LEGAL ADVICE TO COUNSEL REGARDING PROPOSED CONTRACT LANGUAGE | ATTORNEY CLIENT |
| | 11/22/2006 | KRUGER-F, ESQ. | CHALMERS-S, ESQ. | BOBAK-M, ESQ. PEACOCK-D BUSCH-A | EMAIL AND ATTACHED DRAFT AGREEMENT CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |
| | 11/24/2006 | CHALMERS-S, ESQ. | PEACOCK-D BOBAK-M, ESQ. | CHALMERS-S, ESQ. ALMEIDA-D | EMAIL AND ATTACHED DRAFT IMPORT AGREEMENT CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |
| | 11/29/2006 | VOGT-T | PEACOCK-D BRICKEY-J ROSS-R, ESQ. | | EMAIL PROVIDING CONFIDENTIAL INFORMATION FOR THE PURPOSE OF RENDERING LEGAL ADVICE TO COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |
| | 11/29/2006 | BRICKEY-J | PEACOCK-D ROSS-R, ESQ. VOGT-T | | EMAIL PROVIDING CONFIDENTIAL INFORMATION FOR THE PURPOSE OF RENDERING LEGAL ADVICE TO COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| | 11/29/2006 | ROSS-R, ESQ. | PEACOCK-D VOGT-T BRICKEY-J | | EMAIL CONTAINING LEGAL ADVICE FROM COUNSEL AB LEGAL DEPARTMENT REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |
| | 11/29/2006 | BRICKEY-J | PEACOCK-D | ROSS-R, ESQ. VOGT-T | EMAIL PROVIDING CONFIDENTIAL INFORMATION FOR THE PURPOSE OF RENDERING LEGAL ADVICE TO COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| | 11/29/2006 | CHALMERS-S, ESQ. | PEACOCK-D | BOBAK-M, ESQ. KRUGER-F, ESQ. SUMMERS-E, ESQ. MARKATOS-D, ESQ. | EMAIL PROVIDING CONFIDENTIAL INFORMATION FROM COUNSEL REGARDING PROPOSED CONTRACT LANGUAGE OF PROPOSED IMPORT AGREEMENT | ATTORNEY CLIENT JOINT DEFENSE |
| | 11/29/2006 | KRUGER-F, ESQ. | PEACOCK-D CHALMERS-S, ESQ. | BOBAK-M, ESQ. | EMAIL PROVIDING CONFIDENTIAL INFORMATION FOR THE PURPOSE OF RENDERING LEGAL ADVICE TO COUNSEL REGARDING CONTRACT LANGUAGE OF PROPOSED IMPORT AGREEMENT | ATTORNEY CLIENT JOINT DEFENSE |

*Warren Distributing, et al. vs. Anheuser-Busch, et al.* -- Privilege Log

| Bates | Date | From | To | CC | Description | Privilege |
|---|---|---|---|---|---|---|
| | 11/29/2006 | VOGT-T | MASSEY-D | BOBAK-M, ESQ. KATZ-F PEACOCK-D SHORT-T BRICKEY-J TEDFORD-R | EMAIL AND ATTACHED DRAFT PRESS RELEASE REFLECTING LEGAL ADVICE FROM COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| | 12/5/2006 | WENGER-D | BOBAK-M, ESQ. PEACOCK-D MASSEY-D | BROWN-J VOELKERDING-R MARLER-S TEDFORD-R | EMAIL PROVIDING CONFIDENTIAL INFORMATION FOR THE PURPOSE OF RENDERING LEGAL ADVICE TO COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| | 12/5/2006 | KRUGER-F, ESQ. | BOBAK-M, ESQ. BARNES-L, ESQ. | FLICK-S, ESQ. PEACOCK-D LARSON-T, ESQ. SHORT-T | EMAIL AND ATTACHED DRAFT IMPORT AGREEMENT AMENDMENT CONTAINING LEGAL ADVICE BY COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| | 12/7/2006 | CHALMERS-S, ESQ. | KRUGER-F, ESQ. | BOBAK-M, ESQ. PEACOCK-D BARNES-L, ESQ. MARKATOS-D, ESQ. | EMAIL CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING IMPORT AGREEMENT AMENDMENT | ATTORNEY CLIENT JOINT DEFENSE |
| | 11/21/2006 | KRUGER-F, ESQ. | CHALMERS-S, ESQ. | BOBAK-M, ESQ. PEACOCK-D | EMAIL AND ATTACHED DRAFT IMPORT AGREEMENT CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |
| | 11/22/2006 | KRUGER-F, ESQ. | CHALMERS-S, ESQ. | BOBAK-M, ESQ. PEACOCK-D BUSCH-A | EMAIL AND ATTACHED DRAFT IMPORT AGREEMENT CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING PROPOSED IMPORT AGREEMENT | ATTORNEY CLIENT JOINT DEFENSE |
| | 11/28/2006 | VOGT-T | BOBAK-M, ESQ. PEACOCK-D KRUGER-F, ESQ. WILLIAMS-B CHALMERS-S, ESQ. | KATZ-F VOGT-T | EMAIL AND ATTACHED DRAFT PRESS RELEASE SEEKING LEGAL ADVICE TO COUNSEL REGARDING DRAFT PRESS RELEASE | ATTORNEY CLIENT JOINT DEFENSE |
| | 12/6/2006 | KRUGER-F, ESQ. | CHALMERS-S, ESQ. | BOBAK-M, ESQ. PEACOCK-D BARNES-L, ESQ. | EMAIL AND ATTACHED DRAFT IMPORT AGREEMENT AMENDMENT CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING PROPOSED IMPORT AGREEMENT AMENDMENT | ATTORNEY CLIENT JOINT DEFENSE |
| | 12/12/2006 | BARNES-L, ESQ. | PEACOCK-D SHORT-T GLICK-J FICHTER-D LAGRAND-B | BOBAK-M, ESQ. JEDLICKA-J, ESQ. KOLDITZ-D, ESQ. | EMAIL CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING PROPOSED IMPORT AGREEMENT | ATTORNEY CLIENT |
| | 12/21/2006 | BOBAK-M, ESQ. | PEACOCK-D | BARNES-L, ESQ. | EMAIL REQUESTING CONFIDENTIAL INFORMATION FOR THE PURPOSE OF RENDERING LEGAL ADVICE FROM COUNSEL REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| | 1/19/2007 | BARNES-L, ESQ. | PEACOCK-D SHORT-T GLICK-J | BOBAK-M, ESQ. JEDLICKA-J, ESQ. KOLDITZ-D, ESQ. | EMAIL CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING WHOLESALER LICENSING ISSUES | ATTORNEY CLIENT |
| | 1/19/2007 | BOBAK-M, ESQ. | PEACOCK-D SHORT-T GLICK-J BARNES-L, ESQ. | JEDLICKA-J, ESQ. KOLDITZ-D, ESQ. | EMAIL CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING WHOLESALER LICENSING ISSUES | ATTORNEY CLIENT |
| | 3/1/2007 | BOBAK-M, ESQ. | PEACOCK-D | | EMAIL CONTAINING LEGAL ADVICE OF COUNSEL REGARDING IMPORT AGREEMENT CONTRACT LANGUAGE | ATTORNEY CLIENT |
| | 12/15/2006 | PEACOCK-D | CORBETT-B WILLIAMS-B ZELNO-J | KOLDITZ-D, ESQ. | EMAIL PROVIDING CONFIDENTIAL INFORMATION FOR THE PURPOSE OF RENDERING LEGAL ADVICE TO COUNSEL REGARDING WHOLESALER LICENSING ISSUES | ATTORNEY CLIENT |
| | 12/15/2006 | KOLDITZ-D, ESQ. | VOGT-T PEACOCK-D CORBETT-D WILLIAMS-B ZELNO-J KRUGER-F, ESQ. BARNES-L, ESQ. | JEDLICKA-J, ESQ. | EMAIL CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING WHOLESALER LICENSING ISSUES | ATTORNEY CLIENT |
| | 10/27/2006 | KRUGER-F, ESQ. | BOBAK-M, ESQ. RUTLEDGE-G, ESQ. POWERS-P, ESQ. SHORT-T | | EMAIL AND ATTACHED DRAFT IMPORT AGREEMENT CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING PROPOSED IMPORT AGREEMENT | ATTORNEY CLIENT |
| | 10/29/2006 | KRUGER-F, ESQ. | BOBAK-M, ESQ. RUTLEDGE-G, ESQ. POWERS-P, ESQ. SHORT-T | | EMAIL AND ATTACHED DRAFT DISTRIBUTION AGREEMENT CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING PROPOSED CONTRACT LANGUAGE | ATTORNEY CLIENT |
| | 11/22/2006 | DEMSKY-H | KRUGER-F, ESQ. SHORT-T | SANTEL-T | EMAIL PROVIDING CONFIDENTIAL INFORMATION FOR THE PURPOSE OF RENDERING LEGAL ADVICE TO COUNSEL REGARDING PROPOSED IMPORT AGREEMENT | ATTORNEY CLIENT |
| | 10/23/2006 | KRUGER-F, ESQ. | SHORT-T | | EMAIL AND ATTACHED DRAFT IMPORT AGREEMENT AMENDMENT CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING PROPOSED IMPORT AGREEMENT | ATTORNEY CLIENT |
| | 11/22/2006 | KRUGER-F, ESQ. | SHORT-T | | EMAIL AND ATTACHED DRAFT IMPORT AGREEMENT CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING PROPOSED IMPORT AGREEMENT | ATTORNEY CLIENT |
| | 11/00/2006 | JOLLY-L, ESQ. | PEACOCK-D | | CHART CONTAINING LEGAL STRATEGY AND ADVICE OF COUNSEL REGARDING PROPOSED AB/INBEV TRANSACTION | ATTORNEY CLIENT |
| AB-W01725 AB-W01729 AB-W01734 | 9/27/2006 | | SHORT-T | | PRESENTATION REFLECTING LEGAL STRATEGY OF COUNSEL AND PREPARED IN ANTICIPATION OF LITIGATION REGARDING LEGACY CONTRACT ISSUES FOR PROPOSED INBEV TRANSACTION | ATTORNEY CLIENT; WORK PRODUCT |
| AB-W01748 | 12/8/2006 | | SHORT-T | | PRESENTATION REFLECTING LEGAL STRATEGY OF COUNSEL REGARDING LITIGATION AND TRANSITION ISSUES | ATTORNEY CLIENT; JOINT DEFENSE |
| AB-W01707 | 11/1/2006 | | SHORT-T | | PRESENTATION REFLECTING LEGAL ADVICE OF COUNSEL (ANHEUSER-BUSCH LEGAL DEPARTMENT) REGARDING DISTRIBUTION RIGHTS AFTER INBEV TRANSACTION | ATTORNEY CLIENT |

## *Warren Distributing, et al. vs. Anheuser-Busch, et al.* -- Privilege Log

| Bates | Date | From | To | CC | Description | Privilege |
|---|---|---|---|---|---|---|
| AB-W01837 AB-W01869 AB-W01870 | 10/13/2006 | | PEACOCK-D | | PRESENTATION REFLECTING LEGAL ADVICE OF COUNSEL (ANHEUSER-BUSCH LEGAL DEPARTMENT) REGARDING WHOLESALER TRANSITION AND LITIGATION | ATTORNEY CLIENT; WORK PRODUCT |
| AB-W01899 AB-W01913 | 10/13/2006 | | PEACOCK-D | | PRESENTATION REFLECTING LEGAL ADVICE OF COUNSEL (ANHEUSER-BUSCH LEGAL DEPARTMENT) REGARDING WHOLESALER TRANSITION AND LITIGATION | ATTORNEY CLIENT; WORK PRODUCT |
| AB-W02212 | 12/8/2006 | | PEACOCK-D | | PRESENTATION REFLECTING LEGAL ADVICE AND STRATEGY OF COUNSEL (INBEV LEGAL DEPARTMENT) REGARDING INBEV/AB TRANSACTION | ATTORNEY CLIENT; JOINT DEFENSE |
| AB-W01440 AB-W01449 AB-W01459 | 1/18/2007 | WILLIAMSON-M | WILLIAMSON-M DANKLEF-D CHRINSTANELL-C MARIS-D FEEHAN-K SHORT-T GOLDSTEIN-G BRICKEY-J VOGT-T HARRIS-M GLICK-J AUSTIN-S WILSON-T BARNES-L, ESQ. TEMME-J CHESNUT-J | MANTIA-S BOISSELLE-T MARLER-S | ATTACHED PRESENTATION CONTAINING LEGAL ADVICE AND STRATEGY OF COUNSEL REGARDING IMPLEMENTATION OF INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| AB-W01497 AB-W01506 AB-W01512 AB-W01513 AB-W01516 | 1/26/2007 | AUSTIN-S WILLIAMSON-M | DANKLEF-D CHRISTANELL-C MARIS-D FEEHAN-K SHORT-T GOLDSTEIN-G BRICKLEY-J VOGT-T HARRIS-M GLICK-J AUSTIN-S WILSON-T BARNES-L, ESQ. TEMME-J CHESNUT-J | | ATTACHED PRESENTATION REFLECTING LEGAL ADVICE AND STRATEGY OF COUNSEL REGARDING IMPLEMENTATION OF INBEV/AB TRANSACTION | ATTORNEY CLIENT; JOINT DEFENSE |
| AB-W01536 AB-W01547 AB-W01554 AB-W01555 AB-W01558 | 2/2/2007 | HOUSE-K | DANKLEF-D CHRISTANELL-C MARIS-D FEEHAN-K SHORT-T GOLDSTEIN-G HICKEY-C VOGT-T HARRIS-M GLICK-J AUSTIN-S WILSON-T BARNES-L, ESQ. TEMME-J CHESNUT-J | | ATTACHED PRESENTATION CONTAINING AND REFLECTING LEGAL ADVICE AND STRATEGY OF COUNSEL REGARDING IMPLEMENTATION OF INBEV/AB TRANSACTION | ATTORNEY CLIENT; JOINT DEFENSE |
| AB-W01605 AB-W01636 | 10/25/2006 | | SHORT-T | | ATTACHED PRESENTATION REFLECTING LEGAL ADVICE OF COUNSEL REGARDING IMPLEMENTATION OF PROPOSED INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| AB-W01656 AB-W01658 AB-W01868 AB-W01875 | 2/22/2007 | HOUSE-K | DANKLEF-D CHRISTANELL-C MARIS-D SHORT-T FEEHAN-K GOLDSTEIN-G HICKEY-C VOGT-T HARRIS-M GLICK-J AUSTIN-S WILSON-T BARNES-L, ESQ. TEMME-J CHESNUT-J | MANTIA-S BOISSELLE-T DOWDY-P | ATTACHED PRESENTATION REFLECTING LEGAL ADVICE OF COUNSEL REGARDING IMPLEMENTATION OF INBEV/AB TRANSACTION | ATTORNEY CLIENT; JOINT DEFENSE |
| AB-W00754 AB-W00755 AB-W00756 AB-W00757 | 1/27/2007 | PEACOCK-D | OWENS-M CORBETT-D WILSON-T | | ATTACHED PRESENTATION REFLECTING LEGAL ADVICE AND STRATEGY OF COUNSEL REGARDING IMPLEMENTATION OF INBEV/AB TRANSACTION | ATTORNEY CLIENT; JOINT DEFENSE |
| AB-W00904 AB-W00905 AB-W00906 AB-W00907 | 1/27/2007 | PEACOCK-D | OWENS-M CORBETT-D WILSON-T | | ATTACHED PRESENTATION REFLECTING LEGAL ADVICE AND STRATEGY OF COUNSEL REGARDING IMPLEMENTATION OF INBEV/AB TRANSACTION | ATTORNEY CLIENT; JOINT DEFENSE |
| AB-W00960 | 11/24/2006 | BRITO-C | BUSCH-A | CHALMERS-S, ESQ. | EMAIL REFLECTING LEGAL ADVICE OF COUNSEL REGARDING PROPOSED INBEV/AB TRANSACTION | ATTORNEY CLIENT; JOINT DEFENSE |
| AB-W00961 | 11/24/2006 | BUSCH-A | BRITO-C | PEACOCK-D BOBAK-M, ESQ. | EMAIL REFLECTING LEGAL ADVICE OF COUNSEL REGARDING PROPOSED INBEV/AB TRANSACTION | ATTORNEY CLIENT; JOINT DEFENSE |
| AB-W00978 | 11/28/2006 | PEACOCK-D | CORBETT-D CHALMERS-S, ESQ. | | EMAIL REFLECTING ATTORNEY-CLIENT COMMUNICATION AND LEGAL ADVICE OF COUNSEL REGARDING PROPOSED INBEV/AB TRANSACTION | ATTORNEY CLIENT; JOINT DEFENSE |
| AB-W00996 | 12/5/2006 | DANKLEF-D | PEACOCK-D | LEVY-K | ATTACHED DRAFT AGENDA REFLECTING LEGAL ADVICE AND STRATEGY OF COUNSEL REGARDING IMPLEMENTATION OF INBEV/AB TRANSACTION | ATTORNEY CLIENT |
| AB-W01013 AB-W01014 | 11/28/2006 | CHALMERS-S, ESQ. | BOBAK-M, ESQ. | CHALMERS-S, ESQ. | EMAIL REFLECTING LEGAL ADVICE OF COUNSEL REGARDING PROPOSED INBEV/AB TRANSACTION | ATTORNEY CLIENT; JOINT DEFENSE |
| AB-W01036 | 12/8/2006 | CORBETT-D | PEACOCK-D | | ATTACHED DRAFT PRESENTATION REFLECTING LEGAL ADVICE OF COUNSEL REGARDING IMPLEMENTATION OF INBEV/AB TRANSACTION | ATTORNEY CLIENT; JOINT DEFENSE |

## *Warren Distributing, et al. vs. Anheuser-Busch, et al.* -- Privilege Log

| | | | | | | |
|---|---|---|---|---|---|---|
| AB-W01073 | 12/11/2006 | CASTELLANO-J | FILAS-M | BRICKLEY-J PEACOCK-D | ATTACHED DRAFT PRESENTATION REFLECTING LEGAL ADVICE AND STRATEGY OF COUNSEL REGARDING IMPLEMENTATION OF INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |
| AB-W01152 | 12/21/2006 | MCDONALD-L | MCDONALD-L PEACOCK-D CAHILLANE-S SILEO-R MARLER-S DANKENBRINK-D BRICKEY-J NEAR-T RANDALL-D HARRIS-M BIRCH-D HICKINGBOTTOM-S THORNE-L TEMME-J HIGGINS-S HICKEY-C CASS-R PANUCCI-M WILLIAMS-C LOZADO-P VAN WEES-D POLLEY-F GIARDINA-A MEYRER-R DANKLEF-D CHRISTANELL-C DEKEON-C SHORT-T AUSTIN-S KEEL-M MARKATOS-D, ESQ. BARNES-L, ESQ. | | ATTACHED PRESENTATION REFLECTING ATTORNEY-CLIENT COMMUNICATION AND LEGAL ADVICE OF COUNSEL REGARDING IMPLEMENTATION OF INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |
| AB-W01179 AB-W01184 | 1/3/2007 | MCDONALD-L | CORBETT-D CAHILLANE-S PANUCCI-M HEFFELFINGER-D BIRCH-D HICKINGBOTTOM-S VAN WEES-D HIGGINS-S CASS-R SILEO-R WILLIAMS-C LOZADO-P DANKENBRINK-D DEKEON-C MARKATOS-D NEAR-T HICKEY-C MARLER-S PEACOCK-D SHANAHAN-J | | ATTACHED PRESENTATION REFLECTING LEGAL ADVICE AND STRATEGY OF COUNSEL REGARDING IMPLEMENTATION OF INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |
| AB-W01198 AB-W01209 AB-W01218 | 2/2/2007 | SILEO-R | MARLER-S CHESNUT-J PEACOCK-D HARRIS-M TEMME-J HOUSE-K WILLIAMSON-M WILLIAMS-B BIRCH-D DANKENBRINK-D HIGGINS-S LOZADO-P MARKATOS-D, ESQ. SHANAHAN-J THORNE-L VAN WEES-D | WILLIAMS-C CORBETT-D DEGELIN-L DEKEON-C HEFFELFINGER-D HICKEY-C MCDONALD-L MEYRER-R MINOR-K MUCHONEY-R PANUCCI-M SILEO-R WALKER-T | ATTACHED PRESENTATION REFLECTING LEGAL ADVICE AND STRATEGY OF COUNSEL REGARDING IMPLEMENTATION OF INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |
| AB-W01245 AB-W01255 AB-W01264 | 2/9/2007 | SILEO-R | MARLER-S CHESNUT-J PEACOCK-D HARRIS-M TEMME-J HOUSE-K WILLIAMSON-M WILLIAMS-B BIRCH-D DANKENBRINK-D HIGGINS-S LOZADO-P MARKATOS-D SHANAHAN-J THORNE-L VAN WEES-D | WILLIAMS-C CORBETT-D DEGELIN-L DEKEON-C HEFFELFINGER-D HICKEY-C MCDONALD-L MEYRER-R MINOR-K MUCHONEY-R PANUCCI-M SILEO-R WALKER-T | ATTACHED PRESENTATION REFLECTING LEGAL ADVICE AND STRATEGY OF COUNSEL REGARDING IMPLEMENTATION OF INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |
| AB-W01304 | 12/8/2005 | CORBETT-D | PEACOCK-D MCDONALD-L | | ATTACHED DRAFT PRESENTATION REFLECTING LEGAL ADVICE AND STRATEGY OF COUNSEL REGARDING IMPLEMENTATION OF INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |
| AB-W01335 | 12/11/2006 | CORBETT-D | PEACOCK-D | MCDONALD-L | ATTACHED DRAFT PRESENTATION REFLECTING LEGAL ADVICE AND STRATEGY OF COUNSEL REGARDING IMPLEMENTATION OF INBEV/AB TRANSACTION | ATTORNEY CLIENT JOINT DEFENSE |