NOT FOR PUBLICATION (Document No. 91)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| WARREN DISTRIBUTING CO., PEERLESS BEVERAGE CO., INC., and SHORE POINT DISTRIBUTING COMPANY, | : : : : : |
| Plaintiffs, | : Civil No. 07-1053 (RBK/JS) |
| v. | : **AMENDED OPINION** |
| INBEV USA L.L.C. and ANHEUSER-BUSCH INCORPORATED, | : : : |
| Defendants. | : |

**KUGLER**, United States District Judge:

This matter arises out of the termination of beer distribution rights. Presently before the Court is the Motion to Exclude the Expert Opinion Testimony of Robert J. Taylor IV by Defendant Anheuser-Busch Incorporated ("AB") (Doc. No. 91). AB alleges that the testimony and report of Plaintiffs' expert should be excluded under the precepts of Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). For the reasons discussed below, the Court will deny the Motion in part and grant it in part.

**I.    BACKGROUND**

Beer is distributed in New Jersey in a three-tiered system. Brewers sell to wholesalers (or distributors) who in turn sell to retailers (e.g., bars or convenience stores) who sell to the end

consumer.  Distributors enter into distribution agreements with brewers to be the authorized wholesaler of the brewers' brands in a given area.

Prior to February 23, 2007, Plaintiffs Warren Distributing Co., Peerless Beverage Co, and Shore Point Distributing Company were distributors who had individual agreements with InBev USA L.L.C., a subsidiary of InBev nv/sa, a Belgian entity.  InBev USA was the brewer of Rolling Rock, Rock Green Light, and Loyalhanna Pennsylvania Lager (the "Rolling Rock Brands") and was the exclusive importer of a number of  InBev nv/sa's European brands (the "European Brands").[1]  Plaintiffs had the rights to distribute the Rolling Rock Brands and the European Brands pursuant to their agreements with InBev USA.

On May 19, 2006, AB purchased the Rolling Rock Brands from InBev USA.  Following its acquisition, AB desired to distribute those brands through its existing distributors, rather than through the Plaintiffs.  Thus, following correspondence from AB, on January 25, 2007, Plaintiff Shore Point sold its rights to Crown Beer for 2.5 times gross margin.  Plaintiff Warren Distributing likewise sold its rights just six days later to Ritchie & Page, Harrison, and Konrad on a dollars per case basis.  Plaintiff Peerless, however, never voluntarily consummated the sale of its rights in the Rolling Rock Brands.

Also in 2006, AB entered into an agreement with InBev nv/sa in November to become the exclusive importer of the European Brands.  Pursuant to that agreement, AB sent letters to each of the Plaintiffs in late January 2007 discussing transition of the brands to AB's existing

---

[1] The European Brands are Bass Ale, Beck's Pilsner, Beck's Premier Light, Beck's Dark, Beck's Oktoberfest, Beck's Non-Alcoholic, Löwenbräu Original, Löwenbräu Dark, Löwenbräu Oktoberfestbier, Leffe Blonde, Leffe Brown, Belle Vue Kriek, Belle Vue Gueze, Belle Vue Framboise, Boddingtons Pub Ale, Hoegaarden, Staropramen, Stella Artois, and Tennant's Lager.

distributors and discussing payment of fair market value ("FMV") to each of the distributors, as required by New Jersey law. Specifically, under the Malt Alcoholic Beverage Practices Act (the "Practices Act"), N.J. Stat. Ann. 33:1-93.12 et seq., a "successor brewer" cannot terminate a distribution agreement or relationship with a wholesaler without first paying the wholesaler fair market value of the wholesaler's business with respect to the terminated brands. N.J. Stat. Ann. § 33:1-93.15(d)(1). FMV is statutorily defined as "the price at which the asset would change hands between a willing seller and a willing buyer when neither is acting under compulsion and when both have knowledge of the relevant facts." N.J. Stat. Ann. § 33:1-93.14.

Pursuant to the Practices Act, AB offered FMV payments to the Plaintiffs using the "market multiples" approach, wherein AB proposed to multiply the Plaintiffs' gross profits from 2006 for the European Brands (for all Plaintiffs) and for the Rolling Rock Brands (for Peerless) by a multiple derived from purported comparable transactions. AB also offered an "Enhanced Fair Market Value Payment" for cooperation during the transition. The multipliers AB offered were 3.3 for the European Brands and 2.5 for the Rolling Rock Brands, a multiple that included the enhanced cooperation value. After the parties failed to reach a mutual agreement on the FMV of the terminated brands, AB notified Plaintiffs by individual letters dated February 23, 2007 that their rights to distribute were terminated. AB enclosed checks with the letters in the amounts of $13,719,421 (to Peerless for both the European Brands and the Rolling Rock Brands), $5,071,778 (to Shore Point for the European Brands), and $2,410,118 and $3,856,467 (to two Warren Distributing entities for the European Brands) based on multiples of 3.25 for the European Brands and 2.45 for the Rolling Rock Brands. Collectively, AB paid $25,057,784.

AB's use of the market multiples approach was not an unheard of method for valuing

3

beer distribution rights. Indeed, as even Plaintiffs have agreed during this litigation, market multiples had been used for some time as a method for such valuations in the New Jersey beer distribution market. As asserted by AB, between April 14, 2004 and October 31, 2008, the market multiples approach had been used in at least 21 transactions, including ones involving these Plaintiffs.[2] In none of the listed transactions was the multiplier ever higher than 3.3, at least as alleged by AB.

Notwithstanding the past use of the market multiples approach, Plaintiffs contend that the proper valuation method for their distribution rights is the "discounted cash flow" method ("DCF"). Under that method, Plaintiffs allege that their terminated distribution rights were severely undervalued, specifically alleging that they should have collectively received $65,656,395 – a difference of over $40 million from what they actually received.[3] In support of their position, Plaintiffs retained the services of Robert J. Taylor IV who prepared two reports with respect to the proper FMV.[4] Taylor has an undergraduate degree in economics and a MBA in finance. He is a Certified Public Accountant licensed in the State of Georgia. He holds an Accreditation in Business Valuation designation from the American Institute of Certified Public Accountants. Taylor reports to have almost thirty years experience as a consultant specializing in accounting, financial consulting, and valuation services. He has over nine years experience with Ernst & Whinney (now Earnst & Young) and over twenty years with the Taylor Consulting

---

[2] The exact nature of these transactions is disputed in some cases.

[3] Plaintiffs' expert, after adjustments for subsequent sales of InBev brands after February 2007 and after interest, alleges Plaintiffs are owed $45,256,597. Taylor report at 40.

[4] AB's Motion is directed at Taylor's most recent reported July 15, 2009, and the Court's analysis is likewise limited to that report.

4

Group. He has been engaged for his valuation and accounting services in a number of industries, including "extensive" work in the beverage industry.

In the most recent report (totaling 40 pages, excluding attachments), Taylor engaged in, among other things, two key analyses. First, he deconstructed a transaction between Plaintiff Peerless and the High Grade Beverage Company, another New Jersey beer distributor, for the sale of the European Brand rights in October 6, 2006 (a period just over four months before the February 2007 termination by AB). As argued by AB, the sale was consummated using the market multiples approach and using a 3.3 multiplier. Taylor, however, performed an extensive analysis of the transaction and concluded that because of a side transaction, the actual multiplier was 7.32. Second, Taylor engaged in an extensive discussion of the DCF method and applied it to Plaintiffs' former business with respect to the terminated brands. His ultimate valuation of over $65 million is, according to AB, the equivalent of a 8.4 multiplier – far higher than any of the other transactions in New Jersey that topped out at 3.3.

AB filed the Motion to Exclude the Expert Opinion Testimony of Robert Taylor under Federal Rule of Evidence 702 on October 19, 2009. All parties have now briefed the issue and it is ripe for review.

II.     DISCUSSION

Before delving into AB's legion challenges to the Taylor's expert opinion, the Court must set forth the parameters of a Rule 702/<u>Daubert</u> challenge.

    A.     **Basic 702 Standards**

Admissibility of expert testimony is governed by Rule 702, which was amended in 2000 to reflect the Supreme Court decision in <u>Daubert</u>. The Rule provides as follows:

5

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. This rule requires a court to act as a "gatekeeper" to ensure that expert testimony is both relevant and reliable. Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008). Rule 702 has a "'liberal policy of admissibility.'" Id. (quoting Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997)). The burden of showing expert testimony is admissible, once challenged, lies with the offering party. See Kannankeril, 128 F.3d at 807.

To be admissible, expert testimony must satisfy three requirements under Rule 702: 1) the witness must be an expert (i.e., must be qualified); 2) the expert must testify about matters requiring scientific, technical, or specialized knowledge (i.e., must be reliable); and 3) the expert's testimony must assist the trier of fact (i.e, must fit). Id. (citing Kannankeril, 128 F.3d at 806 (citing In re Paoli R.R. Yard PCB Litig. (Paoli II), 35 F.3d 717, 742 (3d Cir. 1994))); Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000) (stating three requirements are qualifications, reliability, and fit). An expert is qualified if he "'possesses specialized expertise.'" Pineda, 520 F.3d at 244 (quoting Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003)). The qualification requirement is liberally construed. Id.

A reliable opinion is "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." Paoli II, 35 F.3d at 742 (quoting Daubert, 509 U.S. at 589). The focus of the reliability inquiry is on the expert's principles and methodology, not on his conclusions. Daubert, 509 U.S.

at 595.  In determining reliability, a court may look to several non-exhaustive factors, including:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Elcock, 233 F.3d at 745-46 (quoting Paoli II, 35 F.3d at 742 n.8).  As is perhaps particularly relevant when the proffered expert will testify on financial matters, reliability does not require mathematical precision, but it does require that the opinion be based on a "sufficient factual foundation."  Id. at 754 (rejecting economist's opinion on future lost earnings where he disregarded plaintiff's previous working conditions, current earning capacity, and potential lifespan concerns).  The opinion cannot be based on assumptions that are "blatantly incorrect."  Simon v. Weissman, 301 Fed. Appx. 107, 116 (3d Cir. 2008); see also Player v. Motiva Enters. LLC, No. 02-3216, 2006 WL 166452, at *7 (D.N.J. Jan. 20, 2006) (rejecting expert opinion that failed to discuss or recognize relevant facts), aff'd, 240 Fed. Appx. 513 (3d Cir. 2007).

       Finally, an opinion fits a particular case (and thus helps the trier of fact) when there is a "'connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'"  Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000) (quoting Paoli II, 35 F.3d at 743).  Fit is an issue of relevance and simply means that scientific validity of the method or principles applies to the issues at hand.  U.S. v. Ford, 481 F.3d 215, 220 n.6 (3d Cir. 2007).  Merely because a method is reliable does not mean it applies in all cases.  See Daubert, 509 U.S. at 591 (discussing how phases of the moon may fit to show darkness, but not to show whether an individual was acting irrationally).

In certain instances, courts are obligated to provide an in limine hearing before applying <u>Daubert</u> to exclude expert testimony. <u>Padillas v. Stork-Gamco, Inc.</u>, 186 F.3d 412 (3d Cir. 1999). A hearing is required, for example, where the court excludes an expert's conclusions on the grounds that they are "insufficiently explained and the reasons and foundations for them inadequately and perhaps confusingly explicated." <u>Id.</u> In other words, where a report is "conclusory and [does] not adequately explain the basis for [the expert's] opinion or the methodology employed in reaching his conclusions," the "plaintiff needs an 'opportunity to be heard' on the critical issues of scientific reliability and validity." <u>Oddi</u>, 234 F.3d at 152 (quoting <u>Padillas</u>, 186 F.3d at 417). Where the evidentiary record is substantial, however, or the court has before it the information necessary to determine that the expert lacks "good grounds" for his conclusions, a hearing may be unnecessary. <u>Id.</u> at 153. In this dispute, while the Court does grant the Motion in part, no hearing is necessary because Taylor's report is clear and the Court has sufficient information before it to determine if he has "good grounds" for his conclusions.

      **B.**    **Specific Challenges**

AB raises four general challenges to Taylor's expert opinion, which are essentially challenges to reliability and fit. First, AB argues that Taylor ignores the generally accepted market multiples approach by employing the DCF method. AB br. at 10. It alleges that his approach is unreliable because it ignores the facts of record. Second, AB challenges several of Taylor's conclusions regarding the High Grade/Peerless transaction as unreliable speculation. AB br. at 14. Third, AB argues that Taylor's DCF analysis is unreliable because it is based on faulty assumptions and speculative data. AB br. at 27. Fourth and finally, AB argues that Taylor's opinion does not fit the facts of this case because it cannot be reconciled with real-world

transactions. AB br. at 34. Plaintiffs challenge each of these assertions head on and argue, in general, that AB's challenges are not to Taylor's methodologies, but to his conclusions. Pl. br. at 1. The Court mostly agrees and finds that the bulk of Taylor's opinion satisfies the requirements of Rule 702.

### 1. Qualified

As an initial matter, even though AB does not directly challenge Taylor's qualifications, (at least not as an express heading in its brief), it does seem to challenge his qualifications at least once parenthetically. See AB br. at 4 (noting Taylor had only once before valued beer distribution rights (and did so in Kentucky) in his 30-year career). To the extent that this was meant as a challenge to Taylor's qualifications to testify as an expert under Rule 702, that challenge fails. Based on his education, certifications, and experience, Taylor has demonstrated that he possesses specialized skills and knowledge. Therefore, he is qualified as an expert.

### 2. Reliable

As noted, three of AB's primary challenges are to the reliability of Taylor's methodology, and to these three challenges (and their sub-parts) the analysis now turns.

#### a. Whether Taylor Ignored Generally Accepted Valuation Methodology (DCF v. Market Multiples)

AB's first challenge is basically that because the facts of the record show that market multiples has been used so many times, including admittedly several times by the Plaintiffs, Taylor's conclusions are unreliable because he has ignored evidence in the record. See AB br. at

10-14.[5]  Reduced to its basic form, AB's argument is based on the premise that because DCF has never been used, it *cannot* be used.  This is simply not so.

As pointed out by Plaintiffs, AB's argument really goes to which method is better, not to whether one or the other is more reliable.  Pl. br. at 14.  Simply because one method has been previously used does not mean that another method (provided it is otherwise reliable, see Kool, Mann, Coffee & Co. v. Coffey, 300 F.3d 340, 362 (3d Cir. 2002) (discussing the propriety of DCF method in certain contexts)) is somehow per se inadmissible.  Different does not mean unreliable.  In fact, that DCF could have been employed by AB seems clear on the record.  See Anderson Report at ¶¶ 127, 128 (expert report for InBev USA noting that DCF method is a "legitimate method" for determining payment to wholesalers, though noting that it is not preferred where market transactions are available); Kursh depo. at 300:10-11 (AB's expert testifying that he previously used DCF to calculate the value of Corona distribution rights); Kursh report at ¶ 44 ("Of course, with proper application, both the market (multiples) approach and the income (DCF) approach, would be expected to yield comparable valuation results.").  Moreover, DCF does not seem to be wildly different from the market multiples approach in that

---

[5] AB also asserts, in reliance on In re Oracle Corporation Securities Litigation, No. C 01-00988 SI, 2009 WL 1709050, at *28 (N.D. Cal. June 19, 2009), that because Taylor admitted he did not read the deposition transcripts of his clients before producing his report, his entire report should be ignored on that basis alone.  See AB br. at 14 (citing Taylor depo. at 165).  To the extent Oracle has any bearing on this case, it stands for the unremarkable proposition that ignoring deposition testimony that does not support the expert's conclusion or contradicts it makes the expert's conclusions unreliable.  Compare In re Oracle, 2009 WL 1709050, at *28, with Elcock, 233 F.3d at 755-56.  Here, AB has not shown how Taylor has ignored any contradictory deposition testimony.  While AB takes great pains to show that somehow the individual Plaintiffs undermined their own claims by admitting they have used market multiples in the past, the Court is not convinced that those admissions are somehow contradictory to Taylor's conclusion that DCF is a superior valuation method.

it too ultimately provides a multiplier, albeit one based on a number of different variables. Cf. AB br. at 7 (noting that Taylor's ultimate conclusion of FMV at $65 million is approximately an 8.4 multiplier); Kursh report at ¶ 44. Therefore, given that DCF is otherwise a sound method for valuation and given that it otherwise could have been employed by AB, the Court is not convinced that Taylor's opinion is somehow unreliable simply because DCF has not been previously used.

### b. Analysis of the High Grade/Peerless Transaction

The bulk of AB's challenge to Taylor's report is his dissection of the High Grade/Peerless transaction. At the end of Taylor's analysis, he concludes that the transaction did not occur at a 3.3 multiplier as represented by AB, but in fact at a 7.32 multiplier. Taylor report at 20. AB challenges that conclusion by attacking Taylor's review of the record and a number of Taylor's assumptions.

#### (1) Mindreading & Record Evidence of Compulsion

First, AB challenges Taylor's conclusion that the transaction was not representative of FMV because it did not involve a "willing seller." AB br. at 15; Taylor report at 14. AB alleges that Taylor did not employ a reliable scientific methodology in determining that the transaction occurred under duress, and in fact he engaged in impermissible "mindreading." AB br. at 15. Plaintiffs counter that Taylor did not engage in "mindreading" because the materials he reviewed made "crystal clear" that High Grade did not want to sell its InBev portfolio. Pl. br. at 21. Plaintiffs' assertion is incorrect.

An expert cannot testify about a person's intent, motive, or state of mind. Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384, 440-41 (D.N.J. 2009);

11

AstraZeneca LP v. Tap Pharm. Prods., Inc., 444 F. Supp. 2d 278, 293 (D. Del. 2006).  Plaintiffs' assertion that the record is crystal clear as to what the conditions of the High Grade/Peerless sale were is belied by Taylor's own deposition testimony wherein he testified that he inferred what the parties' thoughts were.  Taylor depo. at 207:10-14.  It appears that at a minimum a question of fact exists about whether the High Grade/Peerless transaction involved compulsion or a willing seller.  Compare Salzman depo. at 176:1-2 ("There was no pressure on him to sell."), with DeMarco depo. at 231:13-14 ("I didn't want to sell it.  I was doing everything I can [sic] not to sell it.").  Under these circumstances, Taylor's opinion about the state of mind of the principals of the High Grade transaction is improper.  Whether the transaction involved a willing seller is a question of fact for the jury that can be determined through other evidence, but it is not an appropriate field of inquiry for an expert witness.  Therefore, AB's Motion is granted as to the portions of Taylor's testimony about state of mind in the High Grade transaction.

However, the Court notes that Taylor's ultimate conclusion that the transaction involved a 7.32 multiplier and not a 3.3 multiplier was not based on the parties' states of mind, but on the value of the side transaction.  See Taylor report at 20.  Thus, his opinion regarding the parts of that deal is relevant and the Court must examine AB's challenges.

(2)     **Assumptions to Reach the 7.32 Multiplier**

Seemingly on the same day that High Grade and Peerless entered into their transaction, AB entered into a side transaction with High Grade that offered what Taylor describes as "inducements that were of considerable value."  Taylor report at 16; see Grewal decl., Ex. 2 (October 6, 2006 agreement between High Grade and InBev USA).  Taylor asserts that the side deal was an inducement to get High Grade to accede to the Peerless transaction.  Taylor report at

12

16. The three valuable inducements that he examined were: 1) the "retention of distribution rights" inducement, wherein High Grade was permitted to retain the distribution rights of the entire portfolio of InBev Brands for all of certain counties; 2) the "right of first offer for new brands" inducement, wherein InBev agreed to not grant or transfer any distributor rights to any third party for any new brand in High Grade's InBev territories without first offering the rights to High Grade; and 3) the "tax liability reimbursement" inducement, wherein InBev agreed to pay High Grade's tax liability for the Peerless transaction up to $250,000 under certain conditions. Taylor report at 16-20. AB challenges the valuation of the inducements as unreliable under the non-exhaustive Third Circuit and Daubert reliability factors. AB br. at 20-21.

### (a)     Retention of Distribution Rights

As to the retention inducement, AB argues that Taylor's opinion is unreliable because his opinion that a deal becomes more valuable where the party gets to retain rights it already has is illogical and based on an untestable hypothesis. AB br. at 22. Plaintiffs counter that the retained rights were indisputably valuable and that retention of them was a critical part of the consideration for the High Grade/Peerless transaction. Pl. br. at 27. The Court agrees with AB.

Taylor's sole explanation of why the retention rights should be considered as part of the value of the principal deal is as follows: "The retention of these distribution rights is of real value, as High Grade could sell more cases and earn additional profit from an expanded InBev portfolio." Taylor report at 19. It seems without doubt that the ability to sell brands is valuable. That is not a remarkable statement. But what Taylor fails to appreciate is that because of the enactment of the Practices Act several months before the October 6, 2006 agreement, High Grade was entitled to much of the value of the distribution rights whether it retained them and exercised

them or whether it was forced to give them up.  After the Act, InBev USA could only terminate or fail to renew its agreement with High Grade for "good cause and in good faith."  N.J. Stat. Ann. § 33:1-93.15(c)(1).  A termination absent good cause would have entitled High Grade to "reasonable damages," see N.J. Stat. Ann. § 33:1-93.18(b), which damages seemingly would have approached, if not exactly approximated, the value of the retained rights as calculated by Taylor.  In sum, High Grade retained value in its distribution rights even absent the side transaction.  Taylor's inclusion of that value in his calculation of the true value of the High Grade/Peerless transaction is thus unreliable.  Therefore, Taylor's testimony regarding the value of the retention rights must be excluded.

### (b) Right of First Offer

As to first offer inducement, AB argues that Taylor's opinion is speculative and arbitrary because he relies on "pure guesswork."  AB br. at 23.  Specifically, AB challenges Taylor's assumptions that InBev would introduce three new brands, and that those new brands would sell at a certain rate and profit margin.  AB br. at 23-24.  Plaintiffs offer that Taylor made reasonable assumptions based on the provided records.  Pl. br. at 25-26.  The Court agrees with Plaintiffs.

AB does not seem to quibble with the notion that rights of first refusal are valuable for new beer brands.  Their challenge instead is aimed at some of the assumptions that Taylor made in quantifying the worth of that indisputably valuable right.  But the Court is not convinced that his work was arbitrary or speculative.  The basis for his assumption that three new brands would be introduced was based on analysis of historical evidence.  See Taylor report at 18.  Moreover, his assumptions about case quantities and margin were likewise based on evidence in the record. See Taylor report at 18.  While to be sure he made some assumptions, these assumptions were

educated and reasonable, and were necessary to put value to an indisputably valuable right. As Elcock announced, mathematical precision is not required in these situations (as AB would seemingly demand), rather the expert's opinion need only be based on a "sufficient factual background." 233 F.3d at 754. Taylor's proffered opinion regarding the first offer inducement seems sufficiently grounded in the facts of record. Therefore, the Court cannot grant AB's Motion with respect to Taylor's testimony regarding the value of the first offer inducement.

### (c)     Tax Liability Reimbursement

As to the tax liability inducement, AB argues again that Taylor's conclusions are based on "wild guesses." AB br. at 25. In particular, AB suggests that he uses only his own judgment to determine a number of probabilities relevant to the calculation, rather than basing the probabilities on an independent formula or method. AB br. at 26. Plaintiffs offer that the tax liability right is indisputably valuable, and that Taylor took a view of the entire situation and then used his expert judgment to make some conservative judgments. Pl. br. at 23-24. The Court agrees with Plaintiffs that Taylor's methods are reliable.

Like with the first offer inducement, AB does not meaningfully argue that the tax liability inducement is without value. Instead, they insist that Taylor's judgment alone was not enough to support his conclusions. However, the Court does not interpret Taylor's deposition testimony to mean that he arrived at the values he used by some flip-a-coin method. Instead, it seems as if he looked at a clearly valuable right, which was not certain to vest, and used his review of the record to arrive at some necessary judgments to discount for its potential non-occurrence. See Taylor depo at 212:13-22. The Court is not convinced based on Taylor's report and deposition testimony that he lacked good grounds for his conclusion, and any shortcomings AB believes

exists can be exposed during cross examination. Therefore, the Court cannot grant AB's Motion with respect to Taylor's testimony regarding the value of the tax liability reimbursement.

### c. DCF Variables & Assumptions

AB's next reliability challenge is to Taylor's application of the DCF method to the transaction between Plaintiffs and AB. AB generally challenges two aspects of Taylor's analysis: 1) he used a flawed discounted rate, and 2) he relied on speculative and unsupported data to arrive at his valuation. AB br. at 28-29. Plaintiffs proffer that Taylor's assumptions are all well-reasoned and based on sound methodology. Pl. br. at 15. The Court agrees.

#### (1) Discount Rate

It should be first noted that Taylor asserts that the discount rate is "the most critical component of applying the [DCF]." Taylor report at 34. Seemingly the lower the rate the higher the resultant FMV. AB makes two specific challenges to Taylor's conclusion that 10.6% is the appropriate rate: 1) he arrived at that rate without using appropriate due diligence, including in part, by relying on a consulting expert who had a stake in the outcome; and 2) he arbitrarily assumed a 40/60 debt-to-income ratio when he should have used something closer to 10/90. AB br. at 29-30. Plaintiffs suggest that AB's challenges are based on conclusions rather than methodology. The Court finds that Taylor's analysis is sufficiently reliable.

AB's first challenge is really an allegation of bias that can be appropriately exposed on cross examination. See In re Unisys Savings Plan Litig., 173 F.3d 145, 166 n.11 (3d Cir. 1999) (noting expert witnesses cannot be excluded on the basis of bias). Taylor's explanation of how he arrived at the discount rate is sound and well-elucidated. That he may have predetermined his conclusion is not apparent and can be otherwise examined at trial.

AB's challenge to Taylor's use of the 40/60 debt-to-income ratio is likewise a subject for cross examination. Taylor's report reflects that he considered the debt-to-income ratio of the Plaintiffs and determined that it should otherwise be disregarded in reaching an assessment of the FMV of their terminated rights. Taylor report at 36. His rationale and calculations are well-explained and reliably applied. Taylor report at 36 ("Taken as a whole, I believed the current leverage of the New Jersey Distributors held less weight than industry data. Facilities and equipment held by affiliated entities or leased under operating leases hold the debt ratio down. Market participants would trend to a higher holding of debt, as reflected by their industry and companies like A-B and InBev."). If AB wishes to challenge his calculations it can, but as a matter of law under Rule 702, they are not unreliable.

### (2) Speculative Data

AB further posits that Taylor's report is unreliable because it relies on highly speculative long-term sales projections. AB br. at 31. Here AB makes three charges: 1) Taylor's reliance on Plaintiffs' self-created sales projections was faulty because the projections were inherently biased and were really just guess-work; 2) Taylor conducted no meaningful due diligence to verify the reliability of the projections; and 3) Taylor employed no formula or methodology in selecting the sales projections he ultimately used in his DCF analysis. AB br. at 31-33. Plaintiffs respond that Taylor's projections were not based solely on the say-so of the individual Plaintiffs, but in fact were derived from a variety of sources. Pl. br. at 18. They further note that Taylor details the process by which he arrived at his conclusions, while acknowledging that projecting sales involves – at least in part – some level of educated guessing. Pl. br. at 18-19. Plaintiffs are correct.

AB seems to at times infer that Taylor relied solely on Plaintiffs' flawed internal projections and that he failed to otherwise determine the worth of those projections. It argues that under the holdings of Zenith Electronics Corp. v. WH-TV Broadcasting Corp., 395 F.3d 416 (7th Cir. 2005) and ZF Meritor LLC v. Eaton Corporation, 646 F. Supp. 2d 663 (D. Del. 2009) that his conclusions can thus be discarded. The Court does not agree because Taylor's report clearly spells out that he relied on at least six groups of sources (i.e., not just Plaintiffs' internal projections) and because he clearly lays out his process. Taylor report at 29-31. In the Court's view, he seemingly engaged in due diligence by relying on more than Plaintiffs' say-so in reaching his conclusion. Once again, AB is certainly free to attack his conclusion, but his methods seem reliable and reliably applied under the circumstances.

### 3. Fit

AB makes a final challenge that Taylor's opinion does not "fit" because it does not bear any "relationship to market realities." AB br. at 34. It notes that Taylor's valuation is so disproportionate to any past transaction that it must be excluded. AB br. at 35. Plaintiffs offer that the other transactions are false references points because this transaction involved a larger number of beers and involved distribution rights covering the whole of New Jersey. Pl. br. at 28. The Court can dispose of AB's fit challenge in short order.

At the outset, the Court will note that Plaintiffs' offer that these sales were of unprecedented size seems somewhat overstated. As AB points out, Plaintiffs themselves created a false comparison by combining their three offers and comparing them to single offers. Notwithstanding, the Court is convinced that AB's fit challenge is without merit because the challenge is really a sub-species of their argument above (which the Court rejected) that because

DCF has never been used it cannot be used. Second, passage of the Practices Act was a watershed moment in the history of brewer-distributor relationships in New Jersey and has led to a new world of rights and inherent value. Thus, the Court is not convinced that Taylor's methods lack a connection to the particular issues at stake in this dispute, i.e, that his opinion does not fit.

### III. CONCLUSION

For the foregoing reasons, AB's Motion is **GRANTED** with respect to Taylor's testimony about state of mind in the High Grade transaction and as to his testimony regarding the value of retention rights. It is **DENIED** in all other respects.

Date: 5-28-10  /s/ Robert B. Kugler
ROBERT B. KUGLER
United States District Judge