NOT FOR PUBLICATION                                    (Document Nos. 85, 88, 90)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

```
_____        :
                                        :
WARREN DISTRIBUTING CO.,                :
PEERLESS BEVERAGE CO., INC., and        :
SHORE POINT DISTRIBUTING                :
COMPANY,                                :
                                        :
                Plaintiffs,             :      Civil No. 07-1053 (RBK/JS)
                                        :
        v.                              :      OPINION
                                        :
INBEV USA L.L.C. and                    :
ANHEUSER-BUSCH INCORPORATED,            :
                                        :
                Defendants.             :
_____        :
```

**KUGLER**, United States District Judge:

This matter arises out of the termination of beer distribution rights, and generally poses a single question: Did Plaintiffs receive fair market value?  Presently before the Court are three Motions: 1) the Motion for Summary Judgment by Plaintiffs Warren Distributing Co., Peerless Beverage Co., Inc. and Shore Point Distributing Company as to the Counterclaims by Defendant Anheuser-Busch Incorporated ("AB") (Doc. No. 85); 2) the Motion for Summary Judgment by Defendant InBev USA L.L.C. (Doc. No. 88); and 3) the Motion for Summary Judgment by AB (Doc. No. 90).  For the reasons expressed below, the Motions are granted in part and denied in part.

## I.       BACKGROUND

As this Court has previously noted, beer is distributed in New Jersey in a three-tiered system.  Brewers sell to wholesalers (or distributors) who in turn sell to retailers (e.g., bars or convenience stores) who sell to the end consumer.  Distributors enter into distribution agreements with brewers to be the authorized wholesaler of the brewers' brands in a given area.

Prior to February 23, 2007, Plaintiffs Warren Distributing Co., Peerless Beverage Co, and Shore Point Distributing Company were distributors who had individual agreements with InBev USA L.L.C., a subsidiary of InBev nv/sa, a Belgian entity.  InBev USA was the brewer of Rolling Rock, Rock Green Light, and Loyalhanna Pennsylvania Lager (the "Rolling Rock Brands") and was the exclusive importer of a number of  InBev nv/sa's European brands (the "European Brands").[1]  Plaintiffs had the rights to distribute the Rolling Rock Brands and the European Brands pursuant to their agreements with InBev USA.

On May 19, 2006, AB purchased the Rolling Rock Brands from InBev USA.  Following its acquisition, AB desired to distribute those brands through its existing distributors, rather than through the Plaintiffs.  Thus, following correspondence from AB, on January 25, 2007, Plaintiff Shore Point sold its rights to Crown Beer for 2.5 times gross margin.  Plaintiff Warren Distributing likewise sold its rights just six days later to Ritchie & Page, Harrison, and Konrad on a dollars per case basis.  Plaintiff Peerless, however, never voluntarily consummated the sale of its rights in the Rolling Rock Brands.

---

[1] The European Brands are Bass Ale, Beck's Pilsner, Beck's Premier Light, Beck's Dark, Beck's Oktoberfest, Beck's Non-Alcoholic, Löwenbräu Original, Löwenbräu Dark, Löwenbräu Oktoberfestbier, Leffe Blonde, Leffe Brown, Belle Vue Kriek, Belle Vue Gueze, Belle Vue Framboise, Boddingtons Pub Ale, Hoegaarden, Staropramen, Stella Artois, and Tennant's Lager.

Also in 2006, AB entered into an agreement with InBev nv/sa in November to become the exclusive importer of the European Brands.  Pursuant to that agreement, AB sent letters to each of the Plaintiffs in late January 2007 discussing transition of the brands to AB's existing distributors and discussing payment of fair market value ("FMV") to each of the distributors, as required by New Jersey law.  Specifically, under the Malt Alcoholic Beverage Practices Act (the "Practices Act"), N.J. Stat. Ann. 33:1-93.12 et seq., a "successor brewer" cannot terminate a distribution agreement or relationship with a wholesaler without first paying the wholesaler fair market value of the wholesaler's business with respect to the terminated brands.  N.J. Stat. Ann. § 33:1-93.15(d)(1).  FMV is statutorily defined as "the price at which the asset would change hands between a willing seller and a willing buyer when neither is acting under compulsion and when both have knowledge of the relevant facts."  N.J. Stat. Ann. § 33:1-93.14(c).

Pursuant to the Practices Act, AB offered FMV payments to the Plaintiffs using the "market multiples" approach, wherein AB proposed to multiply the Plaintiffs' gross profits from 2006 for the European Brands (for all Plaintiffs) and for the Rolling Rock Brands (for Peerless) by a multiple derived from purported comparable transactions.  AB also offered an "Enhanced Fair Market Value Payment" for cooperation during the transition.  The multipliers AB offered were 3.3 for the European Brands and 2.5 for the Rolling Rock Brands, a multiple that included the enhanced cooperation value.  After the parties failed to reach a mutual agreement on the FMV of the terminated brands, AB notified Plaintiffs by individual letters dated February 23, 2007 that their rights to distribute were terminated.  AB enclosed checks with the letters in the amounts of $13,719,421 (to Peerless for both the European Brands and the Rolling Rock Brands), $5,071,778 (to Shore Point for the European Brands), and $2,410,118 and $3,856,467

3

(to two Warren Distributing entities for the European Brands) based on multiples of 3.25 for the European Brands and 2.45 for the Rolling Rock Brands.  Collectively, AB paid $25,057,784.

AB's use of the market multiples approach was not an unheard of method for valuing beer distribution rights.  Indeed, as even Plaintiffs have agreed during this litigation, market multiples had been used for some time as a method for such valuations in the New Jersey beer distribution market.  As asserted by AB, between April 14, 2004 and October 31, 2008, the market multiples approach had been used in at least 21 transactions, including ones involving these Plaintiffs.   In none of the listed transactions was the multiplier ever higher than 3.3, at least as alleged by AB.

Notwithstanding the past use of the market multiples approach, Plaintiffs contend that the proper valuation method for their distribution rights is the "discounted cash flow" method ("DCF").  Under that method, Plaintiffs allege that their terminated distribution rights were severely undervalued, specifically alleging that they should have collectively received $65,656,395 – a difference of over $40 million from what they actually received.[2]  In support of their position, Plaintiffs retained the services of Robert J. Taylor IV who prepared two reports with respect to the proper FMV.  In the most recent report, Taylor engaged in an extensive discussion of the DCF method and applied it to Plaintiffs' former business with respect to the terminated brands.

The parties insist that the damages in this matter are influenced by a number of events pre- and post-termination.  For example, prior to the termination of the Plaintiffs' respective

---

[2] Plaintiffs' expert, after adjustments for subsequent sales of InBev brands after February 2007 and after interest, alleges Plaintiffs are owed $45,256,597.  Taylor report at 40.

distribution agreements, Plaintiffs allege that InBev USA actively negotiated with AB to transfer to it the import rights to the European Brands; InBev USA shared confidential, proprietary information with AB; and that InBev USA induced Plaintiffs into large inventory build-ups at the end of 2006, knowing a termination of their distribution rights was forthcoming.  AB, for its part, alleges that it suffered post-termination harm when Plaintiffs continued selling the terminated brands for some months, notwithstanding that they were no longer the authorized distributors. AB further insists that Plaintiff Peerless went one step further than mere post-terminations sales and actively engaged in a duplicitous campaign of holding itself out as an authorized seller of the European Brands, while simultaneously inducing retailers to remove European Brand tap handles.

The litigation history between these parties, however, began before the termination of Plaintiffs' distribution rights on February 23, 2007.  In fact, on February 21, 2007, Plaintiffs filed a verified complaint in the Superior Court of New Jersey, Camden County, Chancery Division, seeking an injunction to prevent the termination of the distribution rights.  The Superior Court denied Plaintiff's request for injunctive relief.

Thereafter, on March 6, 2007, Plaintiffs filed a six-count Complaint with this Court, alleging as follows:

- Count One: Violation of the Practices Act (against InBev USA);

- Count Two: Violation of the Practices Act (against AB);

- Count Three: Violation of the Practices Act (against AB and InBev USA);

- Count Four: Conspiracy to violate the Practices Act (against AB and InBev USA);

- Count Five: Breach of contract (against InBev USA); and

5

- Count Six: Interference with Contract (against AB).

Compl. at 15-20.  AB filed a motion to dismiss on March 26, 2007 and InBev USA did the same on May 22, 2007.  Docs. No. 6, 13.  This Court denied both motions on December 20, 2007, finding that Plaintiffs had stated claims for relief.  Doc. No. 33; Warren Distributing Co. v. InBev USA LLC (Warren I), No. 07-1053, 2007 WL 4554245 (D.N.J. Dec. 20, 2007).  Thereafter, both Defendants answered, with AB alleging four counterclaims.  Docs. No. 36, 39.  In particular, AB alleged as follows:

- Counterclaim One: Unjust enrichment

- Counterclaim Two: Tortious interference with contract (wholesaler contracts);

- Counterclaim Three: Tortious interference with contracts (InBev import agreement); and

- Counterclaim Four: Violation of the Practices Act and the Administrative Code.

See Doc. No. 36 at 16-18.  All parties filed their respective motions for summary judgment on October 19, 2009.  See Docs. No. 85, 88, 90.  Also on October 19, AB filed the Motion to Exclude the Expert Opinion Testimony of Robert J. Taylor IV, Doc. No. 91, which this Court granted in part and denied in part.  See Doc. No. 175; Warren Distributing Co. v. InBev USA LLC (Warren II), No. 07-1053, 2010 WL 2179167 (D.N.J. May 28, 2010).

On March 17, 2010, the Court ordered Plaintiffs to amend the Complaint to properly assert diversity jurisdiction.  Doc. No. 147.  Plaintiffs filed the Amended Complaint on March 24, 2010, and AB and InBev USA each timely filed their respective amended answers.  See Docs. No. 148, 149, 150.  The claims and counterclaims in the Amended Complaint and AB's

Amended Answer remain the same.  See Amd. Compl. at 16-22; Doc. No. 149 at 14-17.[3]

## II.    STANDARD

Summary judgment is appropriate where the court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

"[T]he party moving for summary judgment under Fed.R.Civ.P. 56(c) bears the burden of demonstrating the absence of any genuine issues of material fact."  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996).  The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party satisfies its burden, the nonmoving party must respond by "set[ting] out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  "If the opposing party does not

---

[3] Though the Motions were filed with respect to the original Complaint and original AB Answer, the Motions are not rendered moot by the subsequent amendments to those pleadings since they did not otherwise substantively change.  While the Motions refer to the original pleadings, the analysis will refer to the amended ones as those are now the operative documents.

so respond, summary judgment should, if appropriate, be entered against that party." <u>Id.</u>

## III.   DISCUSSION

Since the bulk of the present Motions concern the Practices Act, a brief introduction is warranted.  It should be initially noted that to resolve many of the underlying disputes, first impressions of the Practices Act are required.  With questions of statutory interpretation, a reviewing court's "primary goal" must be to determine the New Jersey Legislature's intent. <u>Fletcher v. Cessna Aircraft Co.</u>, 991 A.2d 859, 861 (N.J. Super. Ct. App. Div. 2010) (citing <u>Higgins v. Pascack Valley Hosp.</u>, 730 A.2d 327, 334 (N.J. 1999)).  The court must look first to the language of the statute; if the language is clear, it controls.  <u>Id.</u>  If the language is ambiguous, the court must "'seek to effectuate the fundamental purpose for which the legislation was enacted.'"  <u>Id.</u> (quoting <u>Klumb v. Bd. of Educ. of Manalapan-Englishtown Reg'l High Sch. Dist., Monmouth County</u>, 970 A.2d 354, 361 (N.J. 2009)).

Among other things, the purpose of the Practices Act was to "regulate the business relationship between brewers and wholesalers of malt alcoholic beverages . . . and protect beer wholesalers from unreasonable demands and requirements by brewers."  § 33:1-93.13(c).  As this Court has previously noted, the parties agree that the Practices Act governs their relationships and agree that Plaintiffs are "wholesalers" and Defendants are "brewers" as defined by the Practices Act.  <u>See</u> <u>Warren I</u>, 2007 WL 4554245, at *2.

The Practices Act prohibits a brewer from "terminat[ing] . . . a contract . . . with a wholesaler . . . except where the brewer establishes that it has acted for good cause and in good faith."  § 33:1-93.15(c)(1).  "Good cause" is defined as "failure to substantially comply with reasonable terms contained in a contract or agreement."  § 33:1-93.14.  The Act states further that

8

it is a violation for a brewer "to fail to act, during the term of the contract, agreement or relationship between [a brewer and a wholesaler] in a manner consistent with the covenant of good faith and fair dealing." § 33:1-93.15(c)(11).

> However, the Practices Act also provides:

> It shall not be a violation of this act for a successor brewer to . . . terminate, in whole or in part, its contract, agreement or relationship with a wholesaler, or the contract, agreement or relationship with a wholesaler of the brewer it succeeded, for the purpose of transferring the distribution rights in the wholesaler's territory for the malt alcoholic beverage brands to which the successor brewer succeeded, to a wholesaler or wholesalers that then distributes other products of the successor brewer in such territory, provided that the successor brewer or the second wholesaler or wholesalers first pays to the first wholesaler the fair market value of the first wholesaler's business with respect to the terminated brand or brands[.]

§ 33:1-93.15(d)(1). A "successor brewer" is defined as "any person, not under common control with the predecessor brewer, who by any means . . . acquires the business or malt alcoholic beverage brands of another brewer, or otherwise succeeds to a brewer's interest with respect to any malt alcoholic beverage brands." § 33:1-93.14. Additionally, the Practices Act creates a right of action for any brewer or wholesaler to sue "a brewer for violation of this act, or . . . a successor brewer in connection with a termination pursuant to [section 33:1-93.15(d)(1)]." § 33:1-93.18(a). Another relevant portion of the Act states that "any provision of a contract . . . that directly or indirectly requires or amounts to a waiver of any provision of this act, or that would relieve any person of any obligation or liability under this act . . . shall be a violation of this act and shall be null, void and of no effect." § 33:1-93.15(a). With these parameters in mind, the Court turns to the pending Motions.

### A. InBev's Motion for Summary Judgment (Doc. No. 88)

InBev USA asserts that is entitled to judgment as to all of the claims against it, and in the

alternative, that at a minimum it is entitled to judgment on Plaintiffs' request for punitive damages.

### 1.      Count Five: Breach of Contract[4]

As to the breach of contract claim in Count Five, InBev USA lodges that it is entitled to judgment on three grounds: 1) the distribution agreements expired by their own terms; 2) InBev USA had "good cause" to terminate the agreements because its duty to perform was discharged by the doctrine of impossibility/impracticability; or 3) the Practices Act should not be applied retroactively since it would work a manifest injustice.  InBev br. (88) at 6-13.  Plaintiffs counter that 1) the provision of the distribution agreements providing for termination was rendered null and void by the Practices Act; 2) the doctrine of impossibility/practicability does not apply because InBev USA created the impossibility for itself; and 3) InBev's retroactivity argument is without merit because the Act is not being applied retroactively, and even if it were, there is no manifest injustice.  Pl. br. (114) at 22-26.  The Court agrees with Plaintiffs and denies the Motion with respect to Count Five.

To state a claim for breach of contract, a party must allege 1) the parties entered into an agreement, 2) the plaintiff satisfied the terms of the agreement, 3) the defendant failed to satisfy at least one term of the agreement, and 4) the breach caused the plaintiff to suffer a loss.  Cargill Global Trading v. Applied Development Co., No. 03-5920, - - - F. Supp. 2d - - - -, 2010 WL 1568457, at *14 (D.N.J. Apr. 21, 2010); Coyle v. Englander's, 488 A.2d 1083, 1088 (N.J. Super. Ct. App. Div. 1985) (holding prima facie elements for breach of contract are a valid contract, defective performance, and resulting damages).  The oft-repeated elements of a basic contract are

---

[4] InBev USA's briefing begins with Count Five and so the Court's does the same.

offer, acceptance, and consideration.  See Smith v. SBC Commc'ns, Inc., 839 A.2d 850, 861

(N.J. 2004).  The parties do not dispute that they had a valid agreement or that Plaintiffs did not

violate the agreement.  The dispute is over whether InBev USA breached the distribution

agreements by failing to supply the beer after February 2006 (and if so, whether Plaintiffs

suffered a loss).

### a.    Own Terms

InBev USA's principal defense to the breach of contract claim is that the distribution

agreements otherwise expired by their own terms.  AB br. at 6.  Specifically InBev USA points to

§ 4.02 of each the distribution agreements, which states:

> Wholesaler also agrees and acknowledges that Supplier may end its relationship with a
> foreign manufacturer or seller as to one or more Supplier Products at any given time.
> Accordingly, and for whatever reason, should Supplier cease functioning as the United
> States Supplier for any one or more Supplier Products, Wholesaler agrees that it shall
> have no claim for compensation or cause of action against Supplier for damages of any
> kind whatsoever and this Agreement shall terminate immediately but only with regard to
> such Supplier Products that Supplier ceases to import.

Bonaventure decl., Exs. A, B, C.  What InBev fails to appreciate, however, is this Court's prior

holding that if AB is not a successor brewer, § 4.02 "would create a means of terminating the

contracts not permitted by the Practices Act."  See Warren I, 2007 WL 4554245, at *5.  In other

words, § 4.02 is seemingly void as being in conflict with the Practices Act.  See  § 33:1-93.15(a)

(stating any agreement that relieves a person of obligations or liability under the Act is "null,

void and of no effect").  A distribution agreement can only be terminated on two grounds: 1)

good cause, and 2) where a successor brewer satisfies the requirements of the Practices Act.  See

§ 33:1-93.15(c)(1); 33:1-9.15(d)(1); see also Warren I, 2007 WL 4554245, at *5.  In this dispute,

§ 4.02 creates an automatic termination where a successor brewer takes over InBev USA's

interest, regardless of whether the successor pays FMV to the distributors.  This manner of termination directly conflicts with § 33:1-93.15(d)(1), which thus renders § 4.02 void.[5] Therefore, InBev USA cannot rely on § 4.02 to relieve it of liability for the breach of contract claim.[6]

### b.    Good Cause: Impossibility/Impracticability

Notwithstanding, InBev USA insists that even if § 4.02 does not apply, it otherwise had good cause to terminate the distribution agreements.  InBev br. (88) at 9.  InBev USA argues that because its was impossible for it to perform under the agreements (i.e., it no longer had the right to control the terminated brands and thus could not supply them), it therefore had good cause to end the agreements.  InBev br. (88) at 9-10.  InBev USA expressly relies on the doctrine of impossibility/ impracticability.

Impossibility or impracticability is a complete defense where "a fact essential to performance is assumed by the parties but does not exist at the time of performance."  Connell v. Parlavecchio, 604 A.2d 625, 627 (N.J. Super. Ct. App. Div. 1992).  InBev USA bases its defense in particular on the Restatement (Second) on Contracts § 261 (1981), which New Jersey has adopted.  See M.J. Paquet, Inc. v. New Jersey Dep't of Transp., 794 A.2d 141, 148-49 (N.J.

---

[5] InBev USA insists that the Practices Act should not be given retroactive effect to apply to the distribution agreements because it would be "manifestly unjust."  InBev br. (88) at 12. However, the Act is not being "retroactively" applied.  Under § 33:1-93.15(b), on-going contracts that were in effect 60 days after the effective date of the Practices Act (March 1, 2006) were deemed renewed.  Thus, application of the Practices Act here is to the renewed (as a matter of law) distribution agreements, not to the distribution agreements as consummated before the Practices Act became effective.  In other words, the law is not being applied retroactively.

[6] To be clear, the Court's holding here means that if the requirements of § 33:1-93.15(d)(1) were satisfied, Plaintiffs do not have a cause of action for breach.  But if they were not met, § 4.02 does not supply a secondary defense for InBev USA.

2002); Connell, 604 A.2d at 627.  Section 261 provides:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

However, as Plaintiffs point out, the doctrine of impossibility/impracticability does not apply where the impossibility is of the party's own making.  See Pl. br. at 25.  Indeed, section 261 itself states that the impossibility cannot be the result of the party's own fault.  Restatement (Second) on Contracts § 261; see also Directions, Inc. v. New Prince Concrete Constr. Co., 491 A.2d 1347, 1349 (N.J. Super. Ct. App. Div. 1985).

In this dispute, genuine issues of material fact exist as to whether InBev USA's inability to deliver the European Brands (to all Plaintiffs) and the Rolling Rock Brands (to Peerless) was the result of its own actions.  InBev USA itself admits that it caused the sale of the Rolling Rock Brands rights to AB.  See InBev USA 56.1 stmt. (88) at ¶ 5.  In other words, it created the impossibility.  As to the distribution of the European Brands, Plaintiffs have put forth viable evidence that agents of InBev USA were actively involved in the transaction to shift the import rights for those brands from InBev USA to AB.  See Pl. 56.1 stmt. (114) at ¶¶ 17-33.  While InBev USA argues that the transfer of the import rights was not their own doing, see InBev USA reply (139) at 8, the above evidence shows that this is a disputed question of fact.  In effect, the Court cannot say as a matter of law based on the present record that InBev USA did not bring about the impossibility of its performance.

Therefore, the Court must deny InBev USA's Motion as to the breach of contract claims in Count Five.

### 2.      Counts One and Three: Violation of the Practices Act

Before addressing InBev USA's Motion with respect to Counts One and Three, the Court must first construe Plaintiffs' claims.  Exactly what Plaintiffs are alleging in Count One is clear; what they are alleging in Count Three is less so.  Generally, the Court believes that between these Counts, Plaintiffs make two general claims: 1) the termination was invalid because a) no good cause existed for it, and b) AB did not comply with § 33:1-9.15(d)(1); and 2) before the termination, InBev USA breached the duty of good faith and fair dealing by a number of acts. Those acts include the following: a) authorizing AB to interfere with the distribution agreements, b) improperly sharing proprietary information, c) authorizing termination without notice, d) failing to observe reasonable commercial practices, e) inducing inventory build-up, f) imposing unreasonable and coercive deadlines, and g) failing to timely specify the exact amount of the FMV offer.  See Amd. Compl. at ¶ 72.

InBev USA maintains that it is entitled to summary judgment as to all of these claims for a number of reasons.  First, it claims that AB is a successor brewer who paid FMV with respect to the terminated brands.  Second, InBev USA maintains that it acted with good cause and in good faith because it lost the ability to supply the European Brands without fault of its own and that no evidence exists of bad faith.  Third, InBev USA insists that the notice requirement did not apply.  Fourth, InBev USA asserts that it did not engage in coercive tactics because no evidence exists that it "authorized" AB to take any act, the inventory build-up was the result of normal year-end sales, and the exchange of proprietary information was authorized.  InBev br. (88) at 13-23.  Plaintiffs challenge each of these assertions, which is explored more fully below.  In view of the present record before the Court, InBev's Motion is granted in part and denied in part with

respect to Counts One and Three.

**a.      Sucessor Brewer**

Plaintiffs counter InBev USA's charge that AB complied with § 33:1-9.15(d)(1) by asserting that AB was not a successor brewer.  Pl. br. (114) at 9-12.  Plaintiffs' specific challenge misses the mark, but notwithstanding, the Court must deny summary judgment because whether Plaintiffs were paid FMV is a disputed issue of material fact.

A "successor brewer" is statutorily defined as "any person, not under common control with the predecessor brewer, who by any means . . . acquires the business or malt alcoholic beverage brands of another brewer, or otherwise succeeds to a brewer's interest with respect to any malt alcoholic beverage brands."  § 33:1-93.14.  This Court previously noted that whether AB was a successor brewer depended on the factual question of whether it was under common control with InBev USA.  See Warren I, 2007 WL 4554245, at *1.  But what Plaintiffs assert is that common control is not the only issue; rather they insist that InBev USA was really an extension of InBev nv/sa, and thus a second issue is whether AB really succeeded to the former brewer's entire interest with respect to the terminated brands.  Pl. br. (114) at 10.  In support, Plaintiffs offer that the two InBev entities were really a "single corporate soup" wherein several key people overlapped and held positions with both entities.  Pl. br. (114) at 3-6.  As InBev USA accurately points out, Plaintiffs are implicitly asking the Court to pierce the corporate veil and determine that InBev USA was really just InBev nv/sa.  InBev reply (139) at 4.

But the Court will not entertain Plaintiffs' implied request.  As a practical matter, Plaintiffs never actually asked the Court to pierce the corporate veil.  If that is what they wanted, they should have briefed the issue and expressly suggested that the tool be employed.  Moreover,

15

it appears that even if they had requested such an inquisition into the true nature of these two business entities, they put forth little if any evidence to support veil piercing.[7]  See Ramirez v. STi Prepaid LLC, 644 F. Supp. 2d 496, 507 (D.N.J. 2009) (noting relevant factors in veil piercing inquiry).  Absent such support, the Court must take the record as presented at face value and determine if AB were a successor brewer.  The proper questions in that determination are who was the last brewer, who is the new brewer, are they under common control, and did the new brewer succeed to the last brewer's interest with respect to the brands?  See § 33:1-93.14.

The Court can answer those questions as follows.  The last brewer was InBev USA.  See Bonaventre decl., Exs. A, B, C (distribution agreements between Plaintiffs and InBev USA). The new brewer is AB.  See Bonaventre decl., Ex. D (asset purchase agreement between AB and InBev USA), Ex. G (import agreement between AB and InBev nv/sa).  AB and InBev USA were not under common control.  Compare AB 56.1 stmt. (90) at ¶ 5 (stating no common ownership between AB and InBev USA), with Pl. 56.1 responsive stmt. (111) at ¶ 5 (agreed).  AB succeeded to InBev USA's interest with respect to the terminated brands.  See Bonaventre decl. Ex. D (asset purchase agreement between AB and InBev USA), Ex. G (import agreement between AB and InBev nv/sa).  Therefore, AB is a successor brewer.

Nevertheless, InBev USA is not entitled to summary judgment for the termination.  As the movant for summary judgment, InBev USA bears the burden of showing that no genuine

---

[7] Plaintiffs' reliance on Esber Beverage Company v. InBev USA, LLC, No. 2006CA00113, 2007 WL 657691 (Ohio. Ct. App. Mar. 5, 2007) for the proposition that AB is not a successor brewer is misplaced.  See Pl. br. (114) at 11 n.3.  Esber merely holds that under Ohio law, InBev USA was the same brewer as the former entities with which it merged.  2007 WL 657691, at *8.  Such are not the facts here as the successor brewer at issue is a clearly a separate corporation that in no way consolidated or merged its operations with those of the former brewer.

issues of material fact exist for trial.  To avoid liability for the termination under the terms of §
33:1-9.15(d)(1), InBev USA must show that not only was AB a successor brewer, but also that it
paid FMV to the Plaintiffs.  As is discussed more fully below with respect to AB's Motion on the
same grounds, see infra § III.B.1, genuine issues exist as to whether Plaintiffs truly received
FMV.

Therefore, the Court must deny InBev's Motion as to Counts One and Three to the extent
InBev USA relies on the protections of § 33.1-9.15(d)(1) to justify the termination of the
distribution agreements.

### b.      **Good Cause, Good Faith and Fair Dealing**: **Coercive and Abusive Tactics**

Next InBev USA maintains that it is entitled to summary judgment because it acted with
good cause and in good faith with respect to the European Brands.  InBev USA asserts it lost the
ability to supply the European Brands without fault of its own and further asserts that no
evidence of bad faith exists.  InBev br. (88) at 15-16.  Plaintiffs respond that InBev USA
breached its duty of good faith and fair dealing by engaging in a number of coercive and abusive
tactics, including authorizing AB to interfere in the contractual relationship, improperly sharing
proprietary information, and inducing inventory buildups.  Pl. br. (114) at 12-22.  The Court
finds that InBev USA has not shown good cause for the terminations, but finds no evidence
exists that it breached its duty of good faith and fair dealing.

The Court must first quickly dispose of InBev USA's argument that it acted with good
cause in terminating the distribution agreements with respect to the European Brands.  As
discussed at length above, the termination may have come about as a result of InBev USA's own

17

actions, see supra § III.A.1.b, and thus a genuine issue of material fact precludes summary judgment.  But the same is not true of whether InBev USA breached the implied duty of good faith and fair dealing.

A brewer violates the Practices Act by failing to act during the term of a relationship with a distributor consistent with the covenant of good faith and fair dealing.  § 33:1-93.15(c)(11). New Jersey law implies a duty of good faith and fair dealing into every contractual relationship. Wilson v. Amerada Hess Corp., 773 A.2d 1121, 1126 (N.J. 2001).  Good faith has not been precisely defined, but it at least includes "conduct that does not violate community standards of decency, fairness or reasonableness."  Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 864 A.2d 387, 395 (N.J. 2005) (quotations removed).  The covenant of good faith and fair dealing requires that parties to a contract must refrain from doing "'anything which will have the effect of destroying or injuring the right of the other party to receive' the benefits of the contract."  Id. (quoting Palisades Props. Inc. v. Brunetti, 207 A.2d 522, 531 (N.J. 1965)).  An action for breach of the covenant requires proof of "'bad motive or intention.'"  Id. at 396 (quoting Wilson, 773 A.2d at 1130); see also Seidenberg v. Summit Bank, 791 A.2d 1068, 1077 (N.J. Super. Ct. App. Div. 2002) ("To determine what is considered a good faith performance, the court must consider the expectations of the parties and the purposes for which the contract was made.").  "The party claiming a breach of the covenant of good faith and fair dealing 'must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.'"  Brunswick, 864 A.2d at 396 (quoting 23 Williston on Contracts § 63:22, at 513-14 (Lord ed. 2002)).

18

While in the Amended Complaint Plaintiffs allege several instances of purported bad faith conduct, see Amd. Compl. at ¶ 72, in their brief in opposition, Plaintiffs focused their attention on three groups of acts: 1) authorizing AB to interfere in the contractual relationship, 2) improperly sharing confidential and proprietary information, and 3) inducing Plaintiffs to build-up inventory despite knowing that termination of the distribution agreements was forthcoming. Pl. br. (114) at 14, 16, 21.[8]  InBev USA posits that the factual record does not support Plaintiffs' allegations.  See InBev br. (88) at 16, 18-23; Inbev reply (139) at 6-13.  Be that as it may, the Court is compelled to grant summary judgment for a different reason.  As InBev USA repeatedly points out, Plaintiffs have failed to show any damages from the alleged breach of the duty of good faith and fair dealing.  See InBev br. (88) at 21, 23; InBev reply (139) at 12-13.

A cause of action for breach of the covenant of good faith and fair dealing requires resultant loss or damages.  Cf. Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 589-90 (N.J. 1997).  As such, even assuming true that InBev USA allowed AB to interfere with and terminate the distribution agreements, that InBev USA disseminated confidential sales information

---

[8] Count One of the Amended Complaint also alleges that InBev USA failed to give proper notice or an opportunity to cure deficiencies.  Amd. Compl. at ¶ 70; see § 33:1-93.15(c)(3) ("The terms or provisions of a contract or agreement between a brewer and wholesaler shall not permit a brewer, and it shall be a violation of this act for a brewer . . . . to terminate, cancel or refuse to renew a contract, agreement or relationship with a wholesaler, in part or in whole, without first giving the wholesaler written notice setting forth all of the alleged deficiencies on the part of the wholesaler and giving the wholesaler a reasonable opportunity of not more than 120 days to cure the alleged deficiencies; provided, however, that such period for cure may be increased or reduced to a commercially reasonable period by an order of a court in this State in a proceeding in which each party shall bear its own costs and expenses [.]").  As InBev USA points out, and which Plaintiffs did not oppose, the notice requirement is inapplicable in this dispute because the distribution agreements were not terminated for performance deficiencies.  See InBev br. (88) at 16-17.  The Court agrees and grants summary judgment as to the notice deficiency claims in Count One.

regarding the European Brands, and that Plaintiffs were induced into large inventory buildups,

they have not put forth any evidence of a loss.  As best as the Court can tell, Plaintiffs proffer that

the report of Robert Taylor IV clearly spells out the harm they suffered.  See Pl. br. (114) at 21

(citing Plaintiffs' respective answers to interrogatories, which in turn cite to the Taylor report).

But what that report reveals is not harm from these alleged breaches, but a mere failure by AB to

pay sufficient FMV.[9]  Whatever difference, if any, exists between what Plaintiffs were paid and

what they were owed is not a loss flowing from the alleged breach of the covenant of good faith

and fair dealing.  At most, InBev USA's alleged breach caused Plaintiffs' contracts to be

terminated, but they have been compensated for that termination.  While now Plaintiffs argue

that that compensation was insufficient, the shortfall is not a result of InBev USA's purported

breach.  In short, Plaintiffs have not shown any evidence of damage.

Therefore, the Court must grant InBev USA's Motion as to the portions of Counts One

and Three asserting breach of the covenant of good faith and fair dealing.

### 3.      Count Four: Conspiracy

InBev USA next moves for summary as to the conspiracy to violate the Practices Act

claim in Count Four.[10]  InBev br. (88) at 24.  InBev USA makes several challenges to the

conspiracy claim, including that there was no unlawful act, no evidence of an agreement exists,

_____

[9] Also, Taylor's report also details that Plaintiffs subsequently sold the terminated brands that they were allegedly induced to build-up, thus further supporting that they did not suffer harm.  See Taylor report at 2.

[10] Count Three can also be read to state a conspiracy claim, and indeed that is how AB has interpreted it.  See AB br.(90) at 29.  The Court will treat InBev USA's Motion as to the conspiracy claim in Count Four as also being made as to any conspiracy allegations that exist in Count Three.

and Plaintiffs have not shown damages from the alleged conspiracy.  See InBev br. (88) at 24-27.

Plaintiffs offer that circumstantial evidence supports that InBev USA and AB worked together

for the purpose of terminating the distribution agreements, causing inventory build-up, and

sharing proprietary information, and also offer that they were injured by the conspiracy because

their distribution rights were prematurely terminated, they incurred costs in building up

inventory, and the information sharing allowed their competitors to gain an advantage.  See Pl.

br. (114) at 27-28.  The Court finds that Plaintiffs have failed to demonstrate any damages

flowing from the alleged conspiracy.

A civil conspiracy under New Jersey law is the "combination of two or more persons

acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the

principal element of which is an agreement between the parties to inflict a wrong against or an

injury upon another, and an overt act that results in damage."  LoBiondo v. Schwartz, 970 A.2d

1007, 1029-30 (N.J. 2009) (quotations removed); see also Farris v. County of Camden, 61 F.

Supp. 2d 307, 330 (D.N.J. 1999).  As is relevant here, absent damages from the conspiracy, no

cause of action arises.  See Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l

Bank, 395 A.2d 222, 236 (N.J. Super. Ct. App. Div. 1978) ( "The essential element of [civil

conspiracy] is not the conspiracy but the damage inflicted pursuant to it.").  As just discussed

regarding the good faith and fair dealing claim, even assuming that AB and InBev USA

conspired together to cause the inventory build-up, the sharing of information, and to permit AB

to interfere with the distribution agreements, Plaintiffs have not demonstrated any injury from

that conspiracy.  Plaintiffs sold the inventory at a profit.  See Taylor report at 2.  Plaintiffs were

paid over $25 million for the termination of their contracts (though they dispute whether that

amount was sufficient, but at worst they will be paid the proper FMV).  See Taylor report at 2.

Finally, they did not show that they were harmed by the information shared regarding brands they

no longer sell other than through a general allegation in their papers of nonspecific harm.  See Pl.

br. (114) at 28.

Therefore, the Court grants InBev USA's Motion as to Count Four (and any conspiracy

claims in Count Three).

### 4.    Punitive Damages

Finally, InBev USA moves for summary judgment as to the prayer for punitive damages.

InBev USA argues first that punitive damages are not available for breach of contract claims, and

argues that Plaintiffs have failed to otherwise produce clear and convincing evidence entitling

them to such damages.[11]  InBev br. (88) at 27-30.  Plaintiffs did not respond to InBev USA's

contract claims, but did respond that the record shows that InBev USA deliberately manipulated

the Plaintiffs to their detriment.  Pl. br. (114) at 29.  The Court disagrees and grants the Motion.

Punitive damages are available in New Jersey under the Punitive Damages Act, N.J. Stat.

Ann. § 2A:15-5.9 et seq.  Under the Act, punitive damages may be awarded when a plaintiff

proves by clear and convincing evidence that he suffered harm from a defendant's acts or

omissions that were "actuated by actual malice or accompanied by a wanton and willful disregard

for persons who foreseeably might be harmed by those acts or omissions."  § 2A:15-5.12(a).  The

---

[11] In its reply brief, InBev USA also argues that punitive damages are not available
because they are not provided for by the Practices Act.  See InBev reply (139) at 15.  However,
since InBev USA raises this argument for the first time in its reply, the Court will disregard it and
assume that punitive damages are otherwise available in this dispute.  See Aiellos v. Zisa, No.
09-3076, 2009 WL 3486301, at *1 (D.N.J. Oct. 20, 2009) (holding arguments raised for the first
time in reply are waived).

Act does not permit new claims for punitive damages that were not previously available when it was enacted.  § 2A:15-5.15.  For example, punitive damages are not available for breach of contract claims.  See <u>Printing Mart-Morristown v. Sharp Elecs. Corp.</u>, 563 A.2d 31, 38 (N.J. 1988).  Thus, InBev USA is correct that Plaintiffs cannot seek punitive damages for any alleged breach of contract.  But InBev USA is also correct that Plaintiffs are not entitled to punitive damages for *any* claim.

The record here is devoid of any evidence of actual malice or wanton and willful disregard for other persons by InBev USA.  Plaintiffs make the incredible argument that even though they were paid in excess of $25 million for a termination that the Legislature fully contemplated and permits under certain circumstances, <u>see</u> § 33:1-93.15(d)(1), InBev USA somehow acted with malice in terminating the distribution rights.  The Court simply cannot subscribe to this belief.

Therefore, InBev USA's Motion is granted as to the prayer for punitive damages.

**B.      AB's Motion for Summary Judgment (Doc. No. 90)**

Like InBev USA, AB also asserts that it is entitled to judgment as to all of the claims against it.

**1.      Count Two: Violation of the Practices Act**

AB first asserts that it did not violate the Practices Act, as alleged in Count Two, because it was a successor brewer and it paid the requisite FMV to the Plaintiffs.  AB br. (90) at 9-29.  AB maintains that if the Court agrees with this assertion, it should also be granted judgment as to Counts Three, Four, and Six.  AB br. (90) at 29, 33.  Thus analysis begins with Count Two.

AB offers a twofold construction of why it has not violated the Practices Act.  It first

offers that it is a successor brewer because, as is relevant, it was not under common control with InBev USA.  It then offers that under the provisions of § 33:1-93.15(d)(1), as a successor brewer AB did not violate the Practices Act because it first paid the Plaintiffs FMV with respect to the terminated brands before terminating their distribution rights.  AB br. (90) at 11, 14.  Plaintiffs dedicated much of their brief in opposition to refuting that they were paid FMV.  See Pl. br. (111) at 5-27.  Plaintiffs also challenge that AB was a successor brewer.  Pl. br. (111) at 28.  While the Court finds that AB is a successor brewer (as discussed above, see supra § III.A.2.a), the Court finds that genuine issues of material fact exist as to whether AB paid FMV.

AB's specific argument is that it is entitled to judgment as a matter of law because it paid "at least" FMV, as shown by comparable transactions in New Jersey.  See AB br. (90) at 14.  AB seems to infer that if this Court determines that AB offered a reasonable amount, then the Court can enter judgment as a matter of law.  This is simply not so.

FMV is a statutorily defined term and it means "the price at which the asset would change hands between a willing seller and a willing buyer when neither is acting under compulsion and when both have knowledge of the relevant facts."  § 33:1-93.14.  To avoid liability under the Practices Act, a successor brewer must first pay the wholesaler "*the* fair market value of the first wholesaler's business with respect to the terminated brands[.]"  § 33:1-93.15(d)(1) (emphasis added).  The emphasized article is important.  The New Jersey Legislature could just have easily omitted the "the" and left open the possibility that "a" FMV offer and tender are sufficient.  But it did not do so and the Court must give effect to the unequivocal language of the Practices Act as enacted.  Fletcher, 991 A.2d at 861.

Doing so, the Court interprets § 33:1-93.15(d)(1) to require a successor brewer to do

more than show a reasonable tender.  The successor brewer must show *the* price at which willing parties under the circumstances would have agreed.  This interpretation means that whether FMV was offered will almost always be a question of fact for a jury (absent of course a complete failure of the plaintiff to put on any evidence of FMV).  But this does not trouble the Court since this result seems to have been the intent of the Legislature.  It could have alternatively defined FMV in terms that permitted objective determination of FMV as a matter of law.  Cf. N.J. Stat. Ann. § 58:10-23.11b (definitions section of the Spill Compensation and Control Act, N.J. Stat. Ann. § 58:10-23.11 et seq., defining "fair market value" as "the invoice price of the hazardous substances transferred, including transportation charges; but where no price is so fixed, 'fair market value' shall mean the market price as of the close of the nearest day to the transfer, paid for similar hazardous substances, as shall be determined by the taxpayer pursuant to rules of the director").  Having not done so, the Court can only conclude that the Legislature intended that the question of FMV be posed to a jury.

This conclusion is not to suggest that the Court deems AB's tender of over $25 million was somehow deficient.  Certainly it seems reasonable that AB's payment is *a* FMV offer and tender.  See AB br. (90) at 17-18.  Indeed, the history of transactions in New Jersey reveals that a 3.3 multiplier under the market multiples approach has been and continues to be a fair deal to some brewers and wholesalers.  But unfortunately for AB on this Motion, the Practices Act speaks of *the* FMV, not *a* FMV.  The comparable FMV's offered by AB are based on the facts and circumstances of each of those transactions and on the mindset of the particular sellers and buyers.  This Court is not in a position to compare the circumstances of those transactions to this one and reach a determination of what is the proper value; that analysis is squarely within the

25

province of the jury.  This Court can only look to see if facts exist on which a reasonable juror

could find for the Plaintiffs.  Having reviewed Plaintiffs' evidence, in particular the Taylor

report, the Court is compelled to say that yes a reasonable juror could find for Plaintiffs and

determine that $65 million was the FMV.

Therefore, the Court must deny AB's Motion as to Count Two.

### 2.      Counts Three & Four: Conspiracy to Violate the Practices Act

In the alternative, AB further asserts that it is otherwise entitled to judgment as to Counts

Three and Four because no evidence of an agreement or conspiracy exists between it and InBev

USA.  AB br. (90) at 29-30.  For the reasons express above, see supra § III.A.3, AB's Motion is

granted as to the conspiracy claims in Counts Three and Four.

### 3.      Count Six: Tortious Interference

Next, as to the tortious interference claim in Count Six, AB posits that it is entitled to

judgment because there was no contract between InBev USA and the Plaintiffs on February 24,

2007 (when AB allegedly interfered), and regardless, Plaintiffs have not produced evidence of

the requisite malice.  AB br. (90) at 33-35.  Plaintiffs answer by asserting that the InBev USA

distribution agreements were still in full effect, and asserting further that the record contains

sufficient evidence of malice.  Pl. br. (111) at 29-30.  The Court will grant the Motion.

A claim for tortious interference with an existing contract requires a plaintiff to allege: (1)

an existing contractual relationship; (2) intentional interference with that relationship; (3) the

malicious nature of the interference; and (4) damages resulting from the interference.  Matrix

Essentials, Inc. v. Cosmetic Gallery, Inc., 870 F. Supp. 1237, 1248 (D.N.J. 1994), aff'd, 85 F.3d

612 (3d Cir. 1996).  "The term 'malice' does not require ill will toward the plaintiff, but rather 'is

defined to mean that the harm was inflicted intentionally and without justification or excuse.'"
Id. (quoting Printing Mart-Morristown, 563 A.2d at 37).  Malicious conduct violates "standards
of socially acceptable conduct."  Id. (citations and internal quotations omitted).

AB's first assertion that it did not interfere with any contracts because none existed can
be quickly dismissed.  AB relies on § 4.02 of the distribution agreements, which this Court held
above is of no effect.  See supra § III.A.1.a.  AB's second argument is more compelling.

AB expressly argues that no proof of malice, i.e., intent without justification or excuse,
exists because any interference with the distribution agreements was for legitimate business
reasons.  AB br. (90) at 34.  What AB is really asserting is justification for its actions.  Despite
Plaintiffs' protestations that the record shows that AB desired to terminate InBev distributors
wherever possible, that AB shared commercially sensitive information, and that AB flatly refused
to negotiate the FMV offer, see Pl. br. (111) at 30, Plaintiffs have not shown that AB's actions
were not excused.  The Practices Act clearly permits successor brewers to transfer distribution
rights to its own wholesalers.  See § 33:1-93.15(d)(1).  The Practices Act further does not require
any kind of negotiation before a FMV offer and tender is made.  Compare § 33:1-93.15(d)(1),
with Cal. Bus. & Prof. Code. § 25000.2(d), and Okla. Stat. Ann. tit. 37, § 163.18E(E)(3)(a).  As
to the information sharing, Plaintiffs agree that they voluntarily shared this information with
InBev USA (through a third party) without any confidentiality agreement.  Compare AB 56.1
stmt. (90) at ¶ 56; Pl. 56.1 responsive stmt. (111) at ¶ 56.  Their complaints now that they had
some expectation of privacy is unavailing.[12]

_____

[12] Furthermore, regardless of any of the above analysis, Plaintiffs' tortious interference
claim cannot survive because there is no evidence of damages resulting from the interference.
Plaintiffs either did receive or will receive FMV for their rights; either way they are guaranteed

Therefore, the Court grants AB's Motion as to the tortious interference claim in Count Six.

**C.     Plaintiffs' Motion for Summary Judgment as to AB's Counterclaims (Doc. No. 85)**

Finally, Plaintiffs move for summary judgment on the four counterclaims raised by AB.

**1.     Counterclaim One: Unjust Enrichment**

Plaintiffs first assert that they are entitled to judgment as to the unjust enrichment claim in Counterclaim One because they had a lawful right to continue selling the terminated brands and they had a good faith belief that such sales were permitted.  Pl. br. (85) at 9.  AB points out that since Plaintiffs were paid FMV for the terminated brands, permitting them to retain the profits from post-termination sales will result in a double recovery.  AB. br. (118) at 15.  The Court will deny the Motion in part and grant it in part as to Counterclaim One.

At the outset, the Court notes that the unjust enrichment claim perhaps is really two different claims: 1) one based on the post-termination sales by all Plaintiffs, and 2) another based on post-termination tap-switching efforts by Plaintiff Peerless.  The Court will address them separately.

Unjust enrichment is an equitable theory of recovery centered on the principle that "a person shall not be allowed to enrich himself unjustly at the expense of another." Assocs. Commercial Corp. v. Wallia, 511 A.2d 709, 716 (N.J. Super. Ct. App. Div. 1986).  A plaintiff alleging unjust enrichment must show two things: 1) the defendant received a benefit, and 2) retention of the benefit without payment would be unjust. VRG Corp. v. GKN Realty Corp., 641

_____

not to be harmed.

A.2d 519, 526 (N.J. 1994).

### a. Post-Termination Sales

The Court is perplexed how Plaintiffs honestly argue that they are entitled to summary judgment as to the unjust enrichment claim for post-termination sales. Payment for the fair market value of the terminated brands necessarily includes payment for future profits from present (and future) inventory. Cf. Cooper Distrib. Co. v. Amana Refrigeration, Inc., 63 F.3d 262, 278 (3d Cir. 1995) (holding future earnings are incorporated in determining present value of a franchise); Eateries, Inc. v. J.R. Simplot Co., 346 F.3d 1225, 1236 (10th Cir. 2003) ("[F]air market value '*necessarily* incorporate[s] expected future profits." (quoting S. Colorado MRI, Ltd. v. Med-Alliance, Inc., 166 F.3d 1094, 1100 (10th Cir. 1999)). Perhaps the best evidence of this conclusion is that Plaintiffs' **own expert** opines that when the proper FMV is paid to them, it must be offset by the subsequent sales of existing inventory. See Taylor report at 2. Clearly Plaintiffs received a benefit (profits from post-termination sales), and retention of that benefit would be unjust given that AB paid (or will be required to pay at the end of this litigation) full FMV.[13] Permitting them to retain the profits would result in an impermissible double recovery.

Therefore, Plaintiffs' Motion must be denied as to Counterclaim One regarding the post-termination sales of inventory.

### b. Peerless Tap-Switching

The Court however will grant Plaintiffs' Motion with respect to the tap-switching efforts

---

[13] The parties also dedicated some effort to arguing why or why not the post-termination sales were lawful. However, whether or not the post-termination sales were lawful does not govern whether Plaintiffs received compensation for existing inventory and whether retention of the profits from subsequent sales of that inventory was unjust.

by Peerless.  Assuming that AB actually pled this claim (which is disputed and discussed at length below), the heart of the claim is that Peerless was unjustly enriched by retaining the FMV payment from AB while simultaneously removing AB taps from the market.  AB br. (118) at 27-28.  AB seemingly asserts that the FMV payment contemplated a certain volume of sales that Peerless could not subsequently diminish; in other words, Peerless was estopped from reducing AB's marketshare.  But as Plaintiffs correctly point out, construing FMV payment to preclude recovery of lost market presence is erroneous.  Pl. reply (128) at 6.

Among other intents of the Practices Act was " to provide a framework for the malt alcohol beverage industry that recognizes and encourages the beneficial aspects of competition[.]"  § 33:1-93.13(b).  Nothing about the Practices Act infers that a wholesaler, once bought out, should refuse to attempt to regain some of the marketplace for its remaining brands, i.e., that it should cease to compete.  In the context of an unjust enrichment claim, even assuming Plaintiffs tortiously interfered with the market, AB cannot show that it already paid Peerless to maintain the status quo.  This is not to say that it may not have a different cause of action, but it is to say that AB did not pay Peerless to sit idly by for some indeterminate period of time.  To construe payment of FMV under the Practices Act as a placeholder for the successor brewer in the marketplace is an absurd result.

Therefore, the Court will grant Plaintiffs' Motion as to Counterclaim One regarding Peerless's tap-switching efforts.

### 2.    Counterclaims Two and Three: Tortious interference

Plaintiffs next assert that they are entitled to summary judgment as to the tortious interference claims in Counterclaim Two (interference with wholesaler contracts) and

30

Counterclaim Three (interference with InBev import agreement).  Pl. br. (85) at 17-20.  Plaintiffs

contend that their actions were justified by "the rules of the game," (i.e., they were merely

competing), and that there is no evidence of malice or intent.  Pl. br. (85) at 18-19 (citing 49 N.J.

Prac., Business Law Deskbook § 19:24 (2008 ed.)).  AB responds that the rules of the game

require a terminated distributor to stop selling the brand in a given territory and sell the

remaining inventory to the new wholesaler.  AB br. (118) at 30.  AB further responds that

Plaintiffs' post-termination sales were unlawful, thus further in defiance of the rules of the game,

and they acted with clear intent.  AB br. (118) at 30, 32.  AB also points out that Peerless's tap-

switching effort was individually tortious.  AB br. (118) at 31.  The Court finds that genuine

issues of material fact prevent summary judgment as to Counterclaims Two and Three.

Before returning to the law of tortious interference, the question reserved above (see

supra note 13) regarding whether Plaintiffs' post-termination sales were lawful is critical to the

present inquiry, and thus the Court must enter the fray.  Upon review of the undisputed record

and law, the Court finds the post-termination sales were contrary to New Jersey law.

Under Title 33 (Intoxicating Liquors) of the New Jersey Statutes, only those licensed

distributors who are designated by the brand owner or its authorized agent are permitted to sell or

deliver any brand of alcoholic beverage in the State.  N.J. Stat. Ann. § 33:1-2(b).  Under

regulations of the Division of Alcoholic Beverage Control ("ABC"), no licensee "shall

knowingly sell, offer for sale, deliver, receive or purchase . . . any alcoholic beverage" unless a

manufacturer, importer, or wholesaler who owns the brand first files with the Director of the

ABC a schedule listing, among other things, the names and license numbers of the New Jersey

licensee distributors authorized to distribute the product at wholesale.  N.J. Admin. Code § 13:2-

31

33.1(a)-(b).  The Director of the ABC is tasked by the Legislature with the supervision of the

manufacture, distribution, and sale of alcoholic beverages.  N.J. Stat. Ann. § 33:1-3.  Seemingly

in the past when a distributor's distribution rights were terminated, the Director permitted the

terminated distributor to sell off its remaining inventory, notwithstanding that it was no longer a

registered distributor under § 13:2-33.1.  Pl. br. (85), Ex. W at 3 (advisory opinion from the

director of the ABC).[14]  But the Director's past practice was influenced by ambiguity in the

relevant laws that did not directly speak to whether post-termination sales were permitted.  See

Pl. br. (85), Ex. W at 3-4.  However, in the Director's view, the ambiguity ceased with the

passage of the Practices Act.  Pl. br. (85), Ex. W at 4.

      As the Director noted, and with which this Court concurs, the Practices Act seemingly

forecloses post-termination sales.  Pl. br. (85), Ex. W at 4 (citing § 33:1-93.18).  The Practice Act

speaks specifically on the issue of existing inventory in two provisions, § 33:1-93.18(c) and §

33:1-93.18(d).  Subsection c discusses the measure of damages when a distributor is terminated

for good cause, and subsection d discusses damages with respect to an immediate termination

under § 33:1-93.16.  Both sections contemplate that the terminated wholesaler can only seek

payment for existing inventory under the terms of the contract with the brewer.  See § 33:1-

93.18(c) ("Payment for inventory . . . owned . . . by the wholesaler in its operation as a

wholesaler for the brewer's products as provided for under the standards of a written contract or

_____

    [14] Plaintiffs challenge the import of the advisory opinion on several grounds.  See Pl. br.
(85) at 10-11.  Notwithstanding, while the Court is not bound by the opinion, and despite any
procedural deficiencies that led to it being produced, the Court finds the ABC opinion persuasive
authority for answering the pending question of first impression: Are post-termination sales
lawful?  Cf. Chevron, U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43
(1984); In re Carter, 924 A.2d 525, 503 (N.J. 2007).

written agreement . . . is deemed to be a reasonable liquidated damages provision under this act"); § 33:1-93.18(d) ("In the event of a termination under section 5 of this act, payment for inventory in the manner prescribed under the reasonable standards of a contract or agreement is reasonable compensation under this act.").  While these two provisions are by no means unequivocal on the matter of post-termination sales, coupling them with the provisions of N.J. Stat. Ann. § 33:1-2 and N.J. Admin. Code § 13:2-33.1, and with the Director's own reading of the statute that he is tasked with implementing by the Legislature, the Court is convinced that post-termination sales of inventory is unlawful.  Once a brewer supplies a new schedule to the Director, the old distributor is foreclosed from further sales.

Applied here, the record reveals that on February 1, 2007, AB notified the Director that effective February 24, 2007, Plaintiffs were no longer the authorized distributors of the European Brands.  See Wallach decl., Appendix B, Ex. 5 (letter from AB to ABC).  Thus after February 23, Plaintiffs were no longer lawfully able to sell those brands.  What is remarkable is that Plaintiffs themselves acknowledged this reality when they filed their verified complaint in the Superior Court on February 21, 2007, claiming that if their rights were terminated "the [Plaintiffs] would be holding large inventories of the European Brands that *they would not be able to sell on the market* . . . ."  Pl. br. (85), Ex. K at ¶ 58 (verified complaint seeking injunctive relief) (emphasis added).  If for no other reason, Plaintiffs should not be heard to argue before this Court that their post-termination sales were permitted when they previously argued the antipodal position before the Superior Court regarding the same issue.

Having thus determined that Plaintiffs' post-termination sales were unlawful, the Court can informedly turn to the merits of Plaintiffs' Motion with respect to the tortious interference

counterclaims.

### a.   Post-Termination Sales

As noted above, Plaintiffs contend that their post-termination sales were justified by "the rules of the game," i.e., they were merely competing, and that there is no evidence of malice or intent.  Pl. br. (85) at 18-19.  These arguments fail.  Plaintiffs seemingly knew as of February 21, 2007 when they filed the verified complaint seeking injunctive relief that post-termination sales were perhaps not permitted.  Thus there is some evidence that they knew that their competition with AB's licensed distributors was something more than run-of-the-mill business competition.[15]

Moreover, it can hardly be said that there is no evidence of intent or malice.  Plaintiffs clearly knew that their sales were made while other distributors had the right to sell in the area. See Pl. 56.1 stmt. (85) at ¶ 39.  Further, some evidence of malice exists because the post-termination sales were unlawful, a possibility that Plaintiffs recognized before undertaking the sales, and because seemingly Plaintiffs knew that their post-termination sales were outside the bounds of socially acceptable practice in the beer industry, see Matrix Essentials, Inc., 870 F. Supp. at 1248, given that never before had they engaged in post-termination sales.  See Pl. br.(85), Exs. E-G at ¶ 8 (affidavits of the Vice President of Sales and Marketing of Shore Point, Secretary and General Counsel of Warren Distributing, and General Manger of Peerless,

---

[15] Plaintiffs in part argue that they had a good faith belief that their sales were permitted (and thus it was fair competition) because they reached out to a deputy director of the ABC and to the head of the New Jersey Beer Wholesalers' Association to determine if post-termination sales were permitted.  Pl. br. (85) at 9.  Even assuming these things happened and can be proven, the Court is unclear why either contact convinced Plaintiffs that these sales were lawful. Furthermore, Plaintiffs themselves represented to a court in late February 2007 that they could not sell the on-hand inventory.  They cannot have it both ways: on the one hand arguing they believed their sales were lawful, while on the other arguing that the sales could not be consummated.

respectively, stating "If AB or its New Jersey wholesalers had paid [Plaintiffs] fair market value of the distribution rights to the InBev Brands, [Plaintiffs] would have sold its inventory of the InBev Brands to AB's New Jersey wholesalers, as was [their] ordinary business practice.").

Therefore, Plaintiffs' Motion is denied as to Counterclaims Two and Three regarding tortious interference and Plaintiffs' post-termination sales.

### b.    Peerless Tap-Switching

The Court likewise will deny the Motion as to the tortious interference claims regarding Peerless's tap-switching effort.  As an introductory matter, the Court will consider the claim as having been properly pled.  Regardless of whether AB is merely fleshing out its claim (as it argues, see AB br. (118) at 28), or adding an entirely new claim, this Court has broad discretion to permit "eleventh hour" amendments.  See Carr v. Gillis Associated Indus., Inc., 227 Fed. Appx. 172, 176 (3d Cir. 2007); see also Fed. R. Civ. P. 15(a)(2) (court should "freely give leave" to amend when justice requires).  Given that the claims regarding the tap-switching were fully explored during discovery and that Plaintiffs were fully aware of them (as evidenced by their briefing of the claim in their opening brief), to withhold consideration of the claims for not being pled would exalt form over substance.  Thus, the Court will consider the claims regarding the tap-switching efforts as having been properly pled.

Turning to the merits of the claim, Plaintiffs have not sustained their burden of showing no genuine issue exists for trial.  While Plaintiffs merely characterize Peerless's efforts as healthy, legitimate competition, and while Peerless was certainly not foreclosed from attempting to compete, the record contains evidence that Peerless stepped outside of the bounds of socially acceptable conduct.  See Matrix Essentials, Inc., 870 F. Supp. at 1248.  The record shows that

35

perhaps Peerless held itself out as an authorized seller of the European Brands, see Pl. 56.1 stmt. (85) at ¶ 39 (noting four month period of overlapping sales), while simultaneously inducing retail customers to switch to non-AB brands.  See Pl. 56.1 stmt. (85) at ¶¶ 32-33 (stating that Peerless approached tap customers and tried to convince them to switch brands at the same time that AB was trying to convince them not to switch).  The record further reveals that perhaps Peerless's efforts were not motivated by a desire to fairly compete, but by a desire to take advantage of the short term confusion to inflict "pain" and "misery" on AB.  See Wallach decl., Appendix B, Ex. 2 (email from Scott Beim of Peerless stating, inter alia, "A steady adherence to our plan will cause all the pain you describe.  We need to remove [AB's] growth engins [sic] during this short window.").

Therefore, Plaintiffs' Motion is denied as to Counterclaims Two and Three regarding tortious interference and Peerless's tap-switching efforts.

### 3.   Counterclaim Four: Violation of the Practices Act & Administrative Code

Lastly, Plaintiffs move for summary judgment as to Counterclaim Four, which alleges violations of the Practices Act and the Administrative Code.  Plaintiffs insist that the Practices Act does not restrain wholesalers – it only limits the conduct of brewers – and further insist that the Administrative Code does not bar their actions.  Pl. br. (85) at 20-21.  Plaintiffs also suggest that the Administrative Code does not create liability here, since its only purpose was to "insure tax integrity."  Pl. reply (128) at 13-14 (quoting Joseph H. Reinfeld, Inc. v. Schieffelin & Co., 466 A.2d 563, 568-69 (N.J. 1983)).  AB counterpoints that Plaintiffs' proposed interpretation of the Practices Act would lead to absurd results, given that the Act was intended to govern both

36

brewers' and wholesalers' actions.  AB br. (118) at 33.  Regarding the Administrative Code

claim, AB proffers that the Code is clear in prohibiting post-termination sales.  AB br. (118) at

34-35.  The Court will grant the Motion as to both claims.

### a.    Practices Act

Plaintiffs position that the Practices Act does not provide an express cause of action for

an aggrieved brewer is correct.  In reviewing the Practices Act, the Court is tasked with

discerning and furthering the Legislature's intent.  See Klumb, 970 A.2d at 359-60.  Here,

notwithstanding the myriad sections AB cites that create wholesaler duties, see AB br.(118) at

33, the relevant inquiry should be on the only section of the Practices Act wherein the Legislature

unequivocally supplied a statutory cause of action: § 33:1-93.18.  Subsections a-d of that section

only create liability for a brewers' breach:

> • a: "Any brewer or wholesaler may bring an action *against a brewer* for violation of this act, or *against a successor brewer* in connection with a termination" (emphasis added);

> • b: "Without limiting the provisions of subsection a. of this section, if *a brewer* violates paragraph (1), (2) or (3) of subsection c. of section 4 of this act, the injured *wholesaler*'s reasonable damages shall include the fair market value of the wholesaler's business with respect to the terminated brand or brands" (emphasis added);

> • c: "If *a brewer* terminates or fails to renew, in whole or in part, a contract, agreement or relationship with a wholesaler for good cause and in good faith, other than terminations or failures to renew properly based upon grounds for immediate termination under section 5 of this act, *the brewer shall pay* to the *wholesaler* reasonable compensation, which may be established by a reasonable liquidated damages provision in a written contract or written agreement between the brewer and the wholesaler" (emphasis added);

> • d: "In the event of a termination under section 5 of this act [regarding immediate termination of a contract *by a brewer*], payment for inventory in the manner prescribed under the reasonable standards of a contract or agreement is reasonable compensation under this act."

§ 33:1-93.18(a)-(d).  The only provision that supplies a brewer an express cause of action is

37

subsection e, but that cause of action is limited to a brewer adversely affected by another brewer's violation of the Practices Act with respect to a common wholesaler, § 33:1-93.18(e), which is not at stake here.  Under these provisions, the Court can only conclude that a brewer has no express cause of action under the Practices Act for a wholesaler's violation thereof.

While AB might think this an "absurd" interpretation, see AB br.(118) at 34 (citing State, Twp. of Pennsauken v. Shad, 733 A.2d 1159, 1166 (N.J. 1999)), the interpretation nevertheless fully comports with the Legislature's express findings and declarations.  While the opening section of the Practices Act declares that the Act "sets forth [the] respective responsibilities" of both brewers and wholesalers, it also declares that the Act is intended to "protect beer wholesalers from unreasonable demands and requirements by brewers [.]"  See § 33:1-93.13(c). Although perhaps AB might charge that the Court is exalting the latter provision over the former, the Court's reading is guided by the express plain language of the subsequent provisions of the Practices Act, see Klumb, 970 A.2d at 359-60; Fletcher, 991 A.2d at 861, which in no way infer a brewer cause of action for a wholesaler's breach of duties.  See Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis, 444 U.S. 11, 19 (1979) ("[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."); R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co., 773 A.2d 1132, 1142 (N.J. 2001) ("New Jersey courts have been reluctant to infer a statutory private right of action where the Legislature has not expressly provided for such action.").  This conclusion is not to suggest that an aggrieved brewer is without remedy.  As AB has shown here, certain derelictions of duties under the Act could give rise to common law claims such as unjust enrichment, tortious interference, or breach of contract.  But apart from a common law claim, the

38

Practices Act gives a brewer no relief.[16]

Therefore, Plaintiffs' Motion is granted as to the Practices Act claim in Counterclaim Four.

### b.     Administrative Code

The Court must likewise grant Plaintiffs' Motion as to the Administrative Code claim. New Jersey courts have been clear: unless a statute or regulation supplies an express cause of action, a party can only maintain a cause of action by satisfying the elements for an implied cause of action.  See Jalowiecki v. Leuc, 440 A.2d 21, 24 (N.J. Super. Ct. App. Div. 1981); see also R.J. Gaydos, 773 A.2d at 1142.  In this case, no cause of action is supplied (or even inferred) by N.J. Admin. Code § 13:2-33.1, and AB has not pointed the Court to any other regulation or statute supplying such a cause of action.  Nor has AB raised or applied the elements of an implied cause of action.  Thus, there is no basis for liability.

Therefore, Plaintiffs' Motion is granted as the Administrative Code claim in Counterclaim Four.

## IV.     CONCLUSION

For the foregoing reasons, InBev USA's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** as to the notice deficiency claims in Count One, **GRANTED** as to the portions of Counts One and Three asserting breach of the covenant of good faith and fair dealing, **GRANTED** as to the all conspiracy claims in Counts Three and Four, and **GRANTED** as to the prayer for punitive damages.  The Motion is **DENIED**

---

[16] AB could have perhaps argued that the Practices Act supplies an implied right of action, see R.J. Gaydos, 773 A.2d at 1143 (discussing elements of implied private right of action), but AB did not do so and the Court will not raise it sua sponte.

as to the breach of contract claims in Count Five, and **DENIED** as to Counts One and Three to the extent InBev USA relies on the protections of § 33.1-9.15(d)(1) to justify the termination of the distribution agreements.

Further, AB's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** as to all conspiracy claims in Counts Three and Four, and **GRANTED** as to the tortious interference claim in Count Six.  The Motion is **DENIED** as to the Practices Act claim in Count Two.

Finally, Plaintiffs' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** as to the unjust enrichment claim regarding the tap-switching efforts in Counterclaim One, **GRANTED** as to the Practices Act Claim in Counterclaim Four, and **GRANTED** as to the Administrative Code claim in Counterclaim Four. The Motion is **DENIED** as to the unjust enrichment claims regarding post-termination sales in Counterclaim One, and **DENIED** as to the tortious interference claims regarding post-termination sales in Counterclaims Two and Three.

Date:   6-7-10                                          \_\_/s/ Robert B. Kugler\_\_\_\_\_
                                                        ROBERT B. KUGLER
                                                        United States District Judge