# EXHIBIT A

CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# Expert Report of

# Samuel J. Kursh, D.B.A.

August 17, 2009

CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT B**

**Materials Relied Upon**

**Case Filings:**

Complaint

Defendant Anheuser-Busch, Inc.'s Answer to Plaintiff's Complaint and Counterclaims, January 4, 2008

Plaintiff Peerless Beverage Co.'s Responses to Defendant Anheuser-Busch's Second Set of Interrogatories, May 1, 2008

Plaintiff Peerless Beverage Co.'s Supplemental Responses to Defendant Anheuser-Busch's First Set of Interrogatories, May 1, 2008

Plaintiff Shore Point Distributing Co.'s Amended Responses to Defendant Anheuser-Busch's Second Set of Interrogatories, May 7, 2008

Plaintiff Shore Point Distributing Co.'s Supplemental Responses to Defendant Anheuser-Busch's First Set of Interrogatories, May 1, 2008

Plaintiff Warren Distributing Co.'s Second Supplemental Responses to Defendant Anheuser-Busch's First Set of Interrogatories, October 31, 2008

Plaintiff Warren Distributing Co.'s Second Supplemental Responses to Defendant Anheuser-Busch's First Set of Interrogatories, October 31, 2008

Plaintiff Warren Distributing Co.'s Supplemental Responses to Defendant Anheuser-Busch's Second Set of Interrogatories, October 28, 2008

Plaintiff's Answer to Defendant Anheuser-Busch's Counterclaim, January 28, 2008

Plaintiff Peerless Beverage Co.'s Responses to Defendant Anheuser-Busch's Third Set of Interrogatories, June 17, 2009

Plaintiff Shore Point Distributing Co.'s Responses to Defendant Anheuser-Busch's Third Set of Interrogatories, June 17, 2009

Plaintiff Warren Distributing Co.'s Responses to Defendant Anheuser-Busch's Third Set of Interrogatories, June 17, 2009

Plaintiff Peerless Beverage Co.'s Supplemental Responses to Defendant Anheuser-Busch's Third Set of Interrogatories, July 16, 2009

Taylor Report and Attachments, December 1, 2008

Taylor Report and Attachments, July 15, 2009

MacKinlay Report, July 15, 2009

**Depositions and Exhibits:**

| | | | |
|---|---|---|---|
| J. Annarella | A. Demarco | J. Glick | C. Natale | R. Skawinski |
| V. Annarella | J. Demarco | E. Goracy | M. Panucci | L. Wang |
| F. Banko II | D. Donatelli | S. Higgins | D. Peacock | |
| F. Banko III | D. Fichter | R. Koenig | C. Salzman | |
| S. Beim | G. Fiorella | M. Kramer | R. Salzman | |
| A. Christon | D. Frederickson | J. Lau | T. Short | |

**Third Party Documents:**

2007 NBWA Distributor Productivity Report

2008 U.S. Master Tax Guide at 1719 and IRS Form 8824

Brealy and Myers, *Principles of Corporate Finance*

Bureau of Labor Statistics, CPI - All Items

Bureau of Labor Statistics, PPI - Malt Beverages

Damodaran, Aswath, *The Dark Side of Valuation*

Historical Import Shipments by Brand, Beer Marketers INSIGHTS; 1980-2006

Hitchner, James R., *Financial Valuation*, John Wiley & Sons (2006)

Ibbotson 2007 Yearbook

Ibbotson Valuation Edition, 2007

New Jersey Malt Beverages Practices Act

Pratt, Reilly, and Schweihs, *Valuing a Business*

Pratt, Shannon, *Cost of Capital*, John Wiley & Sons (2002)

Pratt, Shannon, *Handbook of Advanced Business Valuation*, Reilly and Schweihs

Tremblay and Tremblay, *The U.S. Brewing Industry, Data and Economic Analysis*

CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# EXHIBIT B
## Materials Relied Upon

**Produced Documents:**

| | | | | |
|---|---|---|---|---|
| AB-W00189 - AB-W00355 | HB000005 - HB000009 | JE000002 - JE000003 | PP010090 - PP010133 | PW002072 - PW002089 |
| AB-W00356 - AB-W00357 | HG000011 | JE000044 - JE000052 | PP010282 - PP010324 | PW002346 - PW002381 |
| AB-W00378 - AB-W00445 | HB000031 - HB000033 | JE000059 - JE000074 | PP010534 - PP010555 | PW003300 |
| AB-W00715 | HB000062 | JE000078 - JE000082 | PP011358 | PW003308 |
| AB-W00967 - AB-W00976 | HB000093 - HB000097 | JE000090 | PP011361 | PW003947 - PW003971 |
| AB-W01713 - AB-W00736 | HB000128 - HB000131 | JE000093 | PP011363 | PW004187 - PW004373 |
| AB-W02274 - AB-W02365 | HB000139 - HB000141 | JE000095 - JE000096 | PP011406 - PP011407 | PW004375 - PW004403 |
| AB-W18881 - AB-W18907 | HG000158 - HG000159 | JE000100 - JE000115 | PP012568 - PP012613 | PW004406 |
| AB-W18937 - AB-W18964 | HG000192 - HG000193 | JE000118 - JE000130 | PP012747 - PP012792 | PW004408 |
| AB-W18965 - AB-W18991 | HG000225 | JE000220 - JE000221 | PP019664 - PP019714 | PW004410 - PW004413 |
| AB-W19019 - AB-W19099 | HG000227 - HG000230 | KB000001 - KB000004 | PP020403 - PP020407 | PW014781 - PW014792 |
| AB-W19822 - AB-W00851 | HG000253 | KB000042 - KB000067 | PP020716 - PP020717 | PW022358 |
| AB-W20631 | HG006397 | NE000003 - NE000037 | PP021119 | PW022913 |
| AB-W32407 - AB-W32429 | HG006614 - HG006615 | NE000018 - NE000037 | PP022506 | PW030216 |
| AB-W35057 - AB-W35058 | HG006548.xls | PP000001 - PP000172 | PP023272 - PP023273 | PW030218 |
| AB-W35132 - AB-W35133 | IBU027 - IBU061 | PP000173 - PP000187 | PP023366 - PP023367 | PW032087 - PW032089 |
| AB-W35159 | IBU087 | PP000204 - PP000238 | PP023581 - PP023582 | PW033264 - PW033269 |
| AB-W44733 | IBU370 - IBU411 | PP000246 | PP030787 - PP030799 | PW033273 - PW033279 |
| AB-W44741 | IBU538 - IBU566 | PP000347 | PP030997 - PP031026 | PW033421 - PW033423 |
| AB-W72337 | IBU1372 - IBU1405 | PP000402 | PP031637 - PP031645 | PW033433 - PW033444 |
| AB-W85402 - AB-W85404 | IBU1406 - IBU1453 | PP000522 - PP000525 | PP032242 - PP032245 | PW033451 |
| AB-W98371 - AB-W98376 | IBU1641 - IBU1914 | PP000736 - PP000745 | PS000047 - PS000105 | PW033458 |
| AB-W118531 - AB-W118554 | IBU2056 - IBU2162 | PP000769 - PP000770 | PS000121 | PW033476 - PW033478 |
| AB-W20673.xls | IBU3194 - IBU3199 | PP001521 - PP001544 | PS000130 | PW033520 - PW033521 |
| AB-W20740.xls | IBU3293 - IBU3294 | PP001747 - PP001905 | PS000136 - PS000138 | PW033548 |
| AB-W30632.xls | IBU4396 | PP002211 | PS000177 - PS000180 | PW033551 |
| AB-W35061.xls | IBU7244 - IBU7272 | PP002432 | PS000295 - PS000318 | PW033561 |
| AB-W35065.xls | IBU7299 - IBU8541 | PP004261 - PP004262 | PS000399 - PS000423 | RP000044 - RP000055 |
| AB-W35117.xls | IBU10143 | PP004276 | PS000659 - PS000660 | RP000097 |
| AB-W35123.xls | IBU10520 - IBU10525 | PP004306 - PP004307 | PS000668 - PS000669 | RP000109 |
| AB-W35127.xls | IBU16068 | PP004655 - PP004656 | PS005145 - PS006605 | RP000113 |
| AB-W35160.xls | IBU17415 | PP005463 - PP005493 | PS007529 - PS007749 | RP000118 |
| AB-W44734.xls | IBU18279 - IBU18469 | PP006140 - PP006184 | PS014364 - PS014397 | |
| CROWN000023 | IBU21017 | PP006712 | PW000001 - PW000111 | |
| CROWN000027 - CROWN000028 | IBU21493 - IBU21749 | PP006922 | PW000124 - PW000303 | |
| CROWN000054 - CROWN000059 | IBU22248 - IBU22441 | PP006923 - PP006935 | PW000671 | |
| CROWN000060 - CROWN000062 | IBU23159 - IBU23252 | PP006940 - PP006971 | PW000676 | |
| CROWN006422 - CROWN006424 | IBU24344 - IBU24490 | PP007451 - PP007568 | PW000931 - PW000932 | |
| CROWN006447 - CROWN006451 | IBU26012 - IBU26013 | PP08203 | PW000969 | |
| | | PP009437 - PP009438 | PW002054 - PW002071 | |

# EXHIBIT B

08/17/2009 17:25 FAX  3018521848       REZNICK_GROUP                    ☑002/029

**Confidential**
**Subject to Protective Order**

**Expert Report**

**ATTORNEYS' EYES ONLY**

In the matter of
Warren Distributing Co.
d/b/a Hub City Distributing Co. South,
Warren Distributing Co., South,
Peerless Beverage Co., Inc., and
Shore Point Distributing Co.

vs.

InBev USA L.L.C. and
Anheuser-Busch, Incorporated

Submitted by:
Brent S. Solomon, MSF, CPA/ABV, CVA, CM&AA

**Documents considered for report:**

1. Expert Report in the matter of Warren Distributing Co. d/b/a Hub City Distributing Co., Warren Distributing Co. South, Peerless Beverage Co., Inc., and Shore Point Distributing Co. vs. InBev USA L.L.C. and Anheuser-Busch, Incorporated; Submitted by A. Craig MacKinlay, Joseph P. Wargrove Professor of Finance, Wharton School, University of Pennsylvania; July 15, 2009

2. Report in the Matter of Warren Distributing Co. d/b/a Hub City Distributing Co., Warren Distributing Co. South, Peerless Beverage Co., Inc., and Shore Point Distributing Co. vs. InBev USA L.L.C. and Anheuser-Busch, Incorporated; Submitted by Robert J. Taylor IV, President Taylor Consulting Group, Inc.; July 15, 2009

3. Expert Report of Samuel J. Kursh, D.B.A; January 15, 2009

4. Morningstar. Stocks, Bonds, Bills, and Inflation 2007 Valuation Edition Yearbook. Chicago: Morningstar, Inc., 2007.

5. The Appraisal Foundation Best Practices for Valuations in Financial Reporting: Intangible Asset Working Group. The Identification of Contributory Assets and the Calculation of Economic Rents (Exposure Draft). Washington: The Appraisal Foundation, 2009.

6. Portions of the Deposition of Daniel Anthony Donatelli, Jr. on May 27, 2009

7. Portions of the Deposition of Frank Banko II on February 10, 2009

8. Portions of the Deposition of James C. Lau on June 12, 2009

9. Portions of the Deposition of Gerald Fiorella on March 31, 2009

10. Portions of the Deposition of Marc Kramer on June 19, 2009

11. Portions of the Deposition of Frank Banko III on June 2, 2009

12. PP004774 – PP004797

13. Portions of the James Annarella Deposition on May 22, 2009

14. PS006054 – PS006056

15. PW004187 – PW004258

16. PS005448 – PS005501

17. Distribution Agreement between InBev USA L.L.C and Peerless Beverage Co., dated July 2005

18. Distribution Agreement between InBev USA L.L.C. and Shore Point Distributing Co., dated April 1, 2005

19. Distribution Agreement between InBev USA L.L.C. and Warren Distributing Co. d/b/a Hub City Distributing Co., dated January 1, 2005

20. Memorandum of Law in Support of Plaintiff's Request for Preliminary Injunctive Relief (March 2, 2007)

21. PW000202 – PW000303

22. PW000001 – PW000090

23. PP000001 – PP000101

# EXHIBIT C

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - x

WARREN DISTRIBUTING CO., d/b/a      :

HUB CITY DISTRIBUTING CO. and       :

WARREN DISTRIBUTING CO. SOUTH,      :

PEERLESS BEVERAGE CO., INC., and   :

SHORE POINT DISTRIBUTING COMPANY,  :

          Plaintiffs          :   Civil No.

v.                                  :  07-1053(RBK)

INBEV USA L.L.C., and               :

ANHEUSER-BUSCH, INCORPORATED,       :

          Defendants           :

- - - - - - - - - - - - - - - - - X


  Videotaped Deposition of A. CRAIG MacKINLAY, Ph.D.

        Philadelphia, Pennsylvania

        Friday, September 11, 2009

          10:31 a.m.


Job No.: 25502151

Pages 1 through 313

Reported by:  Debra A. Whitehead

1          Q    How did you know that?

2          A    Because I knew it was a smaller publicly

3    trade -- I guess to be fair I wasn't positive, but I

4    was quite certain it was part of it.

5          Q    Well, why were you quite certain it was

6    part of it?

7          A    Because a lot of the -- the description of

8    how the index is constructed, it's clear Coors would

9    fall into that category.

10         Q    Where is the description of how the index

11   is constructed located?

12         A    It's in the guide to the Dow Jones indexes.

13         Q    Is that a document that was produced?

14         A    Yes.

15         Q    Have you ever performed a -- a valuation of

16   a business?

17         A    Yes.  That's what I teach.

18         Q    I understand that's what you teach.  But

19   outside of teaching, have you ever been asked to and

20   performed a valuation of a business?

21         A    Indirectly through -- you know, I've done

22   damages-type litigation, which relates to value

23   determination.

24         Q    But my question is, has anyone ever -- have

25   you ever been asked by any company to do a valuation

 1          you got from Mr. French's website, I would appreciate

 2          it.

 3                   A    Okay.  They're in -- they're in that --

 4                   Q    Are they in the report?

 5                   A    Well, the numbers in the report are derived

 6          from the numbers from his website.

 7                   Q    Okay.  And where are -- are the numbers

 8          from his website in some of the documents that you

 9          produced to us?

10                   A    Yes.

11                   Q    OKAY.  Which document?  What kind of

12          document?

13                   A    The same document that has the index

14          information in it.

15                   Q    Okay.  This is the Excel spreadsheet that

16          you --

17                   A    Well, effectively it's printed out from an

18          Excel spreadsheet, yes.

19                   Q    Okay.  Are you aware of any instance in

20          which the Fama-French Three-Factor model has been used

21          to estimate a cost of equity capital in -- in a

22          valuation that was actually performed outside of

23          academia?

24                   A    Yes.  It's very widely used in industry by

25          analysts who are making investment strategies where

1 they're trying to value the companies.

2   Q And who -- who is widely using this?

3   A Most of the quantitative strategists out

4 there use variations of this.  One example would be

5 AQR.

6   Q What is AQR?

7   A It's an asset management firm.  But it's

8 very widely used.

9   Q Well, I'm -- now I'm going to be a little

10 more specific.  When -- when someone is actually

11 sitting down and been asked to do a valuation of a

12 company, are you aware of any -- any instance in which

13 it has been used?

14   MR. DWORETZKY:  Object to the form of the

15 question.

16   You can answer.

17   A Well, again, it's -- when you're running an

18 asset-management strategy, you have to value the

19 companies effectively so that you can decide which

20 ones you think are relatively overvalued and

21 relatively undervalued in the marketplace.  And that's

22 where that model is frequently applied.

23   Q Okay.  And again, who is frequently

24 applying it?

25   A Many, many, many asset manager, at least.

```
1        page.
2                Q    And if we look at Page 335, are these your
3        previous cases?
4                A    Yes.  Some of them, at least.
5                Q    Now, at -- first six lines at the top it's
6        crossed out.  Do you see that?
7                A    Right.
8                Q    What does that represent, the fact you
9        crossed them out?
10               A    Oh, that as I noted them when I wrote up my
11       report I just -- to indicate they were done.
12               Q    And Page 336, what is this?
13               A    That was my very initial consideration of
14       how to tackle this problem.
15               Q    And what -- explain to me what your initial
16       consideration was of how to tackle the problem.
17               A    Well, the first consideration was what
18       model to use to get the cost of capital.
19               Q    Uh-huh.
20               A    And so one possibility, the attritional
21       one, is just to use the capital asset pricing model,
22       which has beta in it.  But I -- I wanted to go beyond
23       that because there is empirical evidence that while
24       the capital asset pricing model does a pretty good
25       job, there are some instances where it just doesn't
```

1     fit perfectly.

2               So then I thought, Well, what are some of

3     the alternatives?  And one of the alternative -- the

4     alternatives are basically modified CAPITAL ASSET

5     PRICING MODELS.  So I wanted to use a modified capital

6     asset pricing model.

7               One modified capital asset pricing model in

8     the so-called -- academics call it the multifactor

9     framework, is the Fama-French model.  Another modified

10    capital asset pricing model is the build-up method

11    that was used generally by Kursh and Taylor.

12              And then it ends up that if you have a

13    publicly traded company and have a value, you can

14    actually use a discounted cash flow approach to back

15    out the cost of capital.  But that wasn't feasible in

16    this particular framework, in any event.

17              So my thought process here was that, you

18    know, that the task I had been asked to do was to come

19    up with -- measure the cost of capital and to have an

20    assessment of whether the experts' approaches were --

21    were solid or not from an economic perspective.

22              And so the one thing you see that's a real

23    weakness of this build-up model that the experts both

24    used is it's basically subjective.  You can see it's

25    subjective because they basically use generally the

1    same methodology, and they get very different answers.

2           And so while the build-up model is a valid

3    approach, quite like many cases in economics and

4    finance, there's many models you can often use to get

5    the answer, and as long as you have consistent

6    assumptions in them, in general you should get the

7    same answer out.

8           And so you can see with this modified

9    capital asset pricing model, with the build-up

10   approach the problem is, or the potential weakness is

11   it's very subjective.  And evidence of this

12   subjectivity is the fact that Taylor and Kursh both

13   used it, and Taylor gets something between 10 and 11

14   percent for the cost of capital and Kursh gets

15   something over 21 percent, I believe.  And so we have

16   this enormous gap, even though they're supposedly

17   using the same model.

18          And so then I thought a bit about, of

19   course, what they had done right or wrong.  And I knew

20   right out of the gate that a major, major weakness of

21   Kursh's approach is it lacked scientific integrity.

22   Because what he did is he added in this 9.68 percent

23   for the size premium to get in the cost of capital of

24   the distributors for the intangible distribution

25   rights.  And there's just no scientific justification

1    for doing that.

2              Because as you've talked about a lot as

3    we've gone through the day, the first thing we want

4    you to note is that 9.68 percent comes from publicly

5    traded data.  And so he has taken the publicly traded

6    data and blindly applying it to a private company.

7    And that's just not appropriate, to blindly apply it

8    to a private company.

9              And especially it's not the case that you

10   can take the market capitalization of the private

11   company and use that and slot it into the sizes of

12   publicly traded companies, and then use that premium

13   and say that applies.  That's basically an

14   apple-versus-oranges type problem.  Then --

15        Q    What's an apple-versus-oranges type

16   problem?

17        A    To use the market capitalization of a

18   private company and map that into the market

19   capitalizations of publicly traded companies to get a

20   measure of the risk premium.  That's a major error.

21   And here's why.  The reason why is the privately

22   traded companies tend to be smaller in general.

23   That's the nature of why they're still private.  And

24   so you can have smaller, relative to publicly traded

25   companies that's privately held that's very low risk.

1            But if you map that into that -- he

2       actually used a sub decile of size-sorted companies to

3       get this 9.68 percent premium.  And you can't do that,

4       because there's no equivalence between the risk of the

5       private company and the risk of those companies that

6       are behind that 9.68 percent number.  Let me tell you

7       why.

8            It's just really intuition.  One has to

9       think about, how do those companies that are publicly

10      traded get way down in the very bottom 5 percent of

11      publicly traded companies?  Well, there's a couple of

12      ways to get there.  One way they get there is they're

13      very young companies, they're starting up, trying to

14      develop new products.  And they're, you know,

15      relatively young, and they're very risky, because

16      they're basically trying -- that's a kind of a sample

17      of the sort of company, they're trying to develop new

18      products.  And so they're very risky.

19           Clearly that's not the situation we had

20      with these New Jersey distributors who all have been

21      in business over 50 years, they sell beer, which has

22      very stable demand, as I noted earlier.  It's often

23      referred to as recession-proof, its demand, by the

24      investment community.

25           And secondly, let's think about what other

1    companies might be in that low part.  How does a

2    company get a low market value?  Well, the way a

3    company gets a low market value is it does really

4    poorly, and its market value falls.

5                Well, those companies that have done really

6    poorly and their market values tumble, they're risky

7    by their very nature.  You know, General Motors, for

8    example, as it was going bankrupt, it would have

9    fallen down into that group.

10               Well, are you comfortable taking a premium

11   that's coming from companies that are start-ups, maybe

12   in very high risk, or other companies who have fallen

13   on hard times, and the reason they're small is because

14   they do have a high cost of capital, so when you

15   discount the flows it pulls them way down to a low

16   market value.

17               There's some work in academic literature by

18   a fellow named Jonathan Berk who talks about this very

19   unusual nature of these small companies and how the

20   reason they are small is because they're risky.

21               And so I was very uncomfortable with

22   Dr. Kursh's approach of taking that 9.68 percent, with

23   no discussion of the brewing industry or the demand

24   for beer, really, and just plug it in as a size

25   premium.  It just doesn't make any -- it's not

1    plausible, in my view, from an economic perspective.

2    Furthermore, if you think about it, you

3    know, using that, just blindly plugging in that size

4    premium, is a very dangerous approach to follow

5    anyway.  Because basically, for example, in that small

6    a sub decile I believe the ranged of market values go

7    from something down not much above zero, maybe 3 or 4

8    million or 2 million, up to I think it's 173 million.

9    And in that one he has a premium of 9.68.

10    Well, what if you had one distributor whose

11    market value was 165 million, and then we have another

12    distributor in the same general region but different

13    company, whose value happened to be 180 million.  If I

14    applied Kursh's methodology, he would say that beer

15    distributor that was 165 million in market value falls

16    into that smallest sub decile, and I'm going to add

17    9.68 percent to get its cost of capital.

18    In contrast, the one that's worth, say, 180

19    or 185 million, not much different from the other one

20    in terms of the overall characteristic of the company,

21    what he would say, Oh, it falls in -- gets out of that

22    lowest sub decile into the top half of that bottom sub

23    decile.  And what he would add is, rather than 9.68

24    percent he would add 4.35 percent, because that's the

25    size premium the minute you move up into that second

Page 127

1    sub decile.

2            So there we've two companies that

3    hypothetically distribute the same products, just have

4    different regions, have very same business

5    characteristics.  And so one should ask themselves are

6    they comfortable thinking that using his methodology,

7    we would get one to have a cost of capital that would

8    be 5 point -- 5.33 percent higher than the other one,

9    when there's really -- the only difference, you know,

10   the difference in market value is really not very

11   much.

12           And so the one thing -- that's the problem

13   with this build-up type approach, is it has an

14   arbitrary nature to, and it's subjective.  And so

15   while I wrote it down as an approach, I knew that, you

16   know, in some sense that wasn't the model I wanted to

17   use, the build-up approach, because it's subjective,

18   and so we're just going to get into the argument, so

19   do you want to make this adjustment or that

20   adjustment?  So what I thought to myself was, Look, I

21   want to bring a scientific approach that's objective

22   to the table, in the framework of the modified capital

23   asset pricing model.

24           And so, yes, I wanted to see if there is a

25   size premium that I should add in.  And I want to see

1    if there's actually a premium related to this

2    so-called HML factor, which is tied to growth

3    prospects and often financial distress.

4              And so the way you do that is you basically

5    run this factor model analysis.  And so I have the

6    standard CAPM in place with the market factor.  And

7    then I have this factor to pick up the size premium.

8    So it's exactly consistent with what they do in the

9    general level; it's just I want to measure what the

10   size premium is, I don't want to prespecify it.

11   Because in my view, scientific research says you

12   measure it, you don't prespecify it.

13             And so I basically want to measure that

14   size premium.  And then I can tell you in academic

15   research that this other factor is every bit as

16   important as the size premium, this so-called HML

17   factor, and so I also want to take it into account.

18             And so basically what that led me to is

19   going down this Fama-French version of the modified

20   capital asset pricing model where, yes, I want to

21   enter the size premium, and yes I want to account for

22   things that are missing from the basic CAPM, but I

23   want to be scientific.

24             And so -- so what I needed was the data

25   that I had sent in.  And then I used the brewers

1     index.  We've already discussed how I believe it's a

2     reasonable match for the risk, given it picks up the

3     risk that comes from the demand for beer.  And then

4     now I can scientifically run an econometric model and

5     I can measure the cost of capital.  And so basically

6     what I was doing here is I was just thinking about the

7     approaches.

8              And I've just given you really the

9     rationale why I ended up with this modified capital

10    asset pricing model with what I would call more

11    scientific adjustments for size.  And I gave you the

12    rationale why I went down that path because I just

13    can't believe that it's plausible for these New Jersey

14    distributors, who have a very safe cash-flow stream,

15    certainly, given the state protection in the

16    distribution rights, given the monopoly, et cetera,

17    that one wants to map those into the risk level of

18    that lowest sub decile, which is exactly what Kursh

19    blindly does.

20             And so your earlier discussion is very

21    right.  It is a hard problem when you're working with

22    the distinction between private and public companies.

23    But the one thing I did not want to do is fall into

24    what I feel is a very bad approach that Kursh used, to

25    add in that 9.68 from publicly traded companies.  But

1    not only publicly traded companies, very unusual

2    publicly traded companies, because you do have to --

3    again, not to be repetitive, but you do have to ask

4    the question, How do they get into that bottom group?

5    And you have to ask the question, Well, am I

6    comfortable using that number to add on to beer

7    distributors for the cost of capital?

8           And I just don't know any economic

9    rationale for doing it.  I've never seen strong

10    justification for that in the academic literature.  It

11    certainly -- that approach is not in peer-reviewed

12    journals, to the best of my knowledge.  And it's just

13    so subjective.

14           And so that's kind of a long-winded answer

15    to what I was doing here and why I went down the path

16    I do.  Because as I say, I didn't -- you know, I could

17    have just followed it, well, it's not wrong.  But it's

18    just so subjective, and you've got to be really

19    careful what you do.

20           And you know, you've got to be sure, if

21    you're going to add in a size premium, that you really

22    think about what's a reasonable size premium for the

23    application.  You've got to think about, you know,

24    exactly what adjustments you want to make, what are

25    appropriate and what aren't appropriate.

1          And, you know, the one adjustment that

2    Kursh doesn't make even that even the Ibbotson book is

3    very clear on, is, you have to worry about industry.

4    He doesn't even worry about industry.  He has a little

5    footnote where he says, Oh, the industry adjustment

6    is -- for a broader measure of the industry is minus

7    214.  But I -- you know, I don't think that that

8    should be added in.  And it's just, you know -- it's

9    just so subjective.

10         So, you know, I think in some ways your

11   other questions are getting at a good point; you know,

12   what is the rationale for the modified cap asset

13   pricing model version I used -- it sometimes in

14   general is referred to as the Fama-French model.  It's

15   because I want to have a scientific approach that was

16   objective, to generate my measure.

17        Q    And using the Dow Small Cap Index to get an

18   indication of the risk for beer was scientific.

19         Is that -- is that your testimony?

20        A    I believe it was scientific, but that's a

21   very good point, because when I got -- when I got

22   Kursh's revised report, he had a section in it

23   discussing my work.  And he talked about how you

24   could -- he had Anheuser-Busch, Molson Coors, Boston

25   Beer, and -- Redhook I believe it was.  And so he had

1    those breweries listed.

2         Q    Okay.

3         A    And then he measured his cost of capital

4    for them.  The cost of capital measure he presented

5    for them was very high.  I think for Redhook he got

6    over 30 percent.  But the problem is that there is

7    absolutely no theoretical justification for the way he

8    measured that cost of capital.  He used this idea he

9    calls total beta.  And total beta is nonsense.

10        One of the pillars of finance is the

11   importance of diversification.  When capital is being

12   allocated by investors, you get -- when you mix things

13   together, you get this reduction in risk through the

14   magic of diversification.  And what that leads to

15   being the case is that when you think about the risk,

16   you should get rewarded in terms of the cost of

17   capital, you don't get rewarded for risk that can be

18   easily diversified away.

19        But -- so what he does is take this non --

20   this diversifiable risk and he adds -- effectively

21   adds that into the cost of capital.  Well, not

22   surprisingly, if you assume that, which you'll never

23   find a single textbook that will suggest you do that,

24   you get really high cost of capital measures.

25        So what I did is I said, Well, just to

1    verify where I'm at, what I did after I got his report

2    is I basically took the returns for Molson Coors, for

3    Boston Beer, and for Redhook.  And I created my own

4    beer index, just to be comfortable with exactly the

5    issue you're talking about.

6            And basically I didn't want to bias it

7    towards one or the other, so I created an equally

8    weighted index of those three beers.  I left

9    Anheuser-Busch out because it was a very large company

10   and one could argue that, you know, because of its

11   large size it's somewhat different.

12           So what I did is I created my own beer

13   index for the same time period that Kursh used in his

14   report and that I had used in my previous one.  And

15   then I reran the cost of capital measure for that

16   index just to be sure I'm comfortable with where I'm

17   at.

18           And what I found when I did that is that I

19   got a very similar answer, whereas I got roughly 13.6

20   with the U.S. Low Cap Brewers Index, when I ran it

21   with that -- my own index using the beers that Kursh

22   put forward, which is a reasonable choice, and I had

23   no problem with that, I got 13.3 something.  And so

24   effectively they were lined right up in the same

25   ballpark.

1          And that just further convinced me that

2     this idea of, you know, trying to use 20-plus percent,

3     which he uses in his main report, and he does it -- is

4     absolutely a wrong approach to estimate the claim that

5     the cost of capitals for Redhook and Boston Beer and

6     Coors are very high, to justify that high number he

7     was using in the first place.

8          But that's just all rubbish, because, you

9     know, as I say, the most basic fundamental in finance,

10    or one of them is, the role of diversification.  And

11    he just misses that.  And so my conclusion was that

12    his methodology was flawed.  And, you know, basically,

13    you know, just to verify there shouldn't be concerns

14    about that U.S. Brewers Index, I did do that run just

15    last week.  And it made it clear to me that I was very

16    comfortable with that result.

17         Q    Well, when you keep talking about the role

18    of diversification, he missed the role of

19    diversification, what do you mean by that in this

20    context?

21         A    What I mean by that is that when you want

22    to figure out the relevant cost of capital, be it the

23    build-up model, any modified CAPM, the CAPM itself,

24    the risk measures you use are not the total risks of

25    the stock.  And so what he does for that measure he

1          puts in, he takes the ratio of the standard deviations

2          of the volatility of the company's stock to the

3          volatility of the market index.  And he calls that

4          ratio the beta, the total beta.

5                    But there's just no justification for doing

6          that.  That's wrong.  You know, there -- in economics,

7          it's often hard to say a model is right or wrong, but

8          that's one case you can say the approach is wrong.

9               Q    And using -- and using the Dow Small Cap

10         Brewers Index to measure, and that you did here, to

11         give you an idea of what was going on in beer, was

12         right, even though Mondavi is one of the four and

13         Brown-Forman is one of the four, and that's

14         scientific?

15              A    Yes, that is scientific.

16              Q    It's scientific to even use it when you had

17         no idea what was in it when you were using it.  That

18         in your mind is science?

19                   MR. DWORETZKY:  Object to the form of the

20         question.

21              Q    Is that science?

22              A    May I answer?  May I answer?

23                   MR. DWORETZKY:  Yes, you're entitled to

24         answer.

25              Q    Yes, you're entitled to answer.

1          So I wasn't overly concerned because, one,

2     the demand for wine is not independent of the demand

3     for beer; and two, Mondavi didn't get any weight

4     really anyway.  But as I said, just to be sure there

5     were no concerns, I did create that second index when

6     I got Kursh's report.

7          And from that second index, just to be

8     concrete, I had those three companies that were beer

9     producers.  And I reran the analysis and got

10    effectively the same answer.  So from that I concluded

11    that I had a robust approach because basically I was

12    getting a similar answer, which is what I'd like.  And

13    so that gave me even more confidence in the use of the

14    Low Cap Brewers Index, which I had no concerns with

15    anyway, but I felt the verification was worthwhile.

16         Q   Well, you said Coors was ten times as large

17    as Mondavi.  Right?

18         A   I didn't say it was ten times, no.  I said

19    an order of magnitude of ten times.

20         Q   Well, order of magnitude, Brown-Forman to

21    Peerless.  Order of magnitude.

22         A   I would have to think about the exact

23    number, but it would be probably somewhere between 10

24    and 100.

25         Q   Well, that's -- is that -- sometime --

# EXHIBIT D

July 2009

ARCHIE CRAIG MACKINLAY                     Home Address:

Finance Department                                18 Fox Ridge Drive
The Wharton School                                Malvern, PA  19355
University of Pennsylvania                         Tel: (610) 296-7971
Philadelphia, PA  19104-6367

Tel: (215) 898-5309

Fax: (215) 898-6200

Email: acmack@wharton.upenn.edu

---

| | |
|---|---|
| EDUCATION | B.Sc. (Chemistry), University of Western Ontario, 1978. |
| | M.B.A., University of Western Ontario, 1980. |
| | M.B.A., University of Chicago, 1983. |
| | Ph.D., Graduate School of Business, University of Chicago, 1985. |
| HONORS, FELLOWSHIPS AND GRANTS | Oxford University Press Century Publication Celebration 100 Best Papers of All Time Award, 2006. |
| | IMCA 2003 Journalism Award. |
| | Geewax, Terker, & Company First Prize for Investment Research in 1999. |
| | Paul A. Samuelson Award for Outstanding Scholarly Writing on Lifelong Financial Security, 1997. |
| | Geewax-Terker Investment Research Fund Grant, 1987-1988, 1988-1989, 1989-1990, 1990-1991, 1991-1992, 1992-1993, 1993-1994, 1994-1995, 1995-1996. |
| | Apply the Knowlege Award, Consulting Group University, 1995. |
| | Roger F. Murray Prize Competition Certificate of Award, Institute for Quantitative Research in Finance, 1993. |

14

Batterymarch Financial Management Fellowship, 1990-1991.

Society of Financial Studies Paper of the Year Award, 1990.

National Science Foundation Grant, 1989-1991.

Smith Breeden Distinguished Paper Award, Journal of Finance, 1989.

Fishman-Davidson Center Fellow, 1987-1988, 1988-1989.

The American Association of Individual Investors Award, 1989.

Institute for Quantitative Research in Finance Grant, 1989.

University of Pennsylvania Research Foundation Grant, 1986-1987, 1990-1991.

University of Chicago Fellowship, 1980-1983.

3M of Canada Fellowship, 1979.

University of Western Ontario Graduate Studies Scholarship, 1979.

| | |
|---|---|
| WORK EXPERIENCE | Joseph P. Wargrove Professor of Finance, The Wharton School, University of Pennsylvania, 1995-present. |
| | Associate Professor of Finance, The Wharton School, University of Pennsylvania, 1991-1995. |
| | Assistant Professor of Finance, The Wharton School, University of Pennsylvania, 1985-1991. |
| | Lecturer in Finance, The Wharton School, University of Pennsylvania, 1984-1985. |

| | | |
|---|---|---|
| THESIS INFORMATION | Title: | An Analysis of Multivariate Financial Tests. |
| | Date: | December 1985. |

15

PAPERS AND
PUBLICATIONS

Econometric Modeling of Limit Order Executions, with
Andrew Lo and June Zhang, Journal of Financial
Economics, Volume 65, Number 1, July 2002,
pp. 31-71.

Consultants adding value: Lessons from the past three
decades, The Journal of Investment Consulting,
Volume 5, Number 2, November/December 2002.

The importance of active investment strategies, Mastering
Investments, Financial Times, James Pickford,
Editor, 2002.

Asset Pricing Models: Implications for expected returns
and portfolio selection, with Lubos Pastor,
Review of Financial Studies, Volume 13,
Number 4, Winter 2000, pp. 883-916.

The declining credit quality of US corporate debt:  Myth
or reality, with M. Blume and F. Lim, Journal of
 Finance, Volume 53, Number 4, August 1998,
pp. 1389-1413.

Maximizing predictability in the stock and bond
markets, with Andrew Lo, Macroeconomic
Dynamics, Volume One, Number 1, 1997,
pp. 102-134.

Event studies in finance and economics, Journal of
Economic Literature, Volume XXXV,
Number 1, March 1997, pp. 13-39.

Multifactor models do not explain deviations from the
CAPM, Journal of Financial Economics,
Volume 38, Number 1, May 1995, pp. 3-28.

On multivariate tests of the CAPM, Journal of
Financial Economics, Volume 18, Number 2,
December 1987, pp. 341-371.

Stock prices do not follow random walks:  Evidence
from a simple specification test, with Andrew
Lo, Review of Financial Studies, Volume 1,

Number 1, Spring 1988, pp. 41-66.

Index-futures arbitrage and the behavior of stock
index futures prices, with Krishna Ramaswamy,
Review of Financial Studies, Volume 1,
Number 2, Summer 1988, pp. 137-158.

The size and power of the variance ratio test in
finite samples, with Andrew Lo, Journal of
Econometrics, Volume 40, Number 2, February
1989, pp. 203-238.

Order imbalances and stock price movements on
October 19 and 20, 1987, with Marshall E. Blume
and Bruce Terker, The Journal of Finance,
Volume 44, Number 4, September 1989,
pp. 827-848.

An econometric analysis of non-synchronous trading,
with Andrew Lo, Journal of Econometrics, Volume
45, Number 1/2, July/August 1990, pp. 181-211.

When are contrarian profits due to stock market
overreaction? with Andrew Lo, Review of
Financial Studies, Volume 3, Number 2, 1990,
pp. 175-205.

Data-snooping biases in tests of financial asset
pricing models, with Andrew Lo, Review of
Financial Studies, Volume 3, Number 3, 1990,
pp. 431-467.

Using generalized method of moments to test
mean-variance efficiency, with Matthew
Richardson, The Journal of Finance, Volume
46, Number 2, June 1991, pp. 511-528.

An ordered probit analysis of transaction stock
prices:  Theory and empirical estimates, with
Jerry Hausman and Andrew Lo, Journal of Financial
Economics, Volume 31, Number 3, June 1992,
319-380.

17

Nontrading effect, with Andrew Lo, <u>The New Palgrave Dictionary of Money and Finance</u>, Stockton Press, 1992, Voume 3, 55-57.

Ethical issues in financial markets:  The American experience: Comment,  in <u>The Ethical Dimension of Financial Institutions and Markets</u>, Berlin: Springer-Verlag, 1995, Chapter 9, 170-179.

Margins and volatility, discussion, in <u>The Industrial Organization and Regulation of the Securities Industry</u>, NBER and University of Chicago Press, 1996, 340-347.

Asset allocation and stock selection:  On the importance of active strategies, <u>Journal of Investment Consulting</u>, Volume 1 Number 1, 1998, 18-22.

<u>Books</u>

<u>The Econometrics of Financial Markets</u>, a textbook, with John Campbell and Andrew Lo, Princeton University Press (Princeton), 1997.

<u>A Non-Random Walk Down Wall Street</u>, a readings book, with Andrew Lo, Princeton University Press (Princeton), 1999. Paperback Edition, 2002.

<u>Invited Paper</u>

Forecastability of stock returns:  A Comparison of the Japanese and U.S. markets, with Andrew Lo, presented at Weiss Center for International Financial Research Conference, Osaka, Japan, January 1992.

<u>Working Papers and Work in Progress</u>

Components of Volatility and Stock Returns, with Jong Won Park, November 2006.

Asset Allocation: An empirical analysis – 1970-2002, working paper, April 2003.

18

Mutual Fund Performance Persistence, with Eun Kang, working paper, March 2009.

Stock Return Factors, with Bruce Grundy and Spencer Martin, work in progress.

Stock-Based Commodity Factors, work in progress.

Statistical Analysis of Performance Measures, work in progress.

| | |
|---|---|
| PROFESSIONAL ACTIVITIES | Program Committee, Western Finance Association, 2000-2009. |

Director, American Finance Association, 1998-2000.

Morgan Stanley Institutional Equity Academic Advisory Board, 2002-present.

Editorial Advisory Board, <u>Investment Management Consultants Association Journal</u>, 1998-present.

Editorial Board Member, <u>Pacific-Basic Finance Journal</u>, 1994-2006.

Economic Advisory Board Member, National Association of Security Dealers, 1996-1998.

Scientific Advisory Board Member, Investment Technology Group, 1997-2000.

Associate Editor, <u>Journal of Business and Economic Statistics</u>, 1990-1995.

Research Fellow, <u>National Bureau of Economic Research</u>, 1989-1995.

Research Associate, <u>National Bureau of Economic Research</u>, 1995-present.

Associate Editor, <u>Review of Financial Studies</u>, 1990-1993.

19

Reviewer for:

    Econometrica
    Financial Review
    Journal of Business
    Journal of Business and Economic Statistics
    Journal of Econometrics
    The Journal of Finance
    Journal of Financial and Quantitative Analysis
    Journal of Financial Economics
    Hong Kong Research Grants Council
    National Science Foundation
    Pacific-Basin Finance Journal
    The Review of Financial Studies
    Social Sciences and Humanities Research
        Council of Canada

Member of:

    American Economic Association
    American Finance Association
    American Statistical Association
    Econometric Society
    Society for Financial Studies
    Western Finance Association

20

# EXHIBIT E

**Expert Report**

**In the matter of**
**Warren Distributing Co.**
**d/b/a Hub City Distributing Co.,**
**Warren Distributing Co. South,**
**Peerless Beverage Co., Inc., and**
**Shore Point Distributing Co.**
**vs.**
**InBev USA L.L.C. and**
**Anheuser-Busch, Incorporated**

**Submitted by**
**A. Craig MacKinlay**
**Joseph P. Wargrove Professor of Finance**
**Wharton School, University of Pennsylvania**
**July 15, 2009**

Please note that this document contains information which has been marked as ATTORNEY'S EYES ONLY and should be treated as such in accordance with the Discovery Confidentiality Order entered in this matter.

1. I am the Joseph P. Wargrove Professor of Finance at the Wharton School of the University of Pennsylvania.  I have been teaching at Wharton since 1984 and in recent years have been teaching the course titled <u>Corporate Finance</u>.  I received my Ph.D. and MBA degrees from the University of Chicago.  My areas of expertise include the empirical validation of asset pricing models, the behavior of stock market prices, valuation of stocks and bonds, market microstructure, and econometric modeling.  I am the co-author of the Ph.D. textbook, The Econometrics of Financial Markets, Princeton University Press, 1997, and have written and published articles on econometric modeling, asset pricing models, event studies, and the behavior of securities prices.  I am a Research Associate of the National Bureau of Economic Research, a member of the Morgan Stanley Institutional Equity Academic Advisory Board, a member of the editorial board of the Journal of Investment Consulting, and a former director of the American Finance Association and the NASD Academic Advisory Board.

2. I have been asked to measure the cost of capital that is appropriate to be used to determine the fair market value as of February 23, 2007 of the rights for exclusive distribution of InBev's European Brands (referred to as "InBev Brands") held by Warren Distributing Co. d/b/a Hub City Distributing, Warren Distributing Co. South, Peerless Beverage Co., Inc., and Shore Point Distributing Co. (collectively referred to as "New Jersey Distributors").[1]  This cost of capital measure plays a key role in the determination of the fair market value using a discounted cash flow approach.  In addition, I have been asked to comment on the cost of capital analysis presented by Dr. Samuel J. Kursh in his expert report[2], (hereafter referred to as the "Kursh report").

3. My estimate of the appropriate weighted average cost of capital to be used for the determination of the fair market value of the distribution rights is 11.1%.   Based on my analysis, I conclude that the cost of capital measure of 10.6% developed in the expert

---

[1] I will refer to the InBev Brands throughout the report.  However, the analysis and conclusions are also applicable to the rights to Rolling Rock for Peerless Beverage Co., Inc.
[2] Expert Report of Samuel J. Kursh, D.B.A., January 15, 2009.

report of Robert Taylor[3] (hereafter referred to as the "Taylor report") is reasonable from an economic perspective, whereas the cost of capital value of 21.6% developed in the Kursh report is not.  Further, based on my examination, I conclude that the methodology used by Dr. Kursh to estimate the cost of capital is unreliable and scientifically unsound.

**Cost of Capital Estimation**

4. With the discounted cash flow valuation approach, the cost of capital is the rate at which the forecasted future incremental cash flows generated by an investment (the distribution of the InBev Brands) are discounted back to the valuation date to measure the fair market value.  This cost of capital should reflect the fact that future cash flows are not certain and have risk associated with them.  Additionally, the cost of capital should reflect that the cash flows are unlevered cash flows – in other words, the cash flows are used to make interest payments on any debt financing as well as to provide the return on investment for equity investors.   Because the cost of capital must reflect both the cost of debt financing and the cost of equity capital, it is referred to as the weighted average cost of capital.

5. The calculation of the weighted average cost of capital requires four inputs – the cost of debt capital, the cost of equity capital, the mix of debt and equity financing, and the applicable tax rate.  It is important that these inputs are specified using reasonable and consistent economic assumptions.  Further, these inputs should reflect the risks of the cash flows associated with the investment being valued (which may or may not differ from the risk of the flows generated by other assets in place).

---

[3] Report In the Matter of Warren Distributing Co. d/b/a Hub City Distributing Co., Warren Distributing Co. South, Peerless Beverage Co., Inc., and Shore Point Distributing Co. vs. InBev USA L.L.C. and Anheuser-Busch, Incorporated Submitted by Robert J. Taylor IV, President Taylor Consulting Group, Inc., December 1, 2008.  I understand this report has been revised for submission on July 15, 2009 and I have reviewed a draft of a section of the updated report related to the calculation of the weighted average cost of capital.

6.   Since the distribution rights are perpetual, they should be valued as a long term investment.  The cost of debt capital can be specified using the approximate interest rate that a borrower facing the risk of the cash flows from distribution rights in New Jersey would pay on long term borrowings.  Robert J. Taylor in his expert report[4] has investigated this interest rate and finds 6.50% to be the cost of debt capital (page 20).  From an economic perspective, given market rates in February 2007, this rate is reasonable, and thus, I will proceed using it.

7.   The cost of equity capital is typically estimated using statistical analysis of historical equity return data.  If there is a match between the risk of the assets a corporation has in place and the risk of the proposed investment, and the corporation is public with outstanding equity, the equity returns of the corporation can be employed.   However, if there is a risk mismatch or equity returns are unavailable, then the equity returns of different companies in the same line of business as the proposed investment can be used through an industry index.  Using historical returns from an industry index will generally lead to a more precise measure of the cost of equity capital than will using returns of an individual company.[5]

8.   While the risk of the InBev distribution rights being valued and the other distribution rights held by the New Jersey Distributors will be similar, the fact that the New Jersey Distributors are privately held means that historical equity returns needed to measure the cost of equity capital are unavailable.  This is a case where the equity returns of different companies in the same line of business as the proposed investment can be used.  An equity index that represents underlying investments that will have risk similar to that of the InBev distribution rights is required.

9.   The fundamental source of risk for the cash flows generated by the InBev distribution rights is the uncertainty of the quantity of beer sales.  Since this factor is the same as the

---

[4] The Taylor report.
[5] The debt to equity ratio also needs to be considered as the cost of equity capital depends on the capital structure.

fundamental source of risk for the beer industry in general, an industry index of brewing related companies can be used to measure the cost of equity capital for the valuation of the distribution rights in New Jersey.  Further, as an empirical matter, market capitalization has been found to be a factor in the cost of capital.  Therefore, I will use the Dow USA Low Cap Brewers Index (hereafter, referred to as the "Brewers Index") to measure the cost of equity capital.  This index consists of small companies that are "manufacturers and shippers of cider or malt products such as beer, ale, and stout."[6] The risk of the equity of a typical company in this index will serve as a reasonable measure for the risk of the equity investment in distribution rights.

10. I will use the Fama-French Three-Factor Model to estimate the cost of equity capital. The Fama-French Model is an extension of the Capital Asset Pricing Model that includes two additional factors to better capture the underlying risk.  Specifically, the Fama-French Model includes extra factors to adjust for company size and company growth prospects as reflected in the book value to market value ratio.[7]  Using the Fama-French Model, the formula for the cost of equity capital is

Cost of Equity Capital     =     Risk-free rate
                                 + $beta_1$ x Market Risk Premium
                                 + $beta_2$ x SMB
                                 + $beta_3$ x HML

where $beta_1$, $beta_2$, and $beta_3$ are the company's sensitivity to the risk factors, SMB (small minus big) is the size factor, and HML (high minus low book value to market value ratio) is the growth factor.

---

[6] See http:\\www.icbenchmark.com for index definition.
[7] See Fama, Eugene and Kenneth French, "The Cross-Section of Expected Stock Returns," Journal of Finance Volume XLVII, Number 2, June 1992 for the original presentation of the Fama-French Three-Factor Model.  For discussion of the Fama-French model see Richard A. Brealey, Stewart C. Myers, and Franklin Allen, Principles of Corporate Finance, Ninth Edition, McGraw-Hill Irwin, 2008, pages 225-227 or Koller, Tim, Marc Goodhart, and David Wessels, Valuation:  Measuring and Managing the Value of Companies, Fourth Edition, John Wiley and Sons, Inc., 2005, pages 315-317.

11. To estimate the factor sensitivities, I statistically relate the monthly returns on the Dow USA Low Cap Brewers Index to the monthly returns for the market risk premium and the Fama-French SMB and HML factors using a regression analysis.  Using five years of monthly data from February 2002 through January 2007, the following estimates were obtained:  $beta_1 = 0.71$; $beta_2 = 0.19$; and $beta_3 = 0.56$.[8]

12. Given the factor sensitivities, the inputs necessary for the cost of equity capital calculation are the risk-free rate and the three factor premiums.  For the risk-free rate, I used 4.8% which is the long-term US government bond yield from February 23, 2007.  I used 7.1% for the market risk premium, 3.7% for the size factor premium, and 5.4% for the growth factor premium. The market risk premium is the average annual return of the stock market minus the annual return on the US government long-term bond for the time period 1926 to 2006 inclusive and is taken from the Stocks, Bonds, Bills, and Inflation 2007 Valuation Edition Yearbook.[9] The size factor premium and growth factor premium represent the annual average return of the respective factors for the time period January 1927 through December 2006 inclusive.[10]

13. Putting together these estimates into the cost of equity capital formula in paragraph 11 gives:

Risk-free Rate  = 4.8%

$beta_1$ x Market Risk Premium  = 0.71 x 7.10%  =  5.0%

$beta_2$ x SMB  = 0.19 x 3.7%  = 0.7%

$beta_3$ x HML  = 0.56 x 5.4%  = 3.0%

---

[8] As a sensitivity check, the analysis was repeated using the time period from January 1993 through January 2007 and the estimates of the factor sensitivities were essentially the same.

[9] Stocks, Bonds, Bills, and Inflation 2007 Valuation Edition Yearbook, Morningstar, Inc., 2007.

[10] Calculated from Fama-French annual factor returns provided on the web site of Professor Kenneth R. French from Dartmouth College (http://mba.tuck.dartmouth.edu/pages/faculty/ken.french/).

Adding these four parts (without rounding) gives a value of 13.6% for the cost of equity capital.

14. This cost of equity capital of 13.6% is for levered equity – that is for equity capital that is combined with debt financing.  To use this value as a measure for the valuation of the InBev distribution rights, it is necessary to adjust for any difference in the capital structure of the average company in the Brewers Index and the amount of debt that the investment in the InBev distribution rights can support.  The average company in the Brewers Index has a debt to value ratio of approximately 20%.  If one assumes that the InBev distribution rights can support the same 20% level of debt, no additional adjustment is needed.  On the other hand, if one assumes that the InBev distribution rights can support a different level of debt, an adjustment is necessary.

15. I first calculate the weighted average cost of capital using a conservative level of debt of 20%, then consider the impact of different levels of debt, and as a last step choose the optimal level of debt.  From the Taylor report, the applicable tax rate for the New Jersey Distributors is 40%.  Using a debt level of 20%, the Weighted Average Cost of Capital can now be calculated using the following formula:

$$\text{WACC} = r_{debt} \times (1-T) \times D/V + r_{equity} \times E/V$$
$$= 6.5\% \times (1-0.4) \times 0.20 + 13.6\% \times 0.80$$
$$= 11.7\%$$

where  $r_{debt}$ is the cost of debt capital;

$r_{equity}$ is the cost of levered equity capital;

D/V is the debt to value ratio;

E/V is the equity to value ratio;

T is the applicable tax rate.

16. The above weighted average cost of capital analysis assumes that the InBev distribution rights can optimally be funded with 80% equity capital and 20% debt capital.  It should

6

be noted that the determination of the optimal capital structure is not an exact science. Therefore, it is prudent to look at the sensitivity of the cost of capital to the capital structure choice. I do this sensitivity analysis by evaluating the weighted average cost of capital under alternative capital structure specifications. For this analysis, the cost of the equity capital is adjusted for leverage. The cost of debt will also change with leverage. As the weight of equity in the capital structure increases, the debt becomes less risky and the cost of debt will decline. However, the results are not very sensitive to the cost of debt.[11] Thus, for the purpose of these calculations, the cost of debt capital is held fixed at 6.5%.

17. In the above analysis, for a capital structure of 20% debt and 80% equity, the cost of capital for the levered equity is 13.6%. To evaluate the sensitivity to the leverage assumption, it is necessary to calculate what the cost of equity capital would be if the financing was all equity and no debt. This gives a value of 12.67% for the cost of unlevered equity capital.[12] With this value for the cost of unlevered equity capital and a cost of debt capital of 6.5%, given an assumed capital structure, the cost of levered equity can be calculated[13] and the weighted average cost of capital can be calculated. The following table presents the values for different capital structures.

---

[11] For example, if one assumes that the cost of debt would be 5.5% (instead of 6.5%) with a capital structure of 10% debt and 90% equity the weighted average cost of capital would differ by less than 0.13%.

[12] The cost of unlevered equity is calculated using the following formula:

$$r_{unlevered\ equity} = [\ r_{equity} + D/E \times (1-T) \times r_{debt}\ ] / [\ 1 + D/E \times (1-T)\ ].$$

See Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, Corporate Finance, Eighth Edition, McGraw-Hill Irwin, 2008, pages 496-497.

[13] The cost of levered equity is calculated using the following formula:

$$r_{equity} = r_{unlevered\ equity} + D/E \times (1-T) \times (r_{unlevered\ equity} - r_{debt}).$$

See Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, Corporate Finance, Eighth Edition, McGraw-Hill Irwin, 2008, pages 496-497.

| D/V | E/V | $r_{debt}$ | $r_{equity}$ | WACC |
|-----|-----|-----|-----|-----|
| 0.0 | 1.0 | 6.5% | 12.7% | 12.7% |
| 0.1 | 0.9 | 6.5% | 13.1% | 12.2% |
| 0.2 | 0.8 | 6.5% | 13.6% | 11.7% |
| 0.3 | 0.7 | 6.5% | 14.3% | 11.1% |
| 0.4 | 0.6 | 6.5% | 15.1% | 10.6% |
| 0.5 | 0.5 | 6.5% | 16.4% | 10.1% |

18. This table shows that the weighted average cost of capital does depend on the capital structure.  As the capital structure is varied, the weighted average cost of capital ranges from 10.1% to 12.7%.  Given evidence in the Taylor report concerning distributor debt levels and the historical stability of beer sales, my judgment is that the optimal capital structure is likely to fall between 20% and 40% debt.  Choosing the midpoint of this range, I conclude that the cost of capital applicable to the valuation of the InBev Distribution rights is 11.1%.  This is an appropriate rate to be used in the discounted cash flow approach for the valuation of the InBev distribution rights.

19. This cost of capital analysis I have done uses an approach different from both the approaches used by Dr. Samuel Kursh[14] and Robert Taylor.[15]  However, the results indicate that, from an economic perspective, the cost of capital estimate of 10.6% made by Robert Taylor is reasonable whereas the estimate of 21.7% by Dr. Samuel Kursh is not.

---

[14] In the Kursh report.
[15] In the Taylor report.

8

**Discussion of the Report of Dr. Samuel Kursh**

20. In my opinion, the report of Dr. Kursh contains a number of errors, misunderstandings, and inconsistencies. These shortcomings lead to his analysis being unreliable and scientifically unsound.

21. In paragraph 39 Dr. Kursh states that "Taylor's method effectively assumes that his case equivalent projections would occur with certainty." This statement is not correct, since the weighted average cost of capital approach implemented by Taylor captures the uncertainty in the projections through the discount rate.

22. In paragraph 49, Dr. Kursh notes that the cost of capital used for the valuation should reflect "the required rate of return of the specific brands and not the WACC of the distributor as a whole." This point is basically correct. However, in the case where the risk of the investment is similar to the risk of the firm as a whole, the use of the firm's WACC is justified. Further, if one wishes to use an approach to the cost of equity capital that incorporates a size effect, by necessity the characteristics of the distributor play a role.

23. In paragraph 52, Dr. Kursh argues that given the size of the distributors, a size premium of 9.68% should be added into the equity cost of capital. There is not any scientific justification for such an arbitrary adjustment. The 9.68% premium measures the average difference between the historical return of equity of the smallest five percent of publically listed companies and the return predicted by the capital asset pricing model. For such an adjustment to be appropriate, it would be necessary for the risk of the distributors to be typical of the smallest five percent of listed companies. Dr. Kursh does not provide any support for this risk equivalence. In fact, one would expect there to be significant differences. Many of the smallest listed companies are research and development oriented companies that do not have established products. They have a

9

relatively high level of risk.  In contrast, the New Jersey Distributors are established companies[16] with a stable product line, exclusive territories, and protection from termination provided by state law.  Further, the small capitalization listed companies will have different levels of debt and operate in different industries.[17]  These are considerations that should be taken into account but are ignored by Dr. Kursh in choosing the 9.68% premium.[18]

24. When betas are estimated for individual companies using historical return data, the beta is not estimated very precisely.  Because betas on average equal one, it is more likely that relative to the estimated beta, the true beta is closer to one than further away from one.  Based on this principle, Marshall Blume suggested that an improved beta estimate can be created by adjusting the estimated beta towards one.  In interpreting Taylor's analysis, in paragraph 54, Dr. Kursh attempts to use the Blume adjustment.  However, for reasons discussed in paragraphs 7 and 8, it was not possible for Taylor to estimate the betas of the distributors from historical equity return data of the companies, and therefore the Blume adjustment is not relevant.

25. In paragraph 54, Dr. Kursh asserts that one would expect the InBev brands "to exhibit a beta at or above 1.0."  This assertion plays a critical role in Dr. Kursh's valuation and is made without support.  Analysis of the returns to the brewing industry finds estimates of beta that are substantially below 1.0.  This raises questions about the reliability of all Dr. Kursh's conclusions from the discounted cash flow analysis.

---

[16] My understanding is that all the distributors have been in business for more than 50 years.

[17] The source of the premium is Stocks, Bonds, Bills, and Inflation 2007 Valuation Edition Yearbook.  This yearbook provides warnings not to add in the size premium without considering the industry (pages 39-42) and provides empirical analysis showing that the size premium is not the same across industries (pages 153-155).  Given that the beer distribution industry is regulated in New Jersey and that the distributors' territories are protected by state law, one would anticipate that any size premium would be minimal and certainly far less than 9.68%.

[18] To get a sense of the impact of adding in such a large premium, I recalculated the value of the distribution rights for Peerless using all of Dr. Kursh's numbers in Exhibit C-1 (page 7 of 8) of his report with the exception of the cost of capital.  Instead of using his estimate of 21.7%, I used my estimate of 11.1%.  Using 11.1% gave a value of $29,918,510.  This value is in sharp contrast to the Kursh value of $13,416,460.

10

26. In paragraph 92, Dr. Kursh states that "the weighted average cost of capital is not appropriate in measuring the value of returns to a private company." I disagree with this statement. First, as Dr. Kursh pointed out in paragraph 49, it is "the investment, not the investor" that matters. Therefore it should not matter if the investor is a private or public company. Second, the approach is generally a valid one and is widely employed for valuation by both private and public companies.

27. Related to point 22 above, in paragraphs 92 and 93, Dr. Kursh argues that the risk preferences of the owners matter for cost of capital to be employed to value the InBev distribution rights. Again this is incorrectly arguing for the investor mattering.

28. In paragraph 98, Dr. Kursh argues that beta tends to 1.0 over time. This is not a general pattern. For example, the betas of many industries consistently stay on one side of one. Some industries consistently have demand for their product that is not sensitive to economic activity and are low beta, while others have demand for their product that is very sensitive to economic activity and are high beta.

**Summary and Conclusion**

29. In my opinion, an appropriate measure of the cost of capital for the valuation of the InBev distribution rights is 11.1%. I conclude that the cost of capital measure of 10.6% developed in the expert report of Robert Taylor is reasonable from an economic perspective. Further, in my view, the analysis of Dr. Kursh leading to a cost of capital of 21.7% is not based on scientifically sound principles and thus is not reliable.

30. My conclusions in this report are presented with a reasonable degree of professional certainty. I reserve the right to supplement or modify my opinions if new information is received or in response to the work and opinions of other experts.

11

Respectfully submitted on July 15, 2009


A. Craig MacKinlay