NOT FOR PUBLICATION                                    (Doc. Nos. 275, 299)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| _____ : | |
| WARREN DISTRIBUTING CO. d/b/a : | |
| HUB CITY DISTRIBUTING CO. and : | |
| WARREN DISTRIBUTING CO. SOUTH, : | |
| PEERLESS BEVERAGE CO., INC., and : | |
| SHORE POINT DISTRIBUTING CO., : | |
| : | |
| Plaintiffs, : | Civil No. 07-1053 (RBK/JS) |
| : | |
| v. : | **OPINION** |
| : | |
| INBEV USA, LLC and : | |
| ANHEUSER-BUSCH, INC., : | |
| : | |
| Defendants. : | |
| _____ : | |

**KUGLER**, United States District Judge:

This case is about whether a party that wins a pyrrhic victory in litigation is entitled to

collect the reasonable attorneys' fees and costs for their largely unsuccessful efforts.  The matter

comes before the Court upon the motion by Plaintiffs to modify the judgment entered on August

13, 2010 (Doc. No. 275), and the motion by Plaintiffs for attorneys' fees and expenses (Doc. No.

299).  For the reasons expressed below, Plaintiffs' motion to modify the judgment is

GRANTED.  With respect to Plaintiffs' motion for attorneys' fees and expenses, the Court holds

that although Plaintiffs are technically entitled to reasonable attorneys' fees for their New Jersey

Practices Act ("Practices Act") claims as a matter of law, due to the overall outcome of the

litigation, Plaintiffs' award is reduced by one hundred percent.

## I.    BACKGROUND

The events which gave rise to this litigation are outlined in the Court's opinion in <u>Warren Distrib. Co. v. InBev USA LLC</u>, No. 07-1053, 2010 WL 2326168, at *1-3 (D.N.J. June 7, 2010). In that case, the Court dismissed a number of Plaintiffs' claims, but allowed the following claims to proceed:  (1) Plaintiffs' claims against Defendants for the alleged violations of the Practices Act; (2) Defendants' state law counterclaims for unjust enrichment and tortious interference for Plaintiffs' post-termination beer sales, and (3) Defendants' tortious interference claim against Plaintiffs for post-termination tap switching.

Before trial, Defendants offered to pay each Plaintiff a fair market value of 3.3 times the gross profits of the European brands.  (Am. Compl. Exs. D-G).  After Plaintiffs refused to accept that offer, Defendants reduced the offer to 3.25 times the fair market value of the European brands.  (Am. Compl. Exs. J-M).

The thirteen-day jury trial began on July 19, 2010 and concluded on August 4, 2010. Each party presented evidence to prove the fair market value of the distribution rights.  Plaintiffs used the cash flow method for valuing the distribution rights, and Defendants used the market multiples approach.  Based upon the cash flow method, Plaintiffs' attorney, Mr. William Hangley, told the jury that the fair market value of the distribution rights was approximately $66 million dollars.  Specifically, Mr. Hangley stated:  "And I want you to understand these are people who have already been paid, my clients, the 25 million dollars. . . . The evidence will show that they should have been paid 66 million dollars. . . . The under payments total some 41 million dollars.  That's what we will show you to be the fair market value of these . . . rights." (Trial Tr., July 19, 2010, at 27).  During trial, the jury expressly rejected the cash flow method

offered by Plaintiffs and validated the market multiples approach.[1]

On August 13, 2010, the Court entered judgment.  (Doc. No. 270).  With respect to Plaintiffs' claim that Defendants failed to pay them the fair market value of the distribution rights pursuant to the Practices Act, the jury made the following determinations.  First, the jury found in favor of Plaintiff Warren Distributing Company ("Warren") and against Defendants in the amount of $96,409.00.  Second, the jury found in favor of Plaintiff Peerless Beverage Company ("Peerless") and against Defendants in the amount of $215,571.40.  Third, the jury found in favor of Plaintiff Shore Point Distributing Company ("Shore Point") and against Defendants in the amount of $78,027.10.

With respect to Defendants' common law counterclaims, the jury made the following determinations.  First, regarding Defendants' counterclaim of unjust enrichment for alleged post-termination beer sales, the jury rendered a verdict:  (1) in favor of Defendants and against Warren for damages in the amount of $217,591.00; (2) in favor of Defendants and against Peerless for damages in the amount of $278,850.00; and (3) in favor of Defendants and against Shore Point for damages in the amount of $141,704.00.  Second, with respect to Defendants' counterclaim for tortious interference for post-termination beer sales, the jury found for Plaintiffs.  Third, regarding Defendants' counterclaim of tortious interference for alleged post-termination "tap switching," the jury rendered a verdict in favor of Peerless and against Defendant Anheuser Busch.  The sum of the judgments in favor of Plaintiffs was $390,007.50, and the sum of the judgments in favor of Defendants was $638.145.00.  Thus, at the conclusion of the litigation, Plaintiffs owed Defendants a total of $248,186.50.

On the last line of the judgment entered by the Court appear the words "NO COSTS."

---

[1] See Trial Tr., Sept. 28, 2010 ("The Court: . . . I think the jury was pretty clear about multiples is the way to go here.").

The judgment does not specify whether this determination applies to Defendants' counterclaims for unjust enrichment and tortious interference, or Plaintiffs' Practices Act claims.  Plaintiffs now ask the Court to modify the judgment to make clear that the Court's determination that neither party should receive costs is inapplicable to Plaintiffs' Practices Act claims.  Plaintiffs also seek reasonable counsel fees and other litigation expenses.

## II.   DISCUSSION

Pursuant to Federal Rule of Civil Procedure 59(e) a party may petition the court to alter or amend a judgment no later than twenty-eight days after the court enters judgment.  Generally, there are four basic grounds upon which a Rule 59(e) motion may be granted:  (1) to correct manifest errors of law or fact upon which the judgment was based; (2) to present newly-discovered or previously unavailable evidence; (3) to prevent manifest injustice; and (4) an intervening change in prevailing law.  See Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985) (purpose of motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence).

### A.    The Malt Alcoholic Beverage Practices Act

One purpose of the Practices Act is to "regulate the business relationship between brewers and wholesalers of malt alcoholic beverages . . . and protect beer wholesalers from unreasonable demands and requirements by brewers."  N.J. Stat. Ann. § 33:1-93.13(c).  The Practices Act prohibits a brewer from "terminat[ing] . . . a contract . . . with a wholesaler . . . except where the brewer establishes that it has acted for good cause and in good faith."  N.J. Stat. Ann. § 33:1-93.15(c)(1).

The Act also provides:

It shall not be a violation . . . for a successor brewer to . . .

> terminate, in whole or in part, its contract, agreement or
> relationship with a wholesaler, or the contract, agreement or
> relationship with a wholesaler of the brewer it succeeded, for the
> purpose of transferring the distribution rights in the wholesaler's
> territory for the malt alcoholic beverage brands to which the
> successor brewer succeeded . . . provided that the successor brewer
> or the second wholesaler or wholesalers first pays to the first
> wholesaler the <u>fair market value</u> of the first wholesaler's business
> with respect to the terminated brand or brands[.]

N.J. Stat. Ann. § 33:1-93.15(d)(1) (emphasis added).  The Act creates a cause of action for any

brewer or wholesaler to sue "a brewer for violation of [the] act, or . . . a successor brewer in

connection with a termination pursuant to [section 33:1-93.15(d)(1)]."  N.J. Stat. Ann. § 33:1-

93.18(a).  The Act provides that "[t]he wholesaler or brewer who sues alleging a violation of [the

Practices Act] <u>shall, if successful, also be entitled to the costs of the action</u>, including, but not

limited to, <u>reasonable attorney's fees</u>."  N.J. Stat. Ann. § 33:1-93.18(a) (emphasis added).

### B.    Costs

Plaintiffs argue that the Court's determination that the parties are entitled to "NO

COSTS" is clearly erroneous because the Act provides "for a mandatory award of . . . costs . . .

to a successful wholesaler."  (Pl.'s Mot., at ¶ 2).  In response, Defendants argue that Plaintiffs are

not entitled to costs because:  (1) they failed to allege any of the four grounds upon which this

Court may grant a Rule 59(e) motion; and (2) they failed to prove that they are the "prevailing

party" under Federal Rule of Civil Procedure 54(d)(1).  Furthermore, Defendants argue that

Plaintiffs are not the prevailing party in this litigation because the sum of the damages awarded

to Defendants for their state law counterclaims is larger than the sum of the damages awarded to

Plaintiffs for their Practices Act claims.  Therefore, Defendants argue, because Plaintiffs suffered

a net loss in the litigation, Defendants are the "prevailing party."

### 1.      Costs Under Rule 54(d)(1)

The award of costs in federal courts is governed by Rule 54(d)(1). See Abrams v. Lightolier Inc., 50 F.3d 1204, 1221 (3d Cir. 1995) (providing that "[u]nder the rules of Erie and Hanna v. Plummer, Rule 54(d)(1) will . . . trump a state cost shifting provision with which it conflicts."); Chaparral Res., Inc. v. Monsanto, Co., 849 F.2d 1286, 1291 (10th Cir. 1988) ("In a diversity case, federal law controls in regard to the assessment of costs."); In re Merrill Lynch Relocation Mgmt., Inc., 812 F.2d 1116, 1120 n.2 (9th Cir. 1987) ("As a general proposition, the award of costs is governed by federal law under Rule 54(d)."); see also 10 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2669, at 251 (3d ed. 1998) ("The award of costs is governed by federal law.").  This rule applies to all costs specifically enumerated in 28 U.S.C. § 1920.  Abrams, 50 F.3d at 1223.  Because the Third Circuit has held that Rule 54(d)(1) only governs costs listed in 28 U.S.C. § 1920, the Court will first analyze whether Plaintiffs are entitled to the costs listed under 28 U.S.C. § 1920, and then whether Plaintiffs are entitled to costs that are not listed in 28 U.S.C. § 1920.

Rule 54(d)(1) provides that "[u]nless a federal statute, [the Federal Rules of Civil Procedure], or a court order provides otherwise, costs–other than attorney's fees–should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1) (emphasis added).[2]  Thus, under Rule 54(d), the court has the discretion to tax costs to the prevailing party as it deems appropriate.

---

[2] Rule 54(d)(1) previously provided that:  "Except when express provision therefore is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs.  Such costs may be taxed by the clerk on one day's notice.  On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court."  The Advisory Committee amended the rule in order to make the rule more understandable to the reader.  The Advisory Committee noted that it did not intend to make any substantive change to the rule:  "[t]he language of Rule 54 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules.  These changes are intended to be stylistic only."  Fed. R. Civ. P. 54 advisory committee's note.  This is particularly relevant because the parties rely upon many cases that apply the previous version of Rule 54(d)(1).

Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 441 (1987) (finding that "[s]ection 1920 enumerates expenses that a federal court may tax as a cost under the discretionary authority found in Rule 54(d)"); Mathews v. Crosby, 480 F.3d 1265, 1276 (11th Cir. 2007) ("[Rule 54(d)(1)] provides that '[e]xcept when express provision therefore is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs . . . .'"); Thompson v. Wal-Mart Stores, Inc., 472 F.3d 515, 517 (8th Cir. 2006) ("Rule 54(d)(1) provides 'costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs.'").  There is a strong presumption, however, that the court should award costs to the prevailing party.  In re Paoli R.R. Yard PCB Litig., 221 F.3d 449, 462 (3d Cir. 2000).  If the Court determines that the prevailing party is not entitled to costs, it should provide a basis for its decision.  Id. at 468 ("Only if . . . the district court can articulate reasons within the bounds of its equitable power, should costs be reduced or denied to the prevailing party.").  The rationale for this rule is that the "denial of costs to the prevailing party . . . is in the nature of a penalty . . . ." ADM Corp. v. Speedmaster Packaging Corp., 525 F.2d 662, 665 (3d Cir. 1975) (quoting Chicago Sugar Co. v. Am. Sugar Ref. Co., 176 F.2d 1, 11 (7th Cir. 1949), cert. denied, 338 U.S. 948 (1950)).

The pivotal issue in a court's decision whether to award costs is the determination of who qualifies as the prevailing party.  Generally, the "prevailing party" is the party who succeeds on "any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing the suit . . . ." Texas State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 791 (1989) (quoting Nadeau v. Helgemoe, 581 F.2d 275, 278-79 (1st Cir. 1978), overruled on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health and Human Res., 532 U.S. 598 (2001) (defining "prevailing party" in the civil rights context)).  Thus, to be

considered the "prevailing party," at minimum, a party must "be able to point to a resolution of

the dispute which changes the legal relationship between itself and the [opposing party]." Id. at

792 (defining "prevailing party" in the context of civil rights litigation under 42 U.S.C. § 1988).

Importantly, however, a party need not succeed on every claim to qualify as the prevailing party.

See Fireman's Fund Ins. Co. v. Tropical Shipping & Const. Co., 254 F.3d 987, 1012-13 (11th

Cir. 2001) (acknowledging precedent establishing that a "party need not prevail on all issues to

justify the full award of costs") (quoting Head v. Medford, 62 F.3d 351, 354 (11th Cir. 1995)).

When multiple parties file claims in one lawsuit (i.e. counterclaims, cross-claims, etc.),

the "prevailing party" is less clear.  Generally, the court may identify the prevailing party under

Rule 54(d) by comparing the amount of damages awarded to the complainant to the amount

awarded to the counterclaimant.  See Hillside Enter. v. Carlisle Corp., 69 F.3d 1410, 1416 (8th

Cir. 1995) (finding that district court did not abuse its discretion by awarding costs to successful

plaintiff who won judgment larger than the judgment awarded to counterclaimant); see also 10

Wright, Miller & Kane, Federal Practice and Procedure § 2667, at 225 (3d ed. 1998) ("a

successful counterclaimant generally will be considered the prevailing party when plaintiff fails

to recover or is awarded less than defendant receives on the counterclaim."); see also

OptiStreams, Inc. v. Gahan, No. 05-0117, 2006 WL 829113, at *10 n.3 (E.D. Cal. 2006) (noting

that "the success of a counterclaim is considered along with the success of a complaint in

determining which is the prevailing party."); Imgarten v. Bellboy Corp., 383 F. Supp. 2d 825,

842 (D. Md. 2005) (awarding costs to claimant because jury verdict in favor of counterclaimant

was "dwarfed" by award in favor of claimant); In re Omeprazole Patent Litig., No. M-21-81,

2004 WL 1782547, at *2 (S.D.N.Y. Aug. 09, 2004) ("[W]here a plaintiff's victory substantially

outweighs the defendants' victory, the plaintiff is considered the prevailing party as that term is

used in Rule 54 (d)(1).") (citing Hillside, 69 F.3d at 1416); cf. Goldman v. Burch, 780 F. Supp. 1441, 1445-46 (S.D.N.Y. 1992) (finding that defendant was entitled to counsel fees when "defendant . . . overwhelmingly succeeded under its counterclaims and to a substantially greater extent than did plaintiffs on their complaint.").

This Court finds that Defendants are the prevailing party in this litigation under Rule 54(d)(1). Defendants "achieve[d] some of the benefit [they] sought in bringing the suit," and the outcome of the litigation changed the legal relationship between the parties. Garland, 489 U.S. at 791, 792. Defendants sought to recover for Plaintiffs' alleged violation of state law prohibitions against unjust enrichment and tortious interference. The jury verdict awarded Defendants $638,145.00 in damages. Thus, it is clear that Defendants achieved the benefit of everything they sought in bringing their counterclaims. Additionally, the outcome of the litigation changes the legal relationship between the parties because the jury found that Plaintiffs were unjustly enriched by their wrongful acts and Plaintiffs tortiously interfered with Defendants' contracts with other distributors.

Moreover, Defendants are the prevailing party because the total amount of damages they received for their state law counterclaims far exceeds the amount of damages Plaintiffs received for their statutory claims. As previously mentioned, when an action involves multiple parties and multiple claims, a court may award costs to the party whose damages award exceeds the award to the opposing party. Here, the jury determined that Peerless, Warren, and Shore Point were entitled to the following amounts of damages respectively: $215,522.40; $96,409.00; and $78,027.10. (Pl.'s Br. Ex. A). Thus, the total amount the jury awarded to Plaintiffs equals $390,007.50. The jury determined that Peerless, Warren, and Shore Point were liable for the following amounts of damages for Defendants' counterclaims respectively: $278,850.00;

$217,591.00; and $141,704.00.  Thus, the jury awarded Defendants a total of $638,145.00 in damages.  Defendants recovered $248,186.50 more in damages than Plaintiffs.  Accordingly, Plaintiffs can hardly consider themselves the "prevailing party" in this litigation.

In sum, because Defendants are the prevailing party in this action under Rule 54(d)(1), and there is a strong presumption that the prevailing party is entitled to costs, this Court finds that Defendants are entitled to the costs listed in Section 1920.

### 2.        Costs Under the Practices Act

As previously mentioned, although a plaintiff who is not the "prevailing party" cannot recover costs under Rule 54(d)(1), this limitation applies only to costs enumerated in 28 U.S.C. § 1920.[3]  Recoverability of costs that are not enumerated in Section 1920, is determined by state law.  See Abrams, 50 F.3d at 1223 ("Rule 54(d)(1) of the Federal Rules of Civil Procedure requires the clerk to award certain litigation expenses to the prevailing party as a matter of course. . . . There is, however, no federal statute or rule providing the rule of decision when a federal court is asked to award litigation expenses other than those enumerated as section 1920 costs.").

Plaintiffs seek costs under the Practices Act.[4]  Under N.J. Stat. Ann. § 22A:2-8, "a party

---

[3] 28 U.S.C. 1920 provides:

> A judge or clerk of any court of the United States may tax as costs the following:
> (1) Fees of the clerk and marshal;
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.
> A bill of costs shall be filed in the same case and, upon allowance, included in the judgment or decree.

[4] In the Motion to Amend the Judgment to Clarify That Costs are Denied Only With Respect to Anheuser-Busch's Counterclaims, Plaintiffs state that "[t]o be consistent with the mandate of the Practices Act, the Judgment should be amended to make clear that the Court has not disallowed costs, including attorneys' fees, under the Practices Act."

to whom costs [is] awarded by law or otherwise in any action, motion or other proceeding," may

collect the following costs:

> The legal fees of witnesses, including mileage for each attendance, masters, commissioners and other officers;
>
> The costs of taking depositions when taxable, by order of the court;
>
> The legal fees for publication where publication is required;
>
> The legal fees paid for a certified copy of a deposition or other paper or document, or map, recorded or filed in any public office, necessarily used or obtained for use in the trial of an issue of fact or the argument of an issue of law, or upon appeal, or otherwise;
>
> Sheriff's fees for service of process or other mandate or proceeding;
>
> All filing and docketing charges paid to the clerk of court;
>
> Such other reasonable and necessary expenses as are taxable according to the course and practice of the court or by express provision of law, or rule of court.

N.J. Stat. Ann. § 22A:2-8.  Because the New Jersey statute includes costs not included in Section

1920,[5] the Court must determine whether Plaintiffs are entitled to "costs" under the state law.

In order to determine whether Plaintiffs are entitled to costs listed under Section 22A:2-8,

the Court must construe the language of the Practices Act.  Section 33:1-93.18(a) of the Practices

Act provides in relevant part:  "The wholesaler or brewer who sues alleging a violation of this

act shall, if successful, also be entitled to the costs of the action including, but not limited to,

---

(Pl.'s Mot. to Am. the J. ¶ 7).

[5] Section 1920 does not provide for "[t]he costs of taking depositions when taxable, by order of the court."  N.J. Stat. Ann. § 22A:2-8.  Moreover, Section 1920 does not contain a residual clause which covers "other reasonable and necessary expenses as are taxable according to the course and practice of the court or by express provision of law, or rule of court."  Id.  However, it is important to note that the Court identifies no "reasonable and necessary expenses" that are taxable "according to the course and practice of the court or by express provision of law, or rule of court" to which Plaintiffs are entitled.

reasonable attorney's fees."[6]  Thus, in order to recover costs under the statute, a plaintiff must be "successful" in litigating claims under the Act.  Although the Act does not define the term "successful," the New Jersey Franchise Practices Act ("NJFPA"), N.J. Stat. Ann. § 56:10-10, which contains identical language to the Practices Act, is instructive.[7]  Generally, in New Jersey the rule is that  "[t]he only 'successful' effort[] in terms of legislative intent . . . is that effort in which counsel . . . prevail[s] for the practical benefit of his client."  Westfield Centre Serv., Inc. v. Cities Serv. Oil Co., 411 A.2d 714, 716 (N.J. Super. Ct. App. Div. 1980).  Moreover, a statute may award attorney fees to a "successful" litigant, provided that "such an award [is] 'reasonable' and reflective of the extent to which the successful party has prevailed."  Id. at 718.  However, "where a substantial portion of the time spent by counsel [is] devoted to issues which . . . were adversely resolved on the merits, the award must reflect such factors."  Id.

Although Defendants' damages award exceeds Plaintiffs' damages award, Plaintiffs are technically entitled to costs under Section 22A:2-8 because Plaintiffs successfully litigated their Practices Act claims.  Similar to the NJFPA, which awards costs to "successful" claimants, the Practices Act provides that a successful plaintiff is entitled to "the costs of the action including, but not limited to, reasonable attorney's fees."  N.J. Stat. Ann. § 33:1-93.18(a).  As previously mentioned, a successful litigant is entitled to "reasonable" costs that are "reflective of the extent to which the successful party . . . prevailed," in the litigation.  Westfield, 411 A.2d at 716.  Here, although Defendants ultimately received a larger damages award for the lawsuit, under New Jersey law, Plaintiffs are entitled to statutory costs because they brought claims to vindicate their rights under the Practices Act, and the jury awarded them damages in the amount of

---

[6] N.J. Stat. Ann. § 33:1-93.18(a) (emphasis added).

[7] See N.J. Stat. Ann. § 56:10-10 ("Such franchisee, if successful, shall also be entitled to the costs of the action including but not limited to reasonable attorney's fees.").

$390,007.50.

In sum, Plaintiffs are only entitled to the costs they incurred while litigating their claims under the Practices Act that are specifically enumerated under Section 22A:2-8, and not listed under 28 U.S.C. § 1920.

## III.    Attorneys' Fees

### A.    Attorneys' Fees Under the Practices Act

Plaintiffs also move for reasonable attorneys' fees.  Plaintiffs argue that they are entitled to reasonable attorneys' fees because they "successfully" litigated their Practices Act claims. Specifically, Plaintiffs contend that they "prevailed on the central issue of the case, namely, that Anheuser-Busch and InBev USA failed to first pay [Plaintiffs] the fair market value of their businesses with respect to the InBev brands prior to termination."  (Pl.'s Br., at 4).  Defendants argue that Plaintiffs are not entitled to attorneys' fees because:  (1) Plaintiffs failed to achieve a "practical benefit" for their clients because the total amount of their recovery is less than the amount Defendants recovered for their counterclaims; (2) the amount of money Defendants offered Plaintiffs for the European brands prior to this litigation exceeds the amount of money the jury awarded Plaintiffs for their Practices Act claims; (3) the amount of money Plaintiffs received was nominal, and therefore did not "materially alter[] the legal relationship between the parties"; and (4) because the Court denied Plaintiffs costs, the Court must also deny Plaintiffs attorneys' fees.  (Def.'s Br., at 5-9).

Rule 54(d)(2) provides for the award of attorneys' fees and other litigation expenses. Fed. R. Civ. P. 54(d)(2) ("A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages.").  However, unlike Rule 54(d)(1), which specifically instructs courts to award costs

to the prevailing party, Rule 54(d)(2) merely "recognizes the possibility of attorney's fees and related non-taxable expenses and establishes a procedure for asserting a right to such an award." See Abrams, 50 F.3d at 1224 (internal quotations omitted).  Thus, courts must look to another source of substantive law to determine whether a party is entitled to attorneys' fees.

Generally, in the Third Circuit, "the right of a party or an attorney to recover attorney's fees from another party in a diversity action is a matter of state substantive law." Mitzel v. Westinghouse Elec. Corp., 72 F.3d 414, 417 (3d Cir. 1995) (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y., 421 U.S. 240, 260 n.31 (1975); Abrams, 50 F.3d at 1224.  In New Jersey, the attorney fee shifting analysis begins with the "proposition that New Jersey has a strong public policy against the shifting of costs." Myron Corp. v. Atl. Mut. Ins. Corp., 4 A.3d 999, 1001 (N.J. 2010) (internal quotations omitted).  Furthermore, New Jersey has expressly "adopt[ed] the 'American Rule,' which prohibits recovery of attorneys' fees by the prevailing party against the losing party." Id. (citing In re Estate of Vayda, 875 A.2d 925, 928 (N.J. 2005)).  Departure from the American Rule is only appropriate "where there is 'express authorization by statute, court rule or contract,'" or "when the interests of equity demand it." In re Estate of Vayda, 875 A.2d at 928 (quoting In re Estate of Lash, 776 A.2d 765, 779 (N.J. 2001) (Verniero & LaVecchia, J.J., dissenting)) (internal quotations omitted).  The general policy underlying fee-shifting statutes in New Jersey is "to ensure 'that plaintiffs with bona fide claims are able to find lawyers to represent them [,] . . . to attract competent counsel in cases involving statutory rights, . . . and to ensure justice for all citizens.'" New Jerseyans for Death Penalty Moratorium v. N.J. Dep't of Corrections, 883 A.2d 329, 338 (N.J. 2005) (emphasis added).  The New Jersey Supreme Court has also recognized that "fee-shifting provides an incentive to competent counsel to undertake high risk cases and to represent victims . . . who suffer relatively minor losses." Furst v. Einstein

Moomjy, Inc., 860 A.2d 435, 446 (N.J. 2004).

In this case, the applicable statute is the Practices Act.  The Practices Act entitles plaintiffs who successfully litigate their statutory claims to reasonable attorneys' fees. Specifically, the Act provides that the "wholesaler . . . who sues alleging a violation of [the Practices Act] shall, if successful, also be entitled to the costs of the action including, but not limited to, reasonable attorney's fees."  N.J. Stat. Ann. § 33:1-93.18(a) (emphasis added). Therefore, under the terms of the Act, a plaintiff may recover "reasonable" attorneys' fees by proving that he "successfully" litigated his statutory claims.

Importantly, however, a plaintiff need not succeed on the merits in the overall litigation to recover reasonable attorneys' fees for their Practices Act claims.  Even a relatively minor success during the pendency of the trial warrants an award so long as the award is "reflective of the extent to which the successful party has prevailed."  Westfield, 411 A.2d at 717.  In Westfield, the plaintiff, owner of a gasoline dealership franchise, sued the defendant franchisor, alleging that the defendant terminated its lease to operate a service station in violation of the NJFPA.  Id. at 715.  The plaintiff sought an injunction against the defendant franchisor prohibiting termination of the plaintiff's lease, and granting damages, counsel fees, and costs. Id.  Like the Practices Act, the relevant statute in Westfield, the NJFPA, entitles successful plaintiffs to costs, including reasonable attorneys' fees.[8]  The trial judge awarded the plaintiff an interlocutory injunction.  Id. at 715.  However, before final adjudication of the plaintiff's NJFPA

---

[8] N.J. Stat. Ann. § 56:10-10 provides in relevant part:

> Any franchisee may bring an action against its franchisor for violation of this act in the Superior Court of the State of New Jersey to recover damages sustained by reason of any violation of this act and, where appropriate, shall be entitled to injunctive relief.  Such franchisee, if successful, shall also be entitled to the costs of the action including but not limited to reasonable attorney's fees.

(emphasis added).

claim, the plaintiff discontinued its business operations. Id. at 716. At the conclusion of the trial, the court upheld the validity of the NJFPA, but rejected the plaintiff's request for damages, as well as the plaintiff's request for injunctive relief and compensatory damages for unjust enrichment. Id. The trial judge awarded the plaintiff $25,865.00 of counsel fees. Id. at 716. The Appellate Division upheld the trial court's determination that the plaintiff was entitled to counsel fees under the NJFPA for litigating its "successful" claims, but remanded the case back to the trial court with instructions to award the plaintiff counsel fees proportional to the extent to which the plaintiff succeeded on its NJFPA claim. Id. at 718. Significantly, the Appellate Division noted that the plaintiff was entitled to recover the counsel fees incurred while litigating its request for an interlocutory injunction because "the success, although limited, was of some value nevertheless." Id. at 718.

Like the plaintiff in Westfield, who successfully obtained an interlocutory injunction but lost all claims for damages on the merits, here, Plaintiffs only succeeded on their Practices Act claims but unsuccessfully litigated Defendants' counterclaims for unjust enrichment and tortious interference. In Westfield, the court determined that the plaintiffs were entitled to attorneys' fees because they achieved the "practical benefit" of a court-ordered interlocutory injunction even though the plaintiffs failed on their claims for compensatory damages, counsel fees, and costs. Id. at 718. Likewise, in this case, Plaintiffs "successfully" litigated their Practices Act claims and therefore received the "practical benefit" of a judgment in their favor. The fact that the "practical benefit" Plaintiffs received is mitigated by Defendants' success does not negate the fact that Plaintiffs "successfully" litigated their Practices Act claims. Therefore, Plaintiffs are technically entitled to recover reasonable attorneys' fees for the cost of litigating their Practices Act claims. Id. ("[t]he fact that contentions which were successful are coupled with other

unsuccessful claims should not prevent allocation of fee charges . . . .") (citing Younger v. Glamorgan Pipe & Foundry Co., 418 F. Supp. 743, 791 (W.D. Va. 1976), vacated and remanded on other grounds, 561 F.2d 563 (4th Cir. 1977)).

Because the jury determined that Defendants did not pay Plaintiffs the fair market value of their distribution rights, the Court finds that Plaintiffs are "successful" litigants under the terms of the Practices Act. The record reveals that Defendants paid Plaintiffs approximately twenty-five million dollars for terminating their distribution rights. As a result, Plaintiffs brought suit, alleging that Defendants violated the Practices Act by terminating contracts with Plaintiffs without paying the fair market value of the distribution rights. After three years of litigation and a thirteen-day trial, the jury determined that Defendants failed to pay Plaintiffs the fair market value of their distribution rights. In making that determination, the jury found that Plaintiffs were entitled to $390,007.50 in damages for their Practices Act claims. Thus, the record demonstrates that Plaintiffs prevailed on one issue in this dispute:  whether Defendants paid the fair market value of their distribution rights.

Although Defendants offer persuasive reasons for why Plaintiffs' application for attorneys' fees is unreasonable, Defendants' arguments that Plaintiffs are not technically a "successful" party under the Practices Act are unpersuasive.[9]  Defendants erroneously suggest that because the jury awarded Defendants $248,186.50 more for their counterclaims than the amount Plaintiffs received for their Practices Act claims, Plaintiffs did not "successfully" litigate their Practices Act claims. This reasoning is flawed for the following reasons. First, the jury verdict belies Defendants' argument that they "overpaid" Plaintiffs twenty-five million dollars for the distribution rights. The jury plainly found that Defendants underpaid Plaintiffs for the

---

[9] The Court addresses the reasonableness of Plaintiffs petition in Section III(B) of this Opinion.

beer distribution rights and awarded Plaintiffs $390,007.50 in damages.  Second, Defendants

provide no support for the proposition that a claimant must recover a <u>larger</u> damage award than a

counterclaimant in order to be a "successful" party under the Practices Act.

      Defendants also argue that Plaintiffs did not succeed on their Practices Act claims

because they "would have been better off had they never filed this lawsuit."  (Def.'s Br., at 7).

Defendants' offer no legal support for this proposition, but instead opine that Plaintiffs did not

prevail because the jury "verdict gave plaintiffs nothing more . . . than was offered [by

Defendants] prior to this lawsuit."  (<u>Id.</u> at 8).  This argument fails because the fact that

Defendants offered Plaintiffs a larger payment for the distribution services than the amount the

jury awarded Plaintiffs during trial is not dispositive on the issue of whether Plaintiffs <u>succeeded</u>

in litigating their Practices Act claims under New Jersey law.  Although perhaps relevant to a

Court's decision to decrease or increase the lodestar, an offer during settlement negotiations is

not determinative on the issue of whether a party achieved some success on the merits on their

state law claims.[10]  The relevant inquiry is what Defendant <u>actually</u> <u>paid</u> for the distribution

rights, not what Defendants offered Plaintiffs months before the onset of this litigation.

Therefore, Defendants' argument that Plaintiffs are not "successful" under the Practices Act

because they would be in a better position if they accepted Defendants' original offer fails.

      Finally, Defendants' argument that Plaintiffs are entitled to no fees because of the

discrepancy between the amount of damages sought and the amount awarded also fails.

---

[10] Under federal law, settlement negotiations may be used to determine the <u>degree of success</u> obtained by a party seeking a counsel fee award.  <u>Lohman v. Duryea Borough</u>, 574 F.3d 163, 166 (3d Cir. 2009) (reducing lodestar when jury awarded plaintiff $12,205.00 after defendant offered plaintiff $75,000.00 during settlement negotiation). However, Plaintiffs cite no New Jersey precedent for the proposition that a plaintiff who receives a settlement offer that is larger than a jury award is not entitled to receive a counsel fee award pursuant to a fee-shifting statute. Moreover, even if the Court considers Defendants' settlement offer of 3.3 times the gross profits of the European brands, the Court is unconvinced that Plaintiff is not entitled to <u>any</u> award based on the Defendant's settlement offer. Although the Court may consider Defendants' settlement offer when determining whether to increase or decrease the lodestar, the Court is not persuaded that a settlement offer defeats Plaintiffs' right to recover attorneys' fees.

Defendants rely on Farrar v. Hobby, 506 U.S. 103 (1992), for the proposition that when "a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim . . . the only reasonable fee is usually no fee at all."  Id. at 117; see Deptford Twp. Sch. Dist. v. Sherman, 279 F. App'x 122, 126 n.2 (3d Cir. 2008) (finding award of attorneys' fees improper when relief achieved by plaintiffs "scant and unimpressive").  Defendants' reliance on Farrar is misplaced.  First, in Farrar, the court was construing 42 U.S.C. § 1988 – a federal civil rights statute.  Therefore, there is no basis for applying its proscriptions to a state statute entitling a successful litigant to attorneys' fees.  Second, Defendants' argument fails because the jury awarded Plaintiffs $390,007.50 on their statutory claims.  $390,007.50 is not a "nominal" sum of money.  Third, the plaintiffs in Farrar failed to prove an essential element of the underlying cause of action, namely, whether the defendant's alleged conspiracy was a proximate cause of any of the plaintiff's injuries.  Farrar, 506 U.S. at 106.  Here, the jury returned a verdict in favor of Plaintiffs, which requires the conclusion that Plaintiffs proved all necessary elements of their Practices Act claims.  Therefore, Defendants' argument that Plaintiffs are not entitled to recover any attorneys' fees for their Practices Act claims fails.

> **B.    Whether Plaintiffs' Request is Reasonable**

        In order to determine the "reasonableness" of a request for attorneys' fees, the New Jersey Supreme Court has articulated a two-step analysis.  First, the court must determine whether the party requesting counsel fees prevailed in the litigation.  N. Bergen Rex Transp., Inc. v. Trailer Leasing Co., 730 A.2d 843, 848 (N.J. 1999).  Second, the Court must calculate the lodestar.  Rendine v. Pantzer, 661 A.2d 1202, 1226 (N.J. 1995).  In setting the lodestar, the court must (1) "determine the reasonableness of the rates proposed by prevailing counsel in support of the fee application," Furst, 860 A.2d at 447, (2) "determine whether the time expended in pursuit

of the 'interests to be vindicated,' the 'underlying statutory objectives,' and recoverable damages

is equivalent to the time 'competent counsel reasonably would have expended to achieve a

comparable result. . . .,'" id., and (3) "decrease the lodestar if the prevailing party achieved

limited success in relation to the relief he had sought," id. (citing Rendine, 661 A.2d at 1227)

(emphasis added); N. Bergen Rex Transp., Inc., 730 A.2d at 850 ("[I]f a successful [prevailing

party] has achieved only limited relief in comparison to all of the relief sought, the [trial] court

must determine whether the expenditure of counsel's time on the entire litigation was reasonable

in relation to the actual relief obtained . . . and, if not, reduce the award proportionately.")

(internal quotation marks omitted).[11]

        The burden of proving that a request for attorneys' fees is reasonable rests with the party

seeking the fees.  Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990); see Middlebrooks

& Shapiro, P.C. v. Esdale, 2005 WL 3691314, at *11 (N.J. Super. Ct. App. Div. Jan. 20, 2006)

("The burden is on the party requesting attorney's fees and expenses to provide the court with

proper documentation supporting the claims."); Maiorino v. Schering-Plough Corp., No. UNN-

L-3021-92, 1995 WL 405034, at *2 (N.J. Super. Ct. Law Div. June 16, 1995) ("The prevailing

party has the burden of establishing the reasonableness of the fees (and costs) requested.").  To

satisfy this burden, the petitioner must "submit evidence supporting the hours worked and rates

claimed."  Rode, 892 F.2d at 1183 (quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)).

The burden shifts to the opponent to challenge, by affidavit or brief and with sufficient

specificity to give notice to the fee applicant, the reasonableness of the fee requested.  Id. (citing

Bell v. United Princeton Props., Inc., 884 F.2d 713, 715 (3d Cir. 1989)).  The district court then

---

[11] In cases where the attorney for the prevailing party has a contingent-fee arrangement, "the trial court should
consider the result achieved, the risks involved, and the relative likelihood of success in the undertaking."  Id. at 448.

enjoys a "great deal of discretion" to adjust the awarded fee in light of the objections. Id. (citing Bell, 884 F.2d at 721). The Court must nonetheless go "line-by-line" through the billing statement and conduct "a thorough and searching analysis" to facilitate appellate review. Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 426 F.3d 694, 703 n.5 (3d Cir. 2005) (quoting Evans v. Port Auth. of N.Y. & N.J., 273 F.3d 346, 362 (3d Cir. 2001)).

With these principles in mind, the Court turns to the question of whether Plaintiffs' request for attorneys' fees is reasonable.

### 1.    Prevailing Party

In New Jersey, "[t]he threshold issue in determining whether an attorneys' fee award is reasonable is whether the party seeking the fee prevailed in the litigation." N. Bergen Rex Transp., Inc., 730 A.2d at 848 (citing Singer v. State, 472 A.2d 138, 141 (1984)). In order to be considered a prevailing party, a party must show that: (1) its lawsuit was causally related to securing the relief obtained, and the party's efforts are a "necessary and important" factor in obtaining the relief; and (2) the relief granted has some basis in law. Id. (citing Singer, 472 A.2d at 142).

Here, Plaintiffs satisfy the first prong of the test. There is a causal nexus between Plaintiffs' lawsuit and the damages award. Plaintiffs brought the action to compel Defendants to pay them the fair market value of their distribution services, and jury found that Defendants' payment was deficient. Thus, Plaintiffs lawsuit was a "necessary and important" factor in bringing about the judgment in their favor.[12] Moreover, Plaintiffs' recovery has a basis in law

---

[12] Though not raised by the parties, the Court notes that there is support for the proposition that Plaintiffs failed to prove a causal nexus between this lawsuit and the relief they obtained as a result of the verdict. As previously mentioned, Defendants offered Plaintiffs a fair market value of 3.3x. (Am. Compl. Exs. D-G). After Plaintiffs rejected that offer, Defendants reduced the offer from 3.3x to 3.25x. During trial, the jury determined that the appropriate valuation method was the multiples approach and awarded Plaintiff 3.3x. (Am. Compl. Exs. J-M). Because Defendants offered Plaintiff the same amount they recovered prior to filing this lawsuit, there is support for

because the Practices Act grants them a right to relief.  Therefore, having determined that

Plaintiffs are the prevailing party in this litigation, the next step in the analysis is to determine

whether Plaintiffs' application is "reasonable."

### 2.   Hourly Rate[13]

The "reasonableness" of the hours Plaintiffs request is determined by the "lodestar."[14]

The lodestar is the number of hours reasonably devoted by Plaintiffs' counsel to the case

multiplied by a reasonable hourly rate.  Singer, 472 A.2d at 144.  The Model Rules of

Professional Conduct outline the "factors to be considered in determining the reasonableness of a

fee."  These factors include:

> (1) the time and labor required, the novelty and difficulty of the
> questions involved, and the skill requisite to perform the legal
> service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of
> the particular employment will preclude other employment by the
> lawyer;
> (3) the fee customarily charged in the locality for similar legal
> services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the
> circumstances;
> (6) the nature and length of the professional relationship with the
> client;

the argument that Defendants paid Plaintiffs 3.3x on their own volition, and consequently, there is no causal nexus between the lawsuit and Plaintiffs' recovery.  See Davidson v. Roselle Park Soccer Fed'n, 700 A.2d 900, 903 (N.J. Super. Ct. Ch. Div. 1996) (citing Feriozzi Co. v. City of Atl. City, 633 A.2d 581 (N.J. Super. Ct. L. Div. 1993)) (finding no causal connection between relief obtained and litigation where eleven-year old girl made all-boys soccer team prior to when her parents brought a New Jersey Law Against Discrimination Claim against defendant soccer federation).

[13] In the Third Circuit, a district court must hold a hearing whenever the reasonable rate is disputed.  M.G. v. E. Reg'l High Sch. Dist., No. 09-4329, 2010 WL 2768606, at *3 (3d Cir. July 14, 2010) (non-precedential opinion) (citing Lanni v. New Jersey, 259 F.3d 146, 149 (3d Cir. 2001)).  Here, the parties dispute the reasonable rate.  Thus, on February 15, 2011, the Court held a hearing and the parties presented their respective positions regarding the reasonableness of Plaintiffs' fee petition.

[14] The Court notes that the New Jersey Supreme Court looks to federal precedent for guidance concerning the lodestar.  See Rendine, 661 A.2d at 1226 (quoting relevant precedent from the Third Circuit regarding the reasonableness of hours expended and hourly rates).

(7) the experience, reputation, and ability of the lawyer or lawyers
performing the services;
(8) whether the fee is fixed or contingent.

RPC 1.5(a).  The court should evaluate the reasonableness of the rates proposed in comparison to

the rates "for similar services by lawyers of reasonably comparable skill, experience, and

reputation in the community."  Furst, 860 A.2d at 447.  The relevant rate is that of the litigation

forum, not the attorney's home.  Interfaith Cmty. Org., 426 F.3d at 705 (finding that when an

out-of-town attorney litigates a matter in a forum, "in most cases, the relevant rate is the

prevailing rate in the forum of the litigation").[15]  A fee applicant may satisfy its burden "by

[submitting] affidavits of non-party attorneys with personal knowledge of the hourly rates

customarily charged in the relevant community."  Apple Corps Ltd., Int'l Comm'ns et al. v. Int'l

Collectors Soc'y, 25 F. Supp. 2d 480, 492 (D.N.J. 1998).  After the fee applicant satisfies its

burden, the burden shifts to the party opposing the fee application "to produce affidavits or other

submissions which create an issue as to the reasonableness of the requested hourly rate."  Id.  "If

the fee applicant fails to meet its initial burden or if the opposing party challenges the fee

applicant's proffer, the determination of the appropriate market rate is vested within the court's

discretion."  Id.

### a.      Relevant Community

In support of Plaintiffs' request for counsel fees, they offer information from the National

Law Journal's sampling of law firm billing rates, (Doc. No. 299 Ex. B), and the affidavit from

Mr. Edward F. Borden, Jr., Esq., (Doc. No. 299 Ex. C).  Mr. Borden's declaration demonstrates

that the hourly rates charged for large, regional law firms that appear in the United States District

---

[15] This "forum rate" rule has two exceptions:  (1) where the specialized expertise of a foreign law firm is required; or
(2) where no local firms are willing to take the case.  Id. at 705.  Neither exception applies to this case.

Court for the District of New Jersey range from $300.00 to $800.00.  (Doc. No. 299 Ex. C ¶ 4).

Mr. Borden's affidavit also states that the rates for associates at those firms ranges from $200.00

to $400.00.  Based upon this information, Mr. Borden concludes that "the hourly rates claimed

by [Plaintiffs' counsel] are reasonable given the attorneys' and other professionals' experience

and background, and are in line with rates usually and customarily charged by comparable law

firms in this geographic area . . . ."  (Id. ¶ 9).  Defendants' counsel offers no evidence to

challenge the statements in Mr. Borden's affidavit, but instead argue that Mr. Borden's affidavit

and the statistics in the National Law Journal reflect the prevailing hourly rates for attorneys in

Philadelphia, not southern New Jersey.

 The Court finds that Plaintiffs' requested hourly rates are reasonable because Plaintiffs

provided adequate documentary support for their hourly rates, and Defendants failed to produce

any contradictory evidence to challenge Plaintiffs' request.  Generally, "[a]n affidavit attesting to

the reasonableness of the requested fee by an attorney familiar with the practice area and

community is adequate to establish a prima facie case, shifting the burden to the opposing party

to produce contradictory evidence."  Jefferson v. City of Camden, No. 01-4218, 2006 WL

1843178, at *16 (D.N.J. June 30, 2006) (citing Washington v. Phila. Cty. Ct. of Common Pleas,

89 F.3d 1031, 1036 (3d Cir. 1996)).  Here, Plaintiffs offer both an affidavit from a

knowledgeable attorney and data from the National Law Journal.  Although Defendants quibble

with the accuracy of Plaintiffs' proposed rates, and dispute whether those rates reflect the

prevailing rates in the southern New Jersey, Defendants fail to offer a single piece of evidence to

support their contentions.  Therefore, because Plaintiffs satisfied their burden and Defendants

failed to satisfy their burden, the Court finds that Plaintiffs' proposed hourly rates are reasonable

for attorneys practicing commercial litigation in this community.

**b.**      **Skill, Experience, and Reputation in the Community**

Plaintiffs submitted affidavits attesting to the hourly rates for the attorneys who devoted substantial time to litigating this case.  Aside from their challenge to the appropriate forum for determining hourly rates, Defendants make no specific objections to the hourly rates for individual attorneys, paralegals, or support staff employed by Plaintiffs.  Thus, the Court will assess whether Plaintiffs' hourly rates are reasonable based upon the skill, experience, and reputation of Plaintiffs' counsel.

**Mr. Hangley**

Mr. Hangley's hourly rates from 2007 to 2010 ranged from $650.00 to $750.00.  In 2010, partners in the Philadelphia and Cherry Hill, New Jersey charged hourly rates of $605.00 to $880.00.  (Mem. of Law in Supp. of Pl.'s Mot. for Attorneys' Fees and Expenses, at 7) (citing The National Law Journal Survey of 2009 Billing Rates)).  Mr. Hangley is a founder and the Chairman of Hangley Aronchick Segal & Pudlin.  Mr. Hangley's extensive career began when he graduated cum laude from the University of Pennsylvania Law School in 1966.  While attending the University of Pennsylvania Law School, Mr. Hangley served as a Comments Editor on the University of Pennsylvania Law Review, and, upon graduation, he was elected to the Order of the Coif.  During his forty-four year career, Mr. Hangley held various positions including, Vice-Chair of the Third Circuit Lawyers Advisory Committee, Chair of the Evidence Committee for the American College of Trial Lawyers, and Co-Chair of the Federal Practice Task Force of the ABA Section of Litigation.  Mr. Hangley is also a Fellow of the American Bar Foundation, a member of the American Law Institute, and a member of the Lawyer's Committee of the National Center for State Courts.  In light of Mr. Hangley's extensive skill and experience, the Court finds that his hourly rate of $750.00 is reasonable.

**Mr. Joseph A. Dworetzky**

Mr. Dworetzky is a senior partner at Hangley Aronchick Segal & Pudlin. Mr. Dworetzky's hourly rates from 2007 to 2010 were $575.00 to $630.00. In 2010, partners in Philadelphia and Cherry Hill, New Jersey charged hourly rates of $605.00 to $880.00. Mr. Dworetzky graduated first in his class from the Villanova School of Law in 1977. During law school, Mr. Dworetzky served as an Associate Editor on the <u>Villanova Law Review</u> and was elected to the Order of the Coif upon graduation. In addition to his extensive experience in private practice, Mr. Dworetzky served as the City Solicitor for the City of Philadelphia. The Court finds that $630.00 is a reasonable rate for a senior partner with Mr. Dworetzky's skill, experience and reputation.

**Mr. Michael Lieberman**

Mr. Lieberman is a partner at Hangley Aronchick Segal & Pudlin. Mr. Lieberman's hourly rates between 2007 and 2010 were $400.00 to $450.00. Mr. Lieberman graduated <u>magna cum laude</u> from the University of Pennsylvania Law School in 1993, where he served as an Editor on the <u>University of Pennsylvania Law Review</u>. Upon graduation, Mr. Lieberman served as a law clerk to the Honorable John F. Gerry, then-Chief Judge of the United States District Court for the District of New Jersey. Mr. Lieberman's hourly rate of $450.00 is reasonable for an attorney in Philadelphia or New Jersey with the same skill, experience and reputation in the legal community.

**Ms. Alva C. Mather**

Ms. Mather is an associate at Hangley Aronchick Segal & Pudlin. Ms. Mather charges an hourly rate of $220.00 to $270.00. Ms. Mather graduated from the University of Pennsylvania Law School in 2004, where she served as an Articles Editor on the <u>University of</u>

<u>Pennsylvania Law Review</u>.  After graduation, Ms. Mather served as a law clerk to the Honorable James T. Giles, Chief Judge of the United States District Court for the Eastern District of Pennsylvania.  Ms. Mather's hourly rate is reasonable for an attorney with her skill, experience and reputation in the community.

**Ms. Rebecca L. Santoro**

Ms. Santoro is a third-year associate at Hangley Aronchick Segal & Pudlin who charges an hourly rate of $200.00 to $220.00.  Ms. Santoro graduated <u>summa cum laude</u> from the University of Pennsylvania Law School in 2007.  During law school, Ms. Santoro served as an Articles Editor for the <u>University of Pennsylvania Law Review</u>.  Ms. Santoro's hourly rate is commensurate with the rates charged by junior associates with her skill, experience and reputation in the Philadelphia and Cherry Hill areas.[16]

### 3.    Reasonableness of Hours Expended

To determine the number of hours reasonably expended, the district court should begin by excluding the hours that were not reasonably expended because, for example, they were "excessive, redundant, or otherwise unnecessary."  <u>Rode</u>, 892 F.2d at 1183.  The court may also exclude hours spent litigating unsuccessful claims provided those claims were "'distinct in all respects from' claims on which the party did succeed."  <u>Id.</u> (citing <u>Institutionalized Juveniles v. Sec'y of Pub. Welfare</u>, 758 F.2d 897, 919 (3d Cir. 1985)).  The court may not reduce the amount of an award based on factors not raised by the adverse party.  <u>McKenna v. City of Philadelphia</u>, 582 F.3d 447, 459 (3d Cir. 2009); <u>Bell</u>, 884 F.2d at 720.  Moreover, the adverse party's

---

[16] In Plaintiffs affidavits, they provide the hourly rates for other attorneys and paralegals who spent time performing tasks related to this case.  Plaintiffs provide no documentation concerning the skills, experience, and reputation of those attorneys and paralegals.  However, based upon the information contained in Mr. Hangley's affidavit and the survey from the National Law Journal, the Court is satisfied that the hourly rates for all of the other attorneys and paralegals in this lawsuit are reasonable.

objections "cannot merely allege in general terms that the time spent was excessive." Bell, 884 F.2d at 720.  Rather, the opposition must clearly identify the type of work being challenged and state the grounds for the belief that the hours so identified are unreasonable.  Id.  At bottom, the fee opponents' objections must be sufficient to give the fee applicant sufficient notice of the challenged aspects of the fee request.  See McKenna, 482 F.3d at 459.

In the moving brief, Plaintiffs' lead counsel, Mr. William T. Hangley, requests a total of $4,282,694.50 for 12,588 hours of legal work provided by seven partners, ten associates, and eight support staff at Hangley Aronchick Segal & Pudlin.  (Aff. of Mr. William T. Hangley ¶¶ 45, 51).  Plaintiffs' application includes all of the fees associated with litigating their successful Practices Act claims as well as their unsuccessful defense against Defendants' unjust enrichment counterclaim.  In the reply brief, Plaintiffs argue that they are entitled to recover counsel fees for defending against Defendants' counterclaims, but concede recovery of the fees associated with litigating Defendants' unjust enrichment counterclaim.  (Reply Br., at 6).  The reply brief states that Plaintiffs devoted 49.50 hours to defending against Defendants' unjust enrichment counterclaim.[17]

Defendants argue, and the Court agrees, that Plaintiffs' claim that they devoted only 49.50 hours to defending against Defendants' unjust enrichment counterclaim is unreasonable. The Court finds it unlikely that Plaintiffs devoted less than fifty hours to conduct discovery, prepare for and take depositions, and draft a motion for summary judgment to defeat Defendants' unjust enrichment counterclaim.  Thus, based upon the Court's observations during trial and the Court's experience managing this case for more than two years before trial, the Court finds that the amount of time Plaintiffs devoted to litigating Defendants' unjust enrichment

---

[17] In the Reply Brief, Plaintiffs' attribute $11,681.50 of their fee request to tasks associated with Defendants' unjust enrichment counterclaim.

counterclaim far exceeds 49.50 hours.  The Court finds that a more reasonable deduction is one percent of the hours devoted to the entire litigation, or 126 hours.  Therefore, the Court will reduce the number of recoverable hours Plaintiffs devoted to this litigation by 126 hours.

### a.      Plaintiffs' Non-Practices Act Claims

Plaintiffs also seek attorneys' fees for hours devoted to litigating Defendants' tortious interference counterclaims.  Plaintiffs argue that they are entitled to fees associated with these non-Practices Act claims because "[a]ll of the claims in this litigation – including . . . all of [Defendants'] counterclaims – arose from the same 'common core of facts . . . .'"  (Pl.'s Reply Br., at 5).  Thus, Plaintiffs argue, "they should not be 'view[ed] as a series of discrete claims." (Id.) (citing Hensley v. Eckerhart, 461 U.S. 424, 435 (1983); Jefferson v. City of Camden, 2006 WL 1843178, at *5.  Defendants argue that there is no legal basis for awarding Plaintiffs counsel fees for their non-Practices Act claims because Plaintiffs litigated those claims unsuccessfully.

The Court finds that Plaintiffs are not entitled to attorneys' fees for litigating Defendants' tortious interference counterclaims.  Plaintiffs offer no legal basis for the award of attorneys' fees for these non-statutory claims.  As previously mentioned, New Jersey has expressly "adopt[ed] the 'American Rule,' which prohibits recovery of attorneys' fees by the prevailing party against the losing party."  Myron Corp., 4 A.3d at 1001 (citing In re Estate of Vayda, 875 A.2d at 928).  Departure from the American Rule is only appropriate "where there is [an] 'express authorization by statute, court rule or contract,'" or "when the interests of equity demand it."  In re Estate of Vayda, 875 A.2d at 928 (quoting In re Estate of Lash, 776 A.2d 765, 779 (N.J. 2001) (Verniero & LaVecchia, J.J., dissenting)) (internal quotation marks omitted); see Maintainco, Inc. v. Mitsubishi Caterpillar Forklift Am., Inc., 975 A.2d 510, 522 (N.J. Super. Ct. App. Div. 2009) ("Generally, 'litigants bear their own expenses for fees and costs except where

specifically authorized by statute, rule, or agreement.'") (citing <u>Josantos Constr. v. Bohrer</u>, 740 A.2d 653, 656 (N.J. Super. Ct. App. Div. 1999)).  Here, Plaintiffs offer no statute, contract, or court rule that entitles them to attorneys' fees for their non-Practices Act claims.  Therefore, Plaintiffs' argument that they are entitled to attorneys' fees for their non-Practices Act claims is without merit.

Moreover, Plaintiffs' argument that Defendants' tortious interference counterclaims arise from the same common core of facts as Plaintiffs' Practices Act claims is unavailing.  When a plaintiff's claims involve "a common core of facts" or are based on "related legal theories, . . . [m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis."  <u>Hensley</u>, 461 U.S. at 435. However, when the plaintiff's unsuccessful "claims . . . do not depend on the same sets of facts and legal theories as . . . claims on which [the plaintiff] has succeeded, fees should not be awarded for work on [the] unrelated claims because the work cannot be deemed to have been expended in pursuit of the ultimate result achieved."  <u>McKenna</u>, 582 F.3d at 457.  Significantly, in a multi-party case, the court "must ensure that a partially successful defendant is not required to provide compensation for an attorney's unrelated efforts on behalf of an unsuccessful plaintiff, or in pursuit of the unsuccessful claims of an only partially victorious plaintiff . . . ." <u>Id.</u>

Here, because Plaintiffs' Practices Act claims and Defendants' tortious interference counterclaims do not share "a common core of facts" and are not based on "related legal theories," the Court will exclude hours Plaintiff devoted to Defendants' tortious interference counterclaims.  Defendants' successful tortious interference counterclaims involved events that transpired after Plaintiffs received compensation for the distribution rights.  Prior to this lawsuit,

Plaintiffs' received a payment of twenty-five million dollars for the right to distribute the European brands, but determined that twenty-five million dollars did not represent the fair market value of those distribution rights.  As a result, Defendants terminated Plaintiffs' distribution rights.  Then, after receiving the twenty-five million dollar payment, Plaintiffs chose to vindicate their rights by bringing a statutory claim in state court to obtain the fair market value of their distribution rights.  In addition, Plaintiffs continued to distribute the European brands notwithstanding the fact that Defendants terminated the distribution agreements.  As a result of Plaintiffs' post-termination conduct, Defendants brought tortious interference counterclaims against Plaintiffs.  Thus, the facts and circumstances that gave rise to Plaintiffs' Practices Act claims - Defendants' payment of the fair market value for the distribution rights - are separate and distinct from the facts that gave rise to Defendants' counterclaims - Plaintiffs' post-termination beer sales and tap switching.[18]

Moreover, Plaintiffs' claims and Defendants' counterclaims derive from different theories of liability.  Plaintiffs' claims derive from Defendants' <u>statutory</u> obligation to pay the

_____

[18] The Court notes that Plaintiffs' state law claims also fail to satisfy the liberal "transaction or occurrence" requirement under Federal Rule of Civil Procedure 13(a)(1)(A).  Federal Rule of Civil Procedure 13(a) provides: "A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction."  Fed. R. Civ. P. 13(a).  In order to determine whether a claim is a compulsory counterclaim, "the relevant inquiry is whether the counterclaim 'bears a logical relationship to an opposing party's claim.'"  <u>Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.</u>, 292 F.3d 384, 389 (3d Cir. 2002) (quoting <u>Xerox Corp. v. SCM Corp.</u>, 576 F.2d 1057, 1059 (3d Cir. 1978)).  "A counterclaim is logically related to the opposing party's claim where separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts."  <u>Great Lakes Rubber Corp. v. Herbert Cooper Co.</u>, 286 F.2d 631, 634 (3d Cir. 1961).  Here, even a cursory comparison of Plaintiffs' Practices Act claims and Defendants' counterclaims reveals that Plaintiffs' Practices Act claims are not logically related to Defendants' counterclaims.  Plaintiffs' claims are concerned with whether Defendants paid the fair market value of the distribution rights based upon the Court's construction of the Practices Act.  On the other hand, Defendants' counterclaims are solely concerned with Plaintiffs' conduct after Defendants terminated the distribution rights.  Moreover, Plaintiffs' post-termination conduct does not necessarily result from Defendants' failure to pay the fair market value of their distribution rights.  Therefore, because Plaintiffs' Practices Act claims are not logically related to Defendants' counterclaims, the Court notes that Plaintiffs cannot satisfy the "transaction or occurrence" requirement under Rule 13(a), much less the "common core of facts" test articulated in <u>Hensley</u>.

fair market value of the distribution rights; whereas Defendants' counterclaims derive from state tort law principles.  Therefore, Plaintiffs' attempt to align their Practices Act claims with Defendants' unjust enrichment and tortious interference counterclaims is unavailing.

### b.   Lack of Specificity

Defendants argue that because Plaintiffs used the "block-billing" time entry method, and failed to distinguish between their Practices Act and non-Practices Act claims, it is impossible to determine whether the amount of time Plaintiffs devoted to tasks related to their Practices Act claims is reasonable.  Defendants also contend that the Court should deny Plaintiffs' application because the Court cannot determine how much time Plaintiffs dedicated to each task within each time entry.

In this Circuit, "[a] fee petition is required to be specific enough to allow the district court 'to determine if the hours claimed are unreasonable for the work performed.'" Washington, 89 F.3d at 1037 (quoting Keenan v. City of Phila., 983 F.2d 459, 472 (3d Cir. 1992)).  In order to meet that standard, the petition should include "some fairly definite information as to the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, e.g., senior partners, junior partners, associates."  Id. (quoting Rode, 892 F.2d at 1190)).  However, "it is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney."  Id. (quoting Rode, 892 F.2d at 1190).

"Block billing is a time-keeping method by which each lawyer and legal assistant enters the total time daily spent working on a case, rather than itemizing the time expended on specific tasks."  United States v. NCH Corp., No. 98-5268, 2010 WL 3703756, at *4 (D.N.J. Sept. 10,

2010) (quoting <u>Brown v. City of Pittsburgh</u>, No. 06-393, 2010 WL 2207935, at *8 n.12 (W.D.

Pa. May 27, 2010) (quoting <u>Welch v. Met. Life Ins. Co.</u>, 480 F.3d 942, 945 (9th Cir. 2007)).

Block billing is an acceptable practice, because it "saves time in that the attorney summarizes

activities rather than detailing every task." <u>NCH Corp.</u>, 2010 WL 3703756, at *4 (quoting

<u>United States ex rel. John Doe v. Pa. Blue Shield</u>, 54 F. Supp. 2d 410, 415 (M.D. Pa. 1999)).

Thus, "[block billing] will be upheld as reasonable if the listed activities reasonably correspond

to the number of hours billed." <u>Id.</u>  Although block billing may often result in a number of

vague entries, rather than excluding an entire entry, the court should examine the listed activities

and the time spent conducting each activity to determine "whether the hours reasonably correlate

to all of the activities performed." <u>Id.</u>

    Here, the Court finds that Defendants' time entries are sufficient.  In support of their fee

request, Plaintiffs submitted documentation specifying the date the work was done, the name of

the attorney or paralegal who performed the task, the number of hours the attorney or paralegal

performed the task, the amount billed to the client, and a detailed description of the task.[19]

Plaintiffs also submitted a summary of the hours each attorney and paralegal devoted to the

entire litigation.  In addition, Plaintiff submitted time entries for work performed on Defendants'

unjust enrichment claim as a separate exhibit attached to the Reply Brief.  The activities listed in

Plaintiffs' fee petition appear to reasonably correspond to the number of hours billed.  Therefore,

the Court finds that Plaintiffs' fee petition contains the requisite level of specificity.

---

[19] For example, a typical entry contains the following information:

| | | | | |
|---|---|---|---|---|
| 10/30/2009 | John Stinson | 4.10 | $861.00 | Researched case law regarding exclusion of expert evidence under FRE 702 for (1) lack of foundation; (2) lack of sufficient underlying information; or (3) non-use of particular methodology. |

(Mem. of L. in Supp. of Pl.'s Mot. for Attorneys' Fees and Expenses, at 282).

Notably, however, Plaintiffs' time entries fail to differentiate between time devoted to litigating Defendants tortious interference counterclaims and Plaintiffs' Practices Act claims. As previously stated, Plaintiffs are not entitled to recover for time devoted to defending against Defendants' tortious interference counterclaims. Thus, the Court must exclude those hours. Based upon the Court's observations during trial and the Court's experience managing the case before trial, the Court finds that the amount of time Plaintiffs devoted to litigating Defendants' tortious interference counterclaims is similar to the amount of time Plaintiffs devoted to litigating Defendants' unjust enrichment counterclaim. Therefore, the Court will reduce the number of hours requested by Plaintiffs by two percent, or 252 hours.

### 4.   Plaintiffs' Limited Success

Having determined the reasonableness of Plaintiffs' hourly rate and time spent litigating the Practice Act claims, the Court must determine whether a reduction is appropriate based upon Plaintiffs' success in the overall litigation. Under New Jersey law, "when a prevailing party has not been successful on all of its claims, an award of attorneys' fees based on an hourly rate times the hours spent may result in an excessive fee." N. Bergen Rex Transp., Inc., 730 A.2d at 849. "A trial court should decrease the lodestar if the prevailing party achieved limited success in relation to the relief he had sought." Furst, 860 A.2d at 447. "[I]f [the] successful [party] has achieved only limited relief in comparison to all of the relief sought, the [trial] court must determine whether the expenditure of counsel's time on the entire litigation was reasonable in relation to the actual relief obtained . . . and, if not, reduce the award proportionately." Id. at 850 (quoting Singer, 472 A.2d at 500) (emphasis added); New Jerseyans for Death Penalty Moratorium, 883 A.2d at 338. For example, "in cases in which the fee requested far exceeds the damages recovered, the trial court should consider the damages sought and the damages actually

recovered." Litton Indus., Inc. v. IMO Indus., Inc., 982 A.2d 420, 429 (N.J. 2009) (internal

quotations omitted).  Moreover, when the amount the plaintiff recovers is actually less than the

amount the plaintiff requests, "the court must consider that fact in determining the overall

reasonableness of the attorney's fee award." Id.

     The Court finds that any award of counsel fees to Plaintiffs must be reduced dramatically

to reflect the overall result of the litigation.  In analyzing Plaintiffs' fee petition, the Court is

guided by the policy underlying all fee-shifting statutes in New Jersey:  "to ensure 'that plaintiffs

with bona fide claims are able to find lawyers to represent them[,] . . . to attract competent

counsel in cases involving statutory rights, . . . and to ensure justice for all citizens." New

Jerseyans for Death Penalty Moratorium, 883 A.2d at 338 (emphasis added).  Fee-shifting

statutes in New Jersey do not serve the purpose of awarding fees to attorneys who leave their

clients in a worse position than they occupied prior to bringing a lawsuit.[20]  Thus, as the Court

stated in Singer, "if a successful plaintiff has achieved only limited relief in comparison to all of

the relief sought, the court must determine whether the expenditure of counsel's time on the

entire litigation was reasonable in relation to the actual relief obtained, and, if not, reduce the

award proportionately."  472 A.2d at 145.  Here, even a cursory assessment of this litigation

merits the conclusion that Plaintiffs' success was, at best, pyrrhic, and therefore unworthy of an

award of any attorneys' fees.

---

[20]  The Court also notes that policy rationales underlying fee-shifting statutes in New Jersey do not apply to this case
with equal force as cases involving civil rights plaintiffs.  Here, the parties are multi-million dollar business entities
engaged in a contractual dispute.  The Court finds it difficult to believe that sophisticated beer distributors will
experience any difficulty finding "competent counsel" in disputes concerning their distribution rights.  If indeed the
Practices Act seeks to further a policy of incentivizing sophisticated beer distributors to bring lawsuits to vindicate
their rights under the Act, then the New Jersey legislature may articulate that rationale in the statute.  Absent that
expression, the Court is guided by the New Jersey Supreme Court's declaration that the purpose of fee-shifting
statutes is to "ensure 'that plaintiffs with bona fide claims are able to find lawyers to represent them[,] . . . to attract
competent counsel in cases involving statutory rights, . . . and to ensure justice for all citizens." New Jerseyans for
Death Penalty Moratorium, 883 A.2d at 338.

First, as previously mentioned in this Opinion, Plaintiffs are not in one sense the "prevailing party" in the litigation because Defendants recovered a significantly larger damages award on their unjust enrichment counterclaim than the award Plaintiffs recovered for their Practices Act claims.  The facts demonstrate that Plaintiffs recovered $390,007.50 on their Practices Act claims, and Defendants recovered $638.145.00 on their unjust enrichment counterclaim – a difference of $248,137.50 favoring Defendants.  As a result, Plaintiffs are now indebted to Defendants for wrongful acts related to this litigation.  This fact alone warrants a significant reduction in Plaintiffs' award.  Second, because the $390,007.50 the jury awarded Plaintiffs is nugatory when compared to the forty-one million dollars Plaintiffs requested, a significant reduction in Plaintiffs' attorney fees is appropriate.  At the outset of the litigation, Plaintiffs' counsel, Mr. Hangley, represented that the fair market value of the distribution rights was approximately sixty-six million dollars.[21]  Thus, based upon Mr. Hangley's representations, Plaintiffs were entitled to approximately forty-one million dollars in damages.  However, during trial, the jury determined that Plaintiffs were entitled to only $390.007.50 in damages.  Thus, Plaintiffs received less than one percent of the amount they sought in recovery from Defendants. The counsel fee award must reflect this outcome.

Third, a significant reduction is appropriate because Plaintiffs would be in a better position if they did not bring the litigation in the first instance.  Prior to this action, Defendants

---

[21] Mr. Hangley made the following representations during his Opening Statement on July, 19, 2010:

> And I want you to understand these are people who have already been paid, my clients, the 25 million dollars. . . . The evidence will show that they should have been paid 66 million dollars. . . . The under payments total some 41 million dollars.  That's what we will show you to be the fair market value of these products.  Of these, more accurately, these rights.

(Trial Tr., July 19, 2010, at 27).

offered to pay each Plaintiff a fair market value of 3.3 times gross profits of the European

brands.  (Am. Compl. Exs. D-G).  After Plaintiffs refused to accept this payment, Defendants

reduced the offer to 3.25 times gross profits of the European brands.  (Am. Compl. Exs. J-M).

Then, "[a]fter three and a half years of litigation, the production of hundreds of thousands of

pages of document discovery, extended mediation, twenty-six depositions, six expert reports,

extensive motion practice, including discovery motions, motions to dismiss, summary judgment

motions and Daubert motions," and a thirteen-day trial, the jury determined that the fair market

value of the European brands was 3.3 times gross profits of the European brands.  (Pl.'s Br., at

1).  Thus, after expending millions of dollars litigating this dispute, Plaintiffs landed in the same

position they occupied months before the beginning of the litigation.  Finally, as Defendants

correctly observe, the jury rejected Plaintiffs' discounted cash flow method for valuing the

distribution rights, and validated Defendants' market multiples method.[22]  Therefore, in addition

to determining that Plaintiffs were entitled to less than one percent of the amount they requested,

the jury rejected Plaintiffs' valuation method.  This is significant because it demonstrates that the

jury rejected the very basis for Plaintiffs' contention that Defendants failed to pay the fair market

value of the distribution rights.

　　　　In sum, aside from the inconsequential sum they received in damages (.05 percent of the

amount requested), there is little evidence that Plaintiffs succeeded on any important issue in this

litigation.  Therefore, because the overall outcome of this litigation heavily favors Defendants,

the Court will reduce Plaintiffs' counsel fees award by one hundred percent.  Accordingly,

Plaintiffs are entitled to $0.00 in attorneys' fees.

---

[22] See Trial Tr., Sept. 28, 2010 ("The Court: . . . I think the jury was pretty clear about multiples is the way to go here.").

**IV.    Other Litigation Expenses**[23]

Plaintiffs seek out-of-pocket expenses totaling $1,047,161.30.  Specifically, Plaintiffs request compensation for:  (1) duplicating, scanning, and imaging ($149,934.28); (2) legal research ($86,971.49); (3) transcripts and court reporting ($158,727.27); (4) travel ($34,235.43); (5) expert witnesses ($484,493.33); (6) "other professional services" ($96,991.71); and (7) "other" expenses ($320.14).  (Pl.'s Br. Ex. 3).

Plaintiffs argue that they are entitled to litigation expenses because the terms "attorneys' fees" includes associated litigation expenses such as meals, lodging, photocopying, etc.  (Pl.'s Reply Br., at 12).  In response, Defendants argue that because Plaintiffs' request for "litigation expenses" really amounts to a request for costs under 28 U.S.C. § 1920 or N.J. Stat. Ann. § 22A:2-8, and neither statute entitles Plaintiffs to recover expert fees, meals, secretarial overtime, and legal research, Plaintiffs' request should be denied.  Defendants further argue that even if Plaintiffs coin their request as a petition for "litigation expenses" associated with reasonable attorneys' fees, the Court should deny Plaintiffs' request because Plaintiffs failed to prove that their request is reasonable.

The Court agrees with Plaintiffs' contention that attorneys' fees include associated out-of-pocket expenses ordinarily charged to a fee-paying client.  However, having determined that Plaintiffs are entitled to no recovery of attorneys' fees, the Court finds that a one hundred percent reduction in the award of Plaintiffs' out-of-pocket expenses is also appropriate.  As previously mentioned, New Jersey follows the American Rule, which provides that "the prevailing litigant is . . . not entitled to collect a reasonable attorneys' fee from the loser."  N.

---

[23] In their reply brief, Plaintiffs withdrew their request for counsel fees relating specifically to Defendants' unjust enrichment counterclaim in the amount of $11,681.50.  (Pl.'s Reply Br., at 6).  In addition, Plaintiffs withdrew their request for meals, postage and delivery, and secretarial overtime.  (Id. at 15).

Bergen Rex Transport, Inc., 730 A.2d at 848.  A court may also award costs "that have been traditionally included as reasonable out-of-pocket expenses incurred by the attorney that are normally charged to a fee-paying client, such as photocopying, paralegal expenses, travel and telephone costs, and the like."  Maintainco, 975 A.2d at 523.  However, as explained in detail in the previous section, the overall result of the litigation heavily favored Defendants.  Defendants succeeded on virtually every substantive issue in this case with the exception of a small amount of damages award to Plaintiffs on their Practices Act claims.  Thus, having determined that Defendants succeeded in the overall litigation, and that Plaintiffs are entitled to $0.00 in reasonable attorneys' fees, the Court also finds that Plaintiffs are also entitled to recover $0.00 in out-of-pocket expenses.

## V.    CONCLUSION

For the reasons expressed above, Plaintiffs' motion to modify the judgment to clarify that costs are denied only with respect to Anheuser-Busch's counterclaims is GRANTED.  Plaintiffs may recover only those costs listed in N.J. Stat. Ann. § 22A:2-8 that are not included in 29 U.S.C. § 1920.  The Court also finds that although the Practices Act technically entitles Plaintiffs to reasonable attorneys' fees as "successful" litigants, Plaintiffs' award is reduced by one hundred percent because the overall result of the litigation heavily favors Defendants.  An appropriate Order shall issue today.


Date:   2/28/2011                                        /s/ Robert B. Kugler
                                                         ROBERT B. KUGLER
                                                         United States District Judge